IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| IN RE MUTUAL FUNDS INVESTMENT LITIGATION | MDL 1586 |
| | |
| IN RE ALGER, COLUMBIA, JANUS, MFS, ONE GROUP, PUTNAM, and ALLIANZ DRESDNER | Case No. 04-md-15863 (Judge Motz) |
| | |
| [Allianz Dresdner Subtrack] | SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT |
| | JURY TRIAL DEMANDED |
| Pingitore v. Allianz Dresdner Asset Management of America, L.P., *et al.* | Case No. 04-md-1933 |

WOLF POPPER LLP
Marian P. Rosner
Chet B. Waldman
Andrew E. Lencyk
845 Third Avenue
New York, NY  10022
Tel.:    (212) 759-4600
Fax:    (212) 486-2093

*Attorneys for Lead Plaintiff, Combined Welfare Fund*

TYDINGS & ROSENBERG LLP
William C. Sammons, Fed Bar No. 02366
John B. Isbister, Fed Bar No. 00639
100 East Pratt Street, 26th Floor
Baltimore, MD 21202
Tel:    (410) 752-9700
Fax:    (410) 727-5460

*Liaison Counsel*

## TABLE OF CONTENTS

NATURE OF THE ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    A.    Plaintiff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

           Structure and Organization of the PIMCO Funds Family: An Overview . . . . . . . 7

                a.    The Investment Advisors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

                b.    The Administrator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

                c.    The Registrant/Issuer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

                d.    The Underwriter/Distributor . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    B.    Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    The Parent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    The Investment Advisor Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    Non-Defendant Pacific Investment Management Company LLC . . . . . . . . . . . . . . . 20

    The Trustee Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

           a.    The Failure of the Interested and "Independent" Trustees . . . . . . . . . . . 24

    The Underwriter/Distributor Defendant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

    Officer Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

    Hedge Fund Related Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

    Market Timing Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    Broker and Clearing Platform Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

    Broker Defendants John Does 1-25 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

CERTAIN RELEVANT NON-PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

    Market Timing Practices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

    Background Information and the Forward-Pricing Rule . . . . . . . . . . . . . . . . . . . . . . 35

    Subverting the Forward-Pricing Rule Through Market Timing . . . . . . . . . . . . . . . . 38

    Harm of Market Timing to Mutual Fund Investors . . . . . . . . . . . . . . . . . . . . . . . . . . 40

    Purported Efforts of Mutual Fund Complexes to Prevent Market Timing . . . . . . . . . . 42

    Active Participation of the ADAM-Affiliated Defendants in Market Timing . . . . . . . . 44

    Unlawful Profits and Activities Stemming From Market Timing . . . . . . . . . . . . . . . . 45

        a.      Excessive Investment Advisory and Administrative Fees . . . . . . . . . . . . 45

        b.      Profits Derived From "Sticky Assets" . . . . . . . . . . . . . . . . . . . . . . . . . . 46

    Late Trading . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

SUBSTANTIVE ALLEGATIONS OF WRONGDOING AT THE
PIMCO FUND COMPLEX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

    Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

    The PIMCO Fund Prospectuses Prohibit Market Timing . . . . . . . . . . . . . . . . . . . . . 51

    The PIMCO Funds Prospectuses on Late Trading . . . . . . . . . . . . . . . . . . . . . . . . . . 57

    The ADAM-Affiliated Defendants Followed an Undisclosed Practice
    Under Which They Allowed Market Timers to Trade in a Manner
    That Conflicted with the Fund Prospectuses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

    The Adam-Affiliated Defendants' Undisclosed Market
    Timing Agreements with Canary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

    Late Trading of the Funds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

    Disclosures of Nonpublic Information to Market Timers . . . . . . . . . . . . . . . . . . . . . 76

    Regulatory and Criminal Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

Additional False and Misleading Statements and Omissions in the PIMS Trust
Prospectuses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

Rampant Timing Through Third Party Brokers - e.g., Prudential . . . . . . . . . . . . . . . . . . 81

Additional Examples of the ADAM-Affiliated Defendants Permitting
Large-Scale Market Timing in PIMCO Funds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

Additional Scienter Allegations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

Scienter of the ADAM-Affiliated Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

Scienter of Canary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

Scienter of the Broker and Clearing Platform Defendants . . . . . . . . . . . . . . . . . . . . . . 94

CLASS ACTION ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

CAUSES OF ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

VIOLATIONS OF THE EXCHANGE ACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

FIRST CLAIM FOR RELIEF:  VIOLATION OF SECTION 10(b) OF
THE EXCHANGE ACT AND SEC RULE 10b-5 PROMULGATED
THEREUNDER ON BEHALF OF PURCHASERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

SECOND CLAIM FOR RELIEF:  VIOLATION OF SECTION 10(b) OF
THE EXCHANGE ACT AND SEC RULE 10b-5 PROMULGATED
THEREUNDER ON BEHALF OF HOLDERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

THIRD CLAIM FOR RELIEF:  VIOLATION OF SECTION 20(a)
OF THE EXCHANGE ACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

VIOLATIONS OF THE INVESTMENT COMPANY ACT OF 1940 . . . . . . . . . . . . . . . . . . 110

FOURTH CLAIM FOR RELIEF:  VIOLATION OF SECTION 36(b) OF
THE INVESTMENT COMPANY ACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

FIFTH CLAIM FOR RELIEF:  VIOLATION OF SECTION 48(a)
OF THE INVESTMENT COMPANY ACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

VIOLATIONS OF STATE AND COMMON LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

SIXTH CLAIM FOR RELIEF:  BREACH OF FIDUCIARY
DUTY/CONSTRUCTIVE FRAUD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

SEVENTH CLAIM FOR RELIEF:  AIDING AND ABETTING
BREACH OF FIDUCIARY DUTY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

EIGHTH CLAIM FOR RELIEF:  UNJUST ENRICHMENT . . . . . . . . . . . . . . . . . . . . . . . 115

PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

JURY TRIAL DEMANDED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| IN RE MUTUAL FUNDS INVESTMENT LITIGATION | MDL 1586 |
| IN RE ALGER, COLUMBIA, JANUS, MFS, ONE GROUP, PUTNAM, and ALLIANZ DRESDNER | Case No. 04-md-15863 (Judge Motz) |
| [Allianz Dresdner Subtrack] | SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT |
| | JURY TRIAL DEMANDED |
| Pingitore v. Allianz Dresdner Asset Management of America, L.P., *et al.* | Case No. 04-md-1933 |

The Court-appointed Lead Plaintiff, the Combined Welfare Fund ("Lead Plaintiff" or "Plaintiff"), individually and on behalf of all others similarly situated, by its attorneys, alleges the following upon information and belief, based on the investigation of its counsel, except as to allegations specifically pertaining to the Lead Plaintiff and its counsel, which are based upon personal knowledge. The investigation by Lead Plaintiff's counsel included, among other things, a review of public announcements made by defendants, including statements made in press releases and on company websites, as well as in Securities and Exchange Commission ("SEC") filings; media reports regarding defendants; analyst reports; various informational databases; court filings, including the Complaint and exhibits thereto filed in the Superior Court of New Jersey Chancery Division - General Equity, Essex County, by the Attorney General of the State of New Jersey, on behalf of the Chief of the Jersey Bureau of Securities ("New Jersey") in *New Jersey v. Allianz Dresdner Asset Management of America, et al.*, Docket No. C-54-04 (N.J. Super. Ct. Ch. Div.), dated February 15, 2004 ("New Jersey Complaint" or "NJC"), and other pleadings and documents

filed therein, the Consent Order entered into by New Jersey and certain Allianz Dresdner (as defined below) entities with respect to the NJC on or about June 1, 2004 (the "New Jersey Consent Order"); the Complaint filed by the SEC in *SEC v. PIMCO Advisors Fund Management LLC, et al.*, dated May 6, 2004, 04 Civ. 3464 (VM) (S.D.N.Y.) (the "*SEC v. PIMCO* Complaint"); and the pleadings and papers submitted in that case, the complaint and exhibits thereto filed by the New York State Attorney General in the Supreme Court of the State of New York in *State of New York v. Canary Capital Partners, LLC, et al.*, dated September 3, 2003; the amended complaint and exhibits thereto in *SEC v. Druffner, et al.*, Civ. Action No. 03-12154-NMG (D. Mass.), and the SEC's Order Instituting Administrative and Cease-and-Desist Proceedings Pursuant to Section 15(b) of the Securities Exchange Act of 1934, Sections 203(e) and 203(k) of the Investment Advisers Act of 1940 and Sections 9(b) and 9(f) of the Investment Company Act of 1940, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order, in *In the Matter of PA Fund Management LLC f/k/a PIMCO Advisors Fund Management LLC, et al.*, dated September 13, 2004 ("SEC Consent Order"); the First Amended Complaint dated November 10, 2004 and other pleadings filed in *SEC v. Treadway, et al.*, 04 Civ. 3464 (VM) (S.D.N.Y.) (the "*SEC v. Treadway* Complaint"), certain internal corporate documents from third party sources; as well as interviews of former employees of Allianz Dresdner and its subsidiaries or affiliates, and persons who had direct or indirect knowledge and familiarity with market timing and/or late trading within the mutual fund industry generally, and specifically as it pertained to Allianz Dresdner; and meetings with consultants.

## NATURE OF THE ACTION

1.      This is a class action brought on behalf of a class (the "Class") consisting of all persons and entities who purchased and/or held shares of any mutual fund in the Allianz Dresdner fund family that was advised, sub-advised, and/or managed by PEA Capital LLC, PA Fund Management Co., Pacific Investment Management Company LLC, or their predecessors, or any of

their affiliated investment advisor or sub-advisor companies (collectively, the "PIMCO Funds" or the "Funds"), which shares were harmed or adversely affected by market timing and/or late trading in the Funds, during the period from February 23, 1999 to February 17, 2004, inclusive (the "Class Period"). Excluded from the Class are defendants, members of the immediate families of the individual defendants, and their legal representatives, parents, affiliates, heirs, successors or assigns and any entity in which defendants have or had a controlling interest, all trustees and portfolio managers of the Funds, and any other person who engaged in the wrongful conduct alleged herein (the "Excluded Persons"). Also excluded from the Class are any officers, directors, or trustees of the Excluded Persons. Lead Plaintiff seeks remedies under the Securities Exchange Act of 1934 (the "Exchange Act"), the Investment Company Act of 1940 (the "Investment Company Act"), and state and common law.

2.      This class action concerns improper trading practices in the Funds. In particular, defendants perpetrated two schemes that deprived Plaintiff and the other members of the Class of millions of dollars that they invested in the PIMCO family of mutual funds, which were traditionally viewed as relatively safe investments for long-term investors.

3.      One scheme employed by defendants was "market timing" of the Funds, an investment technique involving short-term, in and out trading of mutual fund shares, designed to exploit inefficiencies in the way mutual fund companies price their shares. The ADAM-affiliated Defendants (as defined herein) improperly permitted certain investors to market time the Funds, thereby allowing these favored investors to take advantage of short-term inefficiencies in the pricing of the Funds in order to reap millions of dollars of short-term profits at the expense of long-term investors, including Plaintiff and the other members of the Class.

4.      Another scheme employed by defendants was "late trading" of the Funds. By law, orders to buy, sell or exchange mutual fund shares must be placed at or before 4:00 p.m. Eastern time on a particular day in order to receive that days net asset value ("NAV"), which is the price of

- 3 -

each share of a fund. Contrary to this rule, the ADAM-affiliated Defendants illegally permitted certain investors to place orders after 4 p.m. Eastern time on a given day, and still receive that day's NAV, thereby allowing these favored investors to capitalize on post- 4:00 p.m. information, while those who traded their mutual fund shares lawfully could not.

5.    The ADAM-affiliated Defendants allowed certain favored investors to engage in market timing and late trading in order to increase the amount of assets in the Funds, which produced greater fees for the ADAM-affiliated Defendants at the expense of other investors, including Plaintiff and the other members of the Class.

6.    The ADAM-affiliated Defendants never disclosed that the Funds were permitting, indeed encouraging, certain favored investors to engage in market timing and late trading, which had detrimental effects on other investors, including Plaintiff and the other members of the Class. Thus, Plaintiff and the other members of the Class purchased and/or held shares of the Funds without knowing that the ADAM-affiliated Defendants was allowing certain favored investors to engage in market timing and late trading, and thus effectively to steal profits from, and increase fees and expenses for, long-term investors in these Funds.

7.    As a result of their schemes, the defendants, including the ADAM-affiliated Defendants, the favored investors who were allowed to engage in market timing and late trading, and the brokers, clearing agents, and other middlemen who participated in, and facilitated, the improper and illegal trading, profited handsomely, while long-term investors, including Plaintiff and the other members of the Class, suffered enormous damages.

8.    As a consequence of their wrongful conduct, certain of the ADAM-affiliated Defendants, to date, have paid government regulators a total of $68 million, $58 million of which was in penalties, to settle actions against them. For instance, certain of the ADAM-affiliated Defendants were the subject of an SEC Consent Order, dated September 13, 2004, pursuant to which they were ordered to pay a total of $50 million, and to comply with certain internal

governance reforms.  The total payment of $50 million consisted of disgorgement in the amount of $10 million, and civil money penalties totaling $40 million, paid by the Funds' investment advisor and sub-advisor, and underwriter/distributor.  The findings of fact by the SEC in the SEC Consent Order against these defendants, all subsidiaries of the Allianz Dresdner U.S. corporate parent, conclude that senior officers of these ADAM-affiliated Defendants knowingly arranged to permit market timing by third parties in the Funds beginning, at least, from 2001 up to and through 2003. In addition, certain of the ADAM-affiliated Defendants were the subject of the New Jersey Consent Order, entered on or about June 1, 2004, paying a total of $18 million in civil penalties and costs, including costs of further enforcement provisions, and each agreed to a series of corporate governance reforms designed to prevent such wrongful activity from recurring.  The findings of fact in the New Jersey Consent Order against certain of these same defendants, as well as the U.S. corporate parent, similarly conclude, *inter alia*, that these entities violated the PIMCO Funds' own prospectuses which "created the misleading impression that they were vigilantly protecting other [Fund] investors against the negative effects of market timing," while their officers "sold the right to market time their funds" to known market timers, without disclosure of any such agreements, in exchange for these preferred investors "parking" assets in other PIMCO Funds, allowing one known market timer alone to effect more than $4 billion in market timing trades.  New Jersey Consent Order, ¶ 2(h).

9.      Moreover, as described below, substantial other evidence exists of the ADAM-affiliated Defendants permitting and/or acquiescing in large-scale timing in PIMCO Funds.  For example, brokers from Prudential Securities, Inc. alone coordinated approximately $30 million of market timing trading in PIMCO Funds during the January 1, 2001 to September 2003 time frame. The ADAM-affiliated Defendants' courting of, and receptiveness to, market timing assets, due to the fees and profits they generated for the PIMCO Funds complex, continued from the beginning, to the end, of the Class Period.

- 5 -

10.     This litigation is brought on behalf of the Class to recover the many millions of dollars in additional damages to its members which remain unrecompensed.

### JURISDICTION AND VENUE

11.     The claims herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5); Sections 36(b) and 48(a) of the Investment Company Act (15 U.S.C. §§ 80a-35(b), and 80a-47(a)); and under state and common law.

12.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa); Sections 36(b)(5) and 44 of the Investment Company Act (15 U.S.C. §§ 80a-35(b)(5), 80a-43); 28 U.S.C. § 1331 and 1337; and principles of supplemental jurisdiction under 28 U.S.C. § 1367.

13.     Venue is proper within this District, as, pursuant to the multi-district provisions of 28 U.S.C. § 1407, this action, along with numerous other actions arising out of substantially similar alleged conduct in the mutual fund industry, has been transferred to, and localized in, this District, by order of the Judicial Panel for Multidistrict Litigation, on February 20, 2004, after full hearing and consideration of all factors, including matters of convenience, and said Panel's subsequent Conditional Transfer Orders, and defendants have not contested such transfer.  Venue is further proper in this District pursuant to §§ 36(b)(5) and 44 of the Investment Company Act (15 U.S.C. §§ 80a-35(b)(5), 80a-43), as defendants transact business in this District, and many Class members reside within this District, and, for the same reasons, is proper as well in the Southern District of New York transferor court.

14.     In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

Doc. 151743

# PARTIES

## A.   Plaintiff

15.     The Court-appointed Lead Plaintiff, the Combined Welfare Fund, a Taft-Hartley

Plan meeting the Employee Retirement Income Security Act's ("ERISA") definition of an

employee welfare benefit plan, purchased and held significant amounts of shares of the Funds,

including, the PIMCO Short Term Fund.  Over, at least, the last five years, the Combined Welfare

Fund has purchased and held shares of PIMCO Funds with a dollar value of, for example,

$700,700 and $302,000 during the Class Period, and has been damaged by defendants' alleged

wrongful conduct.

16.     Plaintiff Warren Meier purchased and held 650 shares of the PIMCO PEA

Innovation Fund during the Class Period, beginning on October 6, 2000, continued to hold such

shares through the date of the filing of the Consolidated Amended Class Action Complaint, and

has been damaged thereby.

### Structure and Organization of the PIMCO Funds Family: An Overview

17.     The PIMCO Funds consist of a series of primarily open-end mutual funds in which

investors contribute cash for the purpose of creating a pool of assets with which to invest and

purchase securities.  In return for their deposits, Fund investors receive shares in the Funds in an

amount directly proportionate to the amount of their investment (i.e., the larger the amount

invested, the more shares the investor receives in a specific Fund).  This cash is then used to

purchase stocks or other securities, consistent with the investment goals and objectives of the

Fund.  Fund shares are issued to Fund investors pursuant to registration statements and

prospectuses that must comply with the Securities Act and the Investment Company Act.

18.     The Funds hold no assets apart from the deposits of their investors, nor do they

conduct any operating or investment activities on their own.  Instead, the Funds are part of a

labyrinthine structure, commonly known as a "complex," in which separate legal entities, which

are nonetheless related to the Funds, and captive to corporate parent, Allianz Dresdner Asset

Management of America ("Allianz Dresdner", "ADAM" or the "Company") and/or its investment

advisers (including PA Fund Management LLC, f/k/a PIMCO Advisers Fund Management LLC

("PAFM"), PEA Capital LLC, f/k/a PIMCO Equity Advisors LLC ("PEA"), and Pacific

Investment Management Company LLC ("PIMCO")), perform and control all necessary activities

related to the sale and redemption of securities, as well as the management of investments.

Indeed, as discussed below, these related entities not only appoint their own representatives to the

Board of Trustees charged with the fiduciary duty of protecting the interests of investors in each

individual Fund, but also control the appointment of the purportedly "independent" members of

these Boards.  These same related entities within the Fund complex receive substantial fees for the

performance of these services, which are calculated as a percentage of the value of the total

deposits under management, as set forth below.  Thus, the larger the amount of deposits under

management, the more that these related entities stand to collect in fees from mutual fund

investors.  This means that, even in the case in which a Fund loses money on its investments, the

related ADAM entities can still increase the fees they earn by simply steering more investor

deposits into the PIMCO Funds.

19.     The key entities that comprise the PIMCO Fund complex are described below.

Each of these entities is controlled not by investors in the individual Funds, but by separate

corporations owned or controlled by the corporate parent, ADAM.  At least some of the ADAM

controlled entities have operated, for their own benefit rather than the benefit of Fund investors.

The key ADAM subsidiaries, whose roles in the PIMCO Fund complex are explained below,

include the following: (i) investment advisors; (ii) administrator; (iii) registrant/issuer; and (iv)

underwriter/distributor.

a.    **The Investment Advisors**

i.    The investment advisors, which for PIMCO Funds included PAFM, PEA, and PIMCO, are responsible both for the creation of the particular PIMCO Fund (including the determination of its investment goals and strategy), as well as for managing the day-to-day activities and individual investments of the Fund.  The PIMCO investment advisers, including PAFM, PEA, and PIMCO, have entered into investment advisory contracts, known as "Advisory Contracts" or "Advisory Agreements," with the registrants/issuers of the PIMCO Funds, on behalf of the individual Funds.  Pursuant to the Advisory Contracts or Agreements, the investment advisers, including PAFM, PEA, and PIMCO, provide research, advice and supervision with respect to investment matters.  Additionally, PAFM, PEA, and PIMCO and other ADAM investment advisers, or their subsidiaries or affiliates, are responsible for performing virtually all critical functions of the PIMCO Funds, including:  (i) determining which securities to purchase and sell and what portion of the Funds' assets to invest; (ii) hiring and employing portfolio managers; (iii) selling shares in the Funds to the public; (iv) performing and/or facilitating all "back-office" operations; (v) determining the net asset value of the Funds on a daily basis; (vi) directing and controlling the investments in the Funds; (vii) ensuring that the investment policies of the Funds are observed; (viii) enforcing the policies of the Funds, including restrictions on trading and other activities that could be detrimental to shareholders of the Funds; (ix) otherwise managing the day-to-day activities of the Funds; (x) reporting on a regular basis to the Board of Trustees of the registrants of the Funds; and (xi) making their officers and employees available to the Board of Trustees of the Funds' registrants for consultation and discussions regarding the administration and management of the Funds and their investment activities.  As detailed herein, PAFM, PEA, and PIMCO are the investment advisors and/or sub-advisors responsible for the management and day-to-day operations for most of the Funds within the PIMCO Fund complex.

ii.    As set forth herein, the investment advisors (and through them, ADAM) are

paid for their services pursuant to Advisory Contracts and Agreements negotiated between the investment advisors and the Trustees of the registrant/issuer, on behalf of the individual Funds themselves. Advisory Contracts and Agreements within the PIMCO Fund family provide for the Funds to pay the investment advisors as much as 1.25% annually of their average NAV, calculated on a daily basis and payable monthly or quarterly, in return for its investment advisory services. Thus, if a Fund has an NAV of $1 billion over the course of the year, it will pay the investment advisor as much as $12.5 million annually from investors' deposits, for its investment advisory services.

      **b.**     **<u>The Administrator</u>**

         i.     PAFM, in addition to serving as investment adviser to PIMCO Funds within the "PIMCO Funds: Multi-Manager Series" (the "MMS Trust") (defined below), is the "Administrator" of the component Funds in the MMS Trust, and is responsible for performing the day-to-day administrative functions of each Fund in that Trust. PIMCO, in addition to serving as investment adviser to the Funds within the "PIMCO Funds: Pacific Investment Management Series" Trust (the "PIMS Trust") (defined below), is the Administrator of the component Funds in the PIMS Trust, and is responsible for performing the day-to-day administrative functions of each Fund in that Trust. According to the Multi-Managers Series Form N-1A Registration Statements and Prospectuses filed during the Class Period, PAFM also retained its affiliate, PIMCO, to perform administrative and other services for the Funds in the MMS Trust as a sub-administrator, pursuant to a "Sub-Administration Agreement" (a/k/a "Portfolio Management Agreements"). The tasks performed by PAFM and PIMCO as Administrators, pursuant to "Administration Agreements," include: (i) performing back-office operations; (ii) calculating the NAV of the individual Funds within the PIMCO Fund complex (for the MMS Trust, and the PIMS Trust, respectively) on a daily basis; (iii) maintaining books and records for the individual Funds; and (iv) monitoring regulatory compliance. The Multi-Manager Series Prospectuses during the Class

Period note that PAFM, as Administrator, among other things, "provides or procures administrative services to the Funds, which include clerical help and accounting, bookkeeping, internal audit services and certain other services they require, and preparation of reports to the Trust's shareholders and regulatory filings." Similarly, the PIMS Prospectuses during the Class Period note that PIMCO, as Administrator, among other things, performs shareholder servicing functions, including preparation of shareholder reports and communications, regulatory compliance, such as reports and filings with the SEC and state securities commissions, and general supervision of the operations of the Funds, including coordination of the services performed by the Funds' transfer agent, custodian, legal counsel, independent accountants, and others. PIMCO (or an affiliate of PIMCO) also furnishes the Funds within the PIMS Trust with office space facilities required for conducting the business of the Funds, and pays the compensation of those officers, employees and Trustees of the Trust affiliated with PIMCO. Like their corporate affiliates, PAFM and PIMCO are corporate subsidiaries (of the U.S. corporate parent, ADAM) responsible for administering the business of numerous funds within the PIMCO Fund complex.

   ii. Similar to their roles as investment advisors, PAFM and PIMCO, as Administrators are generally paid for their services pursuant to the "Administration Agreements" negotiated with the Trustees, on behalf of each individual Fund. PAFM and PIMCO also receive fees based on the Funds' assets under management. During fiscal years 1999-2003, for example, PAFM received monthly fees attributable to the PEA Growth Fund, PEA Target Fund, PEA Opportunity Fund and PEA Innovation Fund of 0.65% of average daily assets under management (0.25% for Institutional and Administrative Classes). PIMCO received monthly fees attributable to the Funds in the PIMS Trust of 0.15% to 0.50%, including 0.20% for the Low Duration, Short-Term and Total Return Funds, 0.29% for the Real Return Fund and 0.35% for the High Yield and StocksPLUS Fund, in addition to fees obtained as sub-administrator of certain of the Funds in the MMS Trust.

c.      The "**Registrant/Issuer**" is an affiliate of the investment advisor under §2(a)(3) of the Investment Company Act (15 U.S.C. § 80a-(2)(a)(3)), and is the legal issuer of each Fund's shares. As the legal issuer for its constituent Funds, the Registrant may only issue shares in such Funds to the public pursuant to a registration statement and prospectus that complies with Section 10 of the Securities Act, and is absolutely liable to purchasers of the shares for any material misstatement and omission in the prospectus under the Securities Act. Similar to the other PIMCO-affiliated entities, the Registrants/Issuers of the Funds, such as the MMS Trust and the PIMS Trust, serve as the Registrants/Issuers for multiple PIMCO Funds.

d.      The "**Underwriter/Distributor**," defendant PIMCO Advisors Distributors LLC ("PIMCO Advisors Distributors" or "PAD"), is a subsidiary of ADAM, and is responsible for the underwriting and retailing (selling) of Fund shares to the public pursuant to a registration statement and prospectus. PAD serves as the Underwriter/Distributor for the PIMCO Funds, including the Funds within the MMS Trust and PIMS Trust. PAD, as Underwriter/Distributor, is strictly liable for any material misstatements or omissions contained in the registration statement and prospectus of a Fund under the Securities Act.

**B.      Defendants**

**The Parent**

20.      Defendant Allianz Dresdner Asset Management of America L.P.  ("ADAM") is a limited partnership organized under Delaware law in 1987. Until Allianz AG (defined below) purchased a majority stake in ADAM on May 5, 2000, ADAM was known as PIMCO Advisors L.P. The primary offices of ADAM are located at 888 San Clemente Drive, Suite 100, Newport Beach, California 92660. ADAM's sole general partner is Allianz PacLife Partners LLC, a Delaware limited liability company with three members, ADAM U.S. Holding LLC, the managing member, which is a Delaware limited liability company, Pacific Life Insurance Company and Pacific Asset Management LLC, a Delaware limited liability company. ADAM U.S. Holding

- 12 -

LLC's sole member is Allianz Dresdner Asset Management of America LLC, a Delaware limited liability company. Allianz Dresdner Asset Management of America LLC has two members, Allianz of America, Inc., a Delaware corporation which owns a 99.9% non-managing interest and Allianz Dresdner Asset Management of America Holding Inc., a Delaware corporation which owns a 0.01% managing interest. Allianz Dresdner Asset Management of America Holding Inc. is a wholly-owned subsidiary of ADAM GmbH, which is wholly-owned by Allianz Aktiengesellschaft ("Allianz AG"), a multinational insurance and financial services holding company based in Munich, Germany. Allianz of America, Inc. is wholly-owned by Allianz AG. Pacific Asset Management LLC is a wholly-owned subsidiary of Pacific Life Insurance Company, a wholly-owned subsidiary of Pacific Mutual Holding Company. Allianz AG indirectly owns a controlling interest in ADAM. Pacific Life Insurance Company owns an indirect minority equity interest in ADAM and is a California based insurance company. As of January 1, 2004, Allianz AG owns approximately 90% of ADAM, leaving Pacific Life with an approximate 10% ownership interest in ADAM. (ADAM is now known as Allianz Global Investors of America, L.P.)

21.     The general partner of ADAM has substantially delegated its management and control of ADAM to an Executive Committee. The Executive Committee of ADAM is comprised of William S. Thompson, Jr. and David C. Flattum.

22.     ADAM has operating subsidiaries and affiliates engaged in the United States mutual funds business under, among others, the "PEA" and "PIMCO" trade names. Some of these subsidiaries and affiliates include mutual fund retailers, broker-dealers, and investment advisers that offer and sell PIMCO Funds to investors which include institutions and individuals. In addition, some of these subsidiaries and affiliates also structure and advise private investments, including hedge funds and limited partnerships, sold to investors. Through its PAFM, PEA and PIMCO subsidiaries, as of September 30, 2003, ADAM had approximately $445.5 billion in assets under management.

- 13 -

23.     Defendant ADAM is sued herein in its capacity as a parent company of the MMS

Trust and related persons and entities, but not in its capacity as parent company of the PIMS Trust,

or PIMCO (defined below).

### The Investment Advisor Defendants

24.     Defendant PIMCO Advisers Fund Management LLC ("PAFM"), a registered

investment adviser under the Investment Advisers Act of 1940 ("Investment Advisers Act"), with

principal executive offices located at 1345 Avenue of the Americas, New York, New York 10105,

is the investment adviser and manager, and provides administrative services, to many of the Funds

and/or their registrants, in particular, to Funds in the MMS Trust, including the "PEA" Funds. At

all relevant times, PAFM (and/or its predecessor entity) was the adviser and administrator of,

among others, the following Funds: PIMCO PEA Target, PIMCO PEA Innovation, PIMCO PEA

Growth, PIMCO PEA Opportunity, and PIMCO PEA Select Growth (until its merger into the PEA

Growth Fund in October 2002). PAFM, a Delaware limited liability company, is a wholly-owned

indirect subsidiary of ADAM, and earns investment management fee revenues for itself and its

corporate parent, ADAM, by providing investment advisory and management services pursuant to

investment advisory agreements with each Fund and/or its Registrant. As a Fund manager, PAFM

provides investment research and portfolio manager services. It also selects the securities for each

Fund to buy, hold or sell. As noted in the MMS Trust Prospectuses filed during the Class Period

(the "MMS Prospectuses"), "[s]ubject to the supervision of the Board of Trustees, the Adviser

[PAFM] is responsible for managing, either directly or through others selected by it, the

investment activities of the Funds and the Funds' business affairs and other administrative

matters." The MMS Prospectuses further state that PAFM, "subject to the supervision of the

Board of Trustees, is responsible for providing advice and guidance with respect to the Funds and

for managing, either directly or through others selected by the Adviser, the investments of the

Funds." Pursuant to its Advisory Agreement with the MMS Trust, PAFM also takes all necessary

- 14 -

steps to implement such decisions, including selecting brokers and dealers, executing and settling the Funds' portfolio transactions, in accordance with detailed criteria set forth in the Advisory Agreement for each Fund in the MMS Trust and internal policies, and provides periodic reports to each of the MMS Trust's board of trustees, which reviews and supervises PAFM's investment activities.  As investment advisor for the MMS Trust Funds, PAFM is responsible for managing the day-to-day activities and individual investments of such Funds, and performs virtually all critical functions of these Funds (such as those discussed in ¶ 19(a)(i) above), including hiring and employing portfolio managers, selling shares in these Funds to the public, performing "back-office" operations, directing and controlling investments in the MMS Trust Funds, ensuring that investment policies of these Funds are observed, enforcing the policies of the MMS Trust Funds, including restrictions on trading and other activities that could be detrimental to the Funds' shareholders.

25.     PAFM receives management fees from the Funds that it manages.  According to the MMS Prospectuses filed during the Class Period, the Advisory Agreement between PAFM and the MMS Trust, and PAFM's most recent Form ADV, dated as of October 2004, PAFM is compensated for its investment advisory services by a percentage of the average daily net assets under its management.  Each Fund pays the Adviser fees in return for providing or arranging for the provision of investment advisory services.  According to the MMS Trust Registration Statements and Prospectuses during the Class Period, the following Funds paid monthly advisory fees to PAFM, or its predecessor entity, at the annual rate (stated as a percentage of the average daily net assets of each Fund) of:  PEA Target Fund - 0.55%; PEA Opportunity Fund - 0.65%; PEA Growth Fund - 0.50%; PEA Innovation Fund - 0.65%.  (The rate for the Select Growth Fund was 0.60%, prior to its merging into the Growth Fund in October 2002.)  During the Class Period, the management fees paid, pursuant to Advisory contracts, by these Funds to PAFM for fiscal years ended June 30, were, as follows:  for fiscal year 2003, PEA Target Fund - $4,470,675, PEA

Opportunity Fund - $1,617,206, PEA Growth Fund - $4,399,810, PEA Innovation Fund - $5,353,827; for fiscal year 2002, PEA Target Fund - $7,551,258, PEA Opportunity Fund - $2,462,723, PEA Growth Fund - $7,299,919, PEA Innovation Fund - $1,386,252, PEA Select Growth Fund - $254,241; for fiscal year 2001, PEA Target Fund - $11,479,530, PEA Opportunity Fund - $3,381,505, PEA Growth Fund - $12,303,201, PEA Innovation Fund - $27,373,864, PEA Select Growth Fund - $283,609; for fiscal year 2000, PEA Target Fund - $9,095,743, PEA Opportunity Fund - $3,486,462, PEA Growth Fund - $13,317,691, PEA Innovation Fund - $21,684,203, PEA Select Growth Fund - $19,736; for fiscal year 1999, PEA Target Fund - $5,837,985, PEA Opportunity Fund - $3,171,024, PEA Growth Fund - $10,728,640, PEA Innovation Fund - $4,453,888, and the PEA Select Growth Fund - $413,258. In the case of Funds for which the Advisor has retained a separate Sub-Advisor, the Advisor (and not the Fund) pays a portion of the advisory fees it receives to the Sub-Advisor – an affiliate of the Advisor – in return for its services. During the Class Period, PAFM utilized defendant PEA Capital LLC as a sub-Advisor for certain of the Funds in the MMS Trust.

26.     As noted above, PAFM also serves as Administrator for the MMS Trust (including, among others, the PEA Target, Opportunity, Growth, Innovation, and Select Growth Funds) and, pursuant to its "Administration Agreements" with the Trust, receives fees for services in this capacity. PAFM also retains sub-administrators that are its affiliates within the PIMCO Fund complex, including Pacific Investment Management Company LLC, to provide such administration services to certain of the Funds. According to the Prospectuses filed during the Class Period, shareholders of each MMS Trust Fund pay an administrative fee to PAFM, computed as a percentage of the Fund's assets attributable in the aggregate to those classes of shares. During the Class Period, the percentages for the PEA Growth Fund, PEA Target Fund, PEA Opportunity Fund and PEA Innovation Fund ranged from 0.25% (for Institutional and Administrative Classes, with Class A, B and C share percentages being higher) to 0.65% of

- 16 -

average daily assets under management.  During the Class Period, the administration fees paid, pursuant to Administration Agreements, by these Funds to PAFM for fiscal years ended June 30, were, as follows: for fiscal year 2003, PEA Target Fund - $3,187,612, PEA Opportunity Fund - $894,882, PEA Growth Fund - $3,485,901, PEA Innovation Fund - $3,259,585; for fiscal year 2002, PEA Target Fund - $5,411,000, PEA Opportunity Fund - $1,390,396, PEA Growth Fund - $5,795,556, PEA Innovation Fund - $6,967,895, PEA Select Growth Fund - $152,203; for fiscal year 2001, PEA Target Fund - $8,306,572, PEA Opportunity Fund - $1,976,964, PEA Growth Fund - $9,703,273, PEA Innovation Fund - $15,982,199, PEA Select Growth Fund - $183,873; for fiscal year 2000, PEA Target Fund - $6,594,163, PEA Opportunity Fund - $2,117,069, PEA Growth Fund - $10,491,542, PEA Innovation Fund - $12,859,854, PEA Select Growth Fund - $11,113; for fiscal year 1999, PEA Target Fund - $4,244,469, PEA Opportunity Fund - $1,950,916, PEA Growth Fund - $8,581,473, PEA Innovation Fund - $1,950,916, PEA Select Growth Fund - $181,254.  As noted, a portion of these fees were then paid by PAFM to any sub-administrators – affiliates of PAFM within the PIMCO Fund complex – that performed such services for the Funds.

27.     Along with the Registrant – the MMS Trust – PAFM, directly or through its sub-advisors, participated in the preparation of the MMS Trust registration statements and prospectuses during the Class Period.  The Advisory Agreements between PAFM and/or its predecessor and the MMS Trust in effect during the Class Period further provide that PAFM: "[w]ill make available to the Trust, promptly upon request, any of the Funds' investment records and ledgers as are necessary to assist the Trust to comply with [applicable laws and regulations], and will furnish to regulatory authorities having the requisite authority any  information or reports in connection with such services which may be requested in order to ascertain whether the operations of the Trust are being conducted in a manner consistent with applicable laws and regulations," and "[w]ill regularly report to the Trust's Board of Trustees on the investment

Doc. 151743

program for each Fund and the issuers and securities represented in each Fund's portfolio, and will furnish the Trust's Board of Trustees with respect to the Funds such periodic and special reports as the Trustees may reasonably request."

28.     Defendant PEA Capital LLC ("PEA"), f/k/a/ PIMCO Equity Advisors LLC, a registered investment Advisor under the Investment Advisors Act was, at all relevant times, the Advisor or sub-advisor (since March 6, 1999, prior to which another affiliate of PAFM served as sub-advisor) to, among other Funds, the PIMCO PEA Target (sub-advisor), PIMCO PEA Innovation (sub-advisor), PIMCO PEA Growth (sub-advisor), PIMCO PEA Opportunity (sub-advisor), PIMCO PEA Select Growth (until its merger into the PEA Growth Fund in October 2002), and according to the NJC, the PIMCO Equity Advisors Horizon Fund, L.P. (the "Horizon Fund"). PEA, a Delaware limited liability company with principal executive offices at 1345 Avenue of the Americas, New York, New York  10105, is a wholly owned indirect subsidiary of ADAM, and an affiliate of PAFM and PIMCO, and, like PAFM, earns investment management fees for itself and its corporate parent, ADAM, by providing investment advisory or sub-advisory and management services, pursuant to advisory or sub-advisory agreements (known as "Portfolio Management Agreements") with the Trust(s), and, in cases where it performs sub-advisory services, with PAFM, the Advisor.  Accounts managed by PEA had combined assets as of September 30, 2003, of approximately $9.1 billion.  According to the October 31, 2003 MMS Trust Registration Statement and Prospectus, PEA, in its capacity as sub-Advisor "has full investment discretion and makes all determinations with respect to the investment of a Fund's assets, subject to the general supervision of the Advisor [PAFM] and the [MMS] Board of Trustees." "Subject to the ultimate responsibility of the Board of Trustees, the Advisor has responsibility to oversee the Sub-Advisors and to recommend their hiring, termination and replacement." *Id.* The Prospectus notes that the Advisor does not need shareholder approval to enter into sub-advisory agreements with affiliates of the Advisor that "are substantially

- 18 -

wholly-owned" by ADAM.  Like the Advisory Agreement, the Sub-Advisory (Portfolio

Management) Agreement between PAFM and PEA provides that PEA "[w]ill make available to

the [MMS] Trust and the Advisor, promptly upon request, any of the Funds' investment records

and ledgers as are necessary to assist the [MMS] Trust to comply with [applicable laws and

regulations], and will furnish to regulatory authorities having the requisite authority any

information or reports in connection with such services which may be requested in order to

ascertain whether the operations of the [MMS] Trust are being conducted in a manner consistent

with applicable laws and regulations," and "[w]ill regularly report to the [MMS] Trust's Board of

Trustees on the investment program for each Fund and the issuers and securities represented in the

Fund's portfolio, and will furnish the [MMS] Trust's Board of Trustees with respect to each Fund

such periodic and special reports as the Trustees may reasonably request."

29.     During the Class Period, PEA – like PAFM – received management fees from the

Funds that it manages, based on a percentage of the average daily net assets under its management.

According to the registration statements and prospectuses covering the MMS Trust during the

Class Period, PAFM, which earned fees based on the amount of assets under its management, in

turn paid PEA (or its predecessor), as the sub-advisor, a monthly fee, as a percentage of the assets

that PEA managed as sub-advisor, at the following annual rates:  0.40% for the PEA Growth Fund,

0.45%  for the PEA Target Fund, and 0.55% for the PEA Opportunity and PEA Innovation Funds.

During the Class Period, such fees, for fiscal years ended June 30, included, for example, the

following: for fiscal year 2003, PEA Target Fund - $3,657,826, PEA Opportunity Fund -

$1,368,406, PEA Growth Fund - $3,519,848, PEA Innovation Fund - $4,530,161; for fiscal year

2002, PEA Target Fund - $6,178,302, PEA Opportunity Fund - $2,083,842, PEA Growth Fund -

$5,839,935, PEA Innovation Fund - $9,635,366; PEA Select Growth Fund - $211,868; for fiscal

1999, PEA Target Fund - $2,563,818, PEA Opportunity Fund - $1,682,634, PEA Growth Fund -

$4,727,674, PEA Innovation Fund - $1,325,219, PEA Select Growth Funds - $340,758.

Doc. 151743

30.     The Funds PEA advises or sub-advises will be referred to collectively as the "PEA Funds."

31.     PAFM and PEA, are referred to collectively as the "Advisor Defendants" or the "Investment Advisors."

## Non-Defendant Pacific Investment Management Company LLC

32.     Pacific Investment Management Co. LLC ("PIMCO"), a registered investment Advisor under the Investment Advisors Act, was, pursuant to an investment advisory contract ("Advisory Contract") between PIMCO and the PIMS Trust, at all relevant times, the investment Advisor to, among other mutual funds, the PIMCO High Yield, PIMCO Real Return, PIMCO Money Market, PIMCO Short Term and PIMCO Low Duration Funds.  PIMCO also serves as a sub-advisor and/or sub-administrator to certain of the Funds in the MMS Trust for which PAFM serves as investment advisor.  PIMCO, a Delaware limited liability company with principal executive offices at 840 Newport Center Drive, Newport Beach, California  92660, is a majority owned subsidiary of ADAM (with a minority interest held by PIMCO Partners, LLC, which in turn is owned by the current managing directors and executive management of PIMCO, according to the October 31, 2003 PIMS Trust Prospectus) and earns investment management fees for itself and its corporate parent, ADAM, by providing investment advisory or sub-advisory and management services, pursuant to Advisory Contracts or Agreements with the PIMS Trust and, in cases where it performs sub-advisory services, with PAFM, the Advisor.  As of September 30, 2003, PIMCO managed approximately $356.6 billion in assets.  As stated in the PIMS registration statements and prospectuses during the Class Period, "Subject to the supervision of the Board of Trustees, PIMCO is responsible for managing the investment activities of the [PIMS Trust's] Funds and the Funds' business affairs and other administrative matters."  (*E.g.*, PIMS October 31, 2003 Prospectus.)  Among other things, PIMCO "places orders for the purchase and sale of portfolio investments for the [PIMS Trust's] Funds' accounts with brokers or dealers selected by it in its

- 20 -

Doc. 151743

discretion." "PIMCO also furnishes to the Board of Trustees, which has overall responsibility for the business and affairs of the [PIMS] Trust, periodic reports on the investment performance of each Fund.... Under the terms of the Advisory Contract, PIMCO is obligated to manage the Funds in accordance with applicable laws and regulations." *Id.*

33.     During the Class Period, PIMCO – like PAFM and PEA – received a monthly investment advisory fee from each Fund that it managed at an annual rate based on average daily net assets of the Funds, which, *inter alia*, for the PIMCO High Yield, Real Return, Short Term and Low Duration Funds was 0.25%, and for the Money Market Fund was 0.15%.  For PIMCO's fiscal years ended March 30, PIMCO received advisory fees, for example, as follows: for fiscal 2003, High Yield Fund - $10,590,729, Real Return Fund - $14,082,155, Money Market Fund - $580,550, Short-Term Fund - $7,487,012, Low Duration Fund - $21,105,390; for fiscal 2002, High Yield Fund - $7,996,501, Real Return Fund - $5,064,008, Money Market Fund - $541,950, Short-Term Fund - $3,548,056, Low Duration Fund - $13,116,919; for fiscal 2001, High Yield Fund - $7,084,431, Real Return Fund - $1,358,282, Money Market Fund - $595,731, Short-Term Fund - $1,707,119, Low Duration Fund - $10,648,205; for fiscal 2000, High Yield Fund - $8,796,696, Real Return Fund - $286,410, Money Market Fund - $754,997, Short-Term Fund - $1,610,960, Low Duration Fund - $10,480,477.

34.     PIMCO also serves as Administrator to the Funds in the PIMS Trust pursuant to an administration agreement ("Administration Agreement") with said Trust, providing the Funds with administrative and shareholder services in connection with Fund operations.  According to PIMS Trust registration statements and prospectuses during the Class Period, the administrative services provided by PIMCO include but are not limited to:  (i) shareholder servicing functions, including preparation of shareholder reports and communications, (ii) regulatory compliance, such as reports and filings with the SEC and state securities commissions, and (iii) general supervision of the operations of the PIMS Trust-related Funds, including coordination of the services performed by

- 21 -

these Funds' transfer agent, custodian, legal counsel, independent accountants, and other services.

PIMCO (or an affiliate of PIMCO) also furnishes the Funds with office space facilities required for

conducting their business, and pays the compensation of those officers, employees and Trustees of

the Trust affiliated with PIMCO.  In addition, PIMCO "arranges for the provision of legal, audit,

custody, transfer agency and other services for the [PIMS Trust-related] Funds, and is responsible

for the costs of registration of the [PIMS] Trust's shares and the printing of Prospectuses and

shareholder reports for current shareholders."  PIMCO, directly or indirectly, participated in the

preparation of the PIMS Trust registration statements and prospectuses during the Class Period.

PIMCO is paid for its role as Administrator, based on a percentage of the Fund's average daily net

assets attributable on an annual basis, at the following rates for, *inter alia*, the following Funds:

High Yield Fund - 25%-65%, Real Return Fund - 20%-65%, Money Market Fund - 20%-45%,

Short-Term Fund - 20%-50%, and Low Duration Fund - 18%-50%, depending on the Class of

shares (*e.g.*, Class A, B).  The aggregate amount of the administrative fees paid by the Funds

administered by PIMCO, were, for example: for fiscal 2003, High Yield Fund - $13,292,594, Real

Return Fund - $18,200,673, Money Market Fund - $1,200,841, Short-Term Fund - $7,961,958,

Low Duration Fund - $20,946,408; for fiscal 2002, High Yield Fund - $9,812,572, Real Return

Fund - $6,326,433, Money Market Fund - $1,012,402, Short-Term Fund - $3,679,902, Low

Duration Fund - $11,333,576; for fiscal 2001, High Yield Fund - $8,316,046, Real Return Fund -

$1,559,146, Money Market Fund - $1,055,918, Short-Term Fund - $1,529,935, Low Duration

Fund - $8,636,136; for fiscal 2000, High Yield Fund - $10,201,282, Real Return Fund - $333,697,

Money Market Fund - $1,325,685, Short-Term Fund - $1,445,630, Low Duration Fund -

$8,469,311.

      35.     In addition, PIMCO acted as sub-administrator for certain Funds advised by PAFM,

and earned fees from those services based on the amount of assets under management.

      36.     The mutual funds PIMCO advises will be referred to collectively as the "PIMS

Doc. 151743

Funds." PIMCO is not named as a defendant herein.

### The Trustee Defendants

37.     Defendant Stephen J. Treadway ("Treadway") was at all relevant times a Trustee and President and Chairman of the Board of Trustees of the MMS Trust, Chief Executive Officer and Managing Director of PAFM, and Chief Executive Officer and Managing Director of PAD. Treadway approved certain market timing agreements with Canary Capital Partners, LLC, as described below. According to a proxy statement filed on or about December 21, 1999 by PIMCO Advisors Holdings LP ("PIMCO Advisors"), the predecessor entity of ADAM, in connection with the Allianz merger, "[t]he merger agreement provides that in connection with the Closing, PIMCO Advisors will enter into employment agreements with" certain specified individuals, including Treadway. This proxy statement states that the employment agreement with Treadway provided that "Mr. Treadway will receive a retention award of $1 million per year for five years conditioned on continued employment and be eligible for an additional award of up to $1 million per year for five years upon the satisfaction of certain performance goals by PIMCO Advisors' retail business." Pursuant to this employment agreement, Treadway received such additional awards during the Class Period. Thus, during the Class Period, Treadway received compensation as an affiliated person of an investment adviser, PAFM, of which he was CEO and Managing Director, from the investment company, the MMS Trust, of which he was President and Chairman of the Board, from the advisory fees gained from the assets advised and/or managed by the investment adviser.

38.     Defendant Theodore J. Coburn ("Coburn") was a Trustee of the MMS Trust since April 2002.

39.     Defendant Donald P. Carter ("Carter") was at all relevant times a Trustee of the MMS Trust.

40.     Defendant E. Philip Cannon ("Cannon") was at all relevant times a Trustee of the MMS Trust and a Trustee of the PIMS Trust. According to the October 31, 2003 MMS Trust

Registration Statement and Prospectus, defendant Cannon oversees a total of 112 Fund portfolios in the PIMCO Fund complex. Cannon signed the registration statements and prospectuses for the MMS and PIMS Trust during the Class Period. Cannon is sued herein in connection with his affiliation with, and in his capacity as Trustee of, the MMS Trust.

41.     Defendant Gary A. Childress ("Childress") was at all relevant times a Trustee of the MMS Trust.

42.     Defendant W. Bryant Stooks ("Stooks") was at all relevant times a Trustee of the MMS Trust.

43.     Defendant Gerald M. Thorne ("Thorne") was at all relevant times a Trustee of the MMS Trust.

44.     As Trustees of the MMS Trust, defendants Treadway, Coburn, Carter, Cannon, Childress, Stooks, and Thorne each signed the Form N-1A registration statements and prospectuses for the MMS Trust, including those for the PEA Target, Opportunity, Growth, Innovation and Select Growth (prior to its merger into the Growth Fund) Funds (including amendments and supplements thereto), during the Class Period.

45.     The Defendants identified in paragraphs 37-44 are referred to collectively as the "Trustee Defendants."

   a.     **The Failure of the Interested and "Independent" Trustees**

46.     Throughout the Class Period, the Trustee Defendants breached their fiduciary duties and failed to adequately protect the interests of MMS Fund shareholders (including shareholders of the PEA Target, Innovation, Growth, Opportunity, and Select Growth Funds) and certain of these defendants also breached their fiduciary duties to PIMS Fund Shareholders (including shareholders of, *inter alia*, the Short-Term and Low Duration Funds), to whom they owed duties of care, candor, and loyalty throughout the Class Period. All of the wrongful activity alleged herein that harmed PIMCO Fund investors was permitted to occur notwithstanding the presence of a Board of

- 24 -

Trustees of the MMS and PIMS Trusts that consisted of – for the MMS Trust, interested Trustee defendant Stephen J. Treadway, and 6 "outside" or "independent" Trustees, and for the PIMS Trust, two interested Trustees, and 6 "outside" or "independent" Trustees (though 4 of them served as Directors or Trustees of other PIMCO Trusts) – all of whom were charged with protecting the interests of the PIMCO Fund shareholders. Defendant Treadway failed to fulfill his duties as a Trustee of certain PIMCO Funds, by facilitating and/or acquiescing in market timing and/or late trading, to the detriment of Fund shareholders, and by favoring interests of the ADAM/PIMCO companies and those of other ADAM entities with whom they were affiliated, without due consideration for the interests of the shareholders of the Funds, including the PEA Target, Innovation, Growth, Opportunity, and Select Growth Funds. The so-called "independent" Trustee defendants also failed to fulfill their duties by failing to detect and put an end to the unlawful practices and dealings that pervaded the PIMCO Fund complex, including, but not limited to, the PEA Target, Innovation, Growth, Opportunity, and Select Growth Funds, as well as the mutual fund industry, over the Class Period.

47.     The Investment Company Act, 15 U.S.C. §80a-1 *et seq.*, requires individual mutual funds, such as the PIMCO Funds, and their registrants (*e.g.*, the MMS and PIMS Trusts) to be governed by a Board of Trustees ("Board"), and further requires, in most cases, that a majority of the members of the Board be independent from, and unaffiliated with, the investment Advisor, or its parents, subsidiaries or affiliates. The purpose of this independence requirement is to ensure that the management of the mutual funds is not dominated by the investment Advisor(s) and that, instead, the fund is managed in the best interests of its shareholders. This responsibility not only includes retaining and monitoring the performance of the investment Advisor, the underwriter/distributor, and administrator, but negotiating contracts with these parties and ensuring that the fees paid are reasonable in relation to the services performed.

48.     The purportedly "independent" trustees, who fulfill this role in addition to their

- 25 -

full-time occupations, oversee dozens (and in some cases over a hundred) of individual Funds within the PIMCO Fund complex, rendering it difficult to oversee the activities of the Funds consistent with their fiduciary duties.  For example, according to SEC filings during calendar year 2003, the MMS Trust's "independent" trustees, Donald P. Carter, Gary A. Childress, Theodore J. Coburn, W. Bryant Stooks and Gerald M. Thorne, each oversee at least 44 PIMCO Funds, and "independent" trustee E. Philip Cannon oversees 112 PIMCO Funds.  For the 2003 fiscal year, Cannon earned $96,670 in compensation from the MMS Trust, and double that amount in compensation for his work for the remainder of the Fund complex, including the PIMS Trust, totaling $183,051 in compensation.

49.     Moreover, besides the difficulty in overseeing so many Funds, the Trustees' interests were aligned with that of the Investment Advisor in seeing the total amount of assets under management increase across these numerous Funds, which meant greater fees for the Investment Advisor, Administrator, Underwriter/Distributor, and other affiliates in the PIMCO Fund complex, and ultimately served the Trustees' own interests.  The fees of the Trustees are paid by the Trust, with income derived from fees associated with the assets under management in the Funds themselves.

50.     As a result of the foregoing, the Trustees are beholden to the Advisor and its affiliates, and therefore suffer from disabling conflicts of interests that prevent them from discharging their fiduciary duties.  For example, despite instances in which certain PIMCO Funds have performed poorly and lagged their peers in economic return, neither Trust's Board has ever replaced a Fund's Investment Advisor with an advisor that is part of another mutual fund complex. Instead, the Boards have renewed their agreements with the Investment Advisors within the PIMCO Fund complex regardless of the Fund's performance, usually without even seeking competitive bids from other investment Advisors.

- 26 -

Doc. 151743

### The Underwriter/Distributor Defendant

51.     Defendant PA Distributors LLC ("PAD") (f/k/a PIMCO Advisors Distributors LLC), a Delaware limited liability company with principal executive offices at 2187 Atlantic Street, Stamford, Connecticut 06902, is a subsidiary of ADAM, an indirect subsidiary of PAFM, and an affiliate of, among other ADAM subsidiaries, PIMCO, and PEA.

52.     At all relevant times, PAD served as the Underwriter and Distributor of each class of mutual fund shares offered by the MMS and PIMS Trusts.  PAD is primarily in the business of selling mutual fund shares, is the Funds' principal distributor, and acts as the principal underwriter in the continuous offering of each Fund's shares.  In addition, PAD was primarily responsible within the PIMCO Fund complex for monitoring market timing and/or late trading.  PAD is registered with the SEC as a broker-dealer.

53.     PAD earns underwriting and distribution fees primarily by distributing the Funds pursuant to distribution contracts it has with the Funds, including Funds within the MMS Trust and the PIMS Trust.  Among other fees received by PAD, the sales charges and distribution and service fee structure, for various classes of ADAM's U.S.-registered retail Funds, includes:  (i) sales charges of up to 5.50% for equities on MMS Trust Class A shares (for which PAD received fees, *e.g.*, during fiscal years (ended June 30) 2003, 2002 and 2001 of $8,360,607, $27,856,694 and $17,921,345 respectively), and up to 5.82% for certain PIMS Trust Funds (for which PAD received fees, *e.g.*, during fiscal years (ended March 31) 2003, 2002 of $46,236,209, $22,855,033 and $6,167,114, respectively), (ii) Contingent Deferred Sales Charges (CDSC) of up to 5% for Class B  shares for MMS Trust Class B equity shares, and up to 5% on certain PIMS Trust Fund shares.  In addition, PAD receives fees in connection with the sale and distribution of Fund shares ("distribution fees") and in connection with services rendered to Fund shareholders and the maintenance of shareholder accounts ("servicing fees"), pursuant to "Distribution and Servicing Plans" executed between PAD and the Registrant/Issuer (*i.e.*, the MMS and PIMS Trusts) of a

- 27 -

particular Fund, on behalf the Funds.  During the Class Period, these fees were:  a 0.25% servicing fee and no distribution fee for Class A and D shares, and 0.75% distribution fee and 0.25% servicing fee for Class B and C shares.

54.     PAD, as distributor, also pays certain fees or commissions in certain circumstances to broker/dealers, including ADAM affiliates, in connection with the sale of Class B, Class C and Class R shares and servicing payments to participating brokers, certain banks and other financial intermediaries in connection with the sale of Class A shares.  PAD enters into Dealer Agreements governing its relationship and payment structure with respect to dealers.

55.     Defendants ADAM, PAD, PAFM and PEA are sometimes collectively referred to herein as the "ADAM-affiliated Defendants."

### Officer Defendants

56.     Defendant John E. Cashwell, Jr. ("Cashwell") was at all relevant times a Senior Vice President of PEA.  Cashwell, along with Taegan Goddard and defendant Kenneth Corba, negotiated, entered into on behalf of PEA, and supervised, market timing agreements.

57.     Defendant Kenneth W. Corba ("Corba") was at all relevant times Managing Director, Chief Executive Officer and Chief Investment Officer of PEA.  As alleged below, Corba, together with Taegan Goddard and Cashwell, negotiated, entered into on behalf of PEA, and supervised market timing agreements.

58.     The defendants identified in paragraphs 56-57 are referred to collectively as the Officer Defendants.

### Hedge Fund Related Defendants

59.     Defendant Edward J. Stern ("Stern"), the Managing Principal of defendants Canary Capital Partners, LLC, Canary Investment Management, LLC, and Canary Capital Partners, Ltd. (referred to collectively herein as "Canary"), was a knowing participant in the wrongful conduct alleged herein.  Defendants Canary Capital Partners, LLC and Canary Investment LLC are New

- 28 -

Jersey limited liability companies that maintain their corporate headquarters at 400 Plaza Drive, Secaucus, New Jersey. Defendant Canary Capital Partners, Ltd., is a Bermuda limited liability company. During the Class Period, Canary engaged in market timing and/or late trading of shares of the Funds.

### Market Timing Defendants

60.     In addition to Canary, the following defendants, among others, engaged in the wrongful market timing of PIMCO Funds, with the knowledge or acquiescence of the ADAM-affiliated Defendants, in order to generate fees and other benefits for themselves, at the expense of Fund investors.

61.     Defendant Prudential Securities, Inc. ("Prudential") was, prior to July 1, 2003, a wholly-owned broker-dealer subsidiary of Prudential Financial, Inc. On July 1, 2003, its ownership was transferred to Wachovia Securities, LLC, a joint venture subsidiary of Wachovia Corporation and Prudential Financial, Inc. During the Class Period, preferred clients of Prudential, with Prudential's substantial assistance, engaged in substantial market timing of PIMCO Funds, as set forth below, to the detriment of Lead Plaintiff and the Class, but to the benefit of the ADAM-affiliated Defendants who reaped additional fees, for example, from the added assets in the Funds due to the substantial market timing effected through, and with the assistance of, Prudential. Prudential is sued as a Market Timing Defendant and as a Clearing Defendant as described below.

62.     Defendant Headstart Advisers Ltd. ("Headstart") is a hedge fund based in the United Kingdom, and was a client of Prudential since at least July 1999. Defendant Chronos Asset Management ("Chronos"), is a hedge fund based in Cambridge, Massachusetts, and was a client of Prudential since at least January 2000. Defendant Pentagon Asset Management ("Pentagon") is a hedge fund based in the United Kingdom, and was a client of Prudential since at least March 2000. Global Analytical Capital ("Global"), based in Salem, Massachusetts, acted as an investment adviser for hedge funds based in the Netherlands Antilles, and was a client of Prudential since at

Doc. 151743

least May 1998.  Defendants Headstart, Chronos, and Pentagon, as well as Global, each engaged in a substantial amount of market timing of PIMCO Funds, through Prudential, as set forth below, to the detriment of Lead Plaintiff and the Class.

63.      Market timer John Does 1-100 are additional Market Timing Defendants whose identities have yet to be ascertained.  Lead Plaintiff will seek to amend this Complaint to state the true names and capacities of said defendants when they have been ascertained.

64.      Defendants Stern, Canary, Prudential, Headstart, Chronos, and Pentagon, and the market timers named as John Does 1-100, are sometimes hereinafter referred to collectively as the "Market Timing Defendants."

### Broker and Clearing Platform Defendants

65.      Defendant Banc of America Securities LLC ("BOA") is a registered broker-dealer with its principal executive offices located at 100 North Tryon Street, Charlotte, North Carolina 28255, and is a subsidiary of Bank of America Corporation, a financial services company.  BOA, acting for itself and as a broker and/or clearing platform for, among others, Canary, engaged in market timing and late trading of shares of the Funds during the Class Period.

66.      Defendant Bear Stearns Securities Corporation, a Delaware corporation with its principal business address at One Metrotech Center North, Brooklyn, NY 11201, is a registered broker-dealer that cleared the securities transactions of its affiliate, defendant Bear Stearns & Co. Inc. and its customers during the Class Period.  Bear Stearns & Co. Inc., a Delaware corporation with its principal business address at 383 Madison Avenue, New York, NY 10179, is also a registered broker-dealer.  Defendants Bear Stearns Securities Corporation and Bear Stearns & Co. Inc. are referred to collectively herein as "Bear Stearns."  Bear Stearns, acting for itself and/or as a broker and/or clearing platform for, among others, Canary, engaged in market timing and late trading of shares of the Funds during the Class Period.

67.      Defendants BOA, Bear Stearns, and Prudential (hereinafter, the "Clearing

- 30 -

Defendants") participated in and enabled the fraudulent scheme and breaches of fiduciary duties alleged herein by knowingly or recklessly allowing market timers to engage in timing and/or late trading via their clearing platforms and were unjustly enriched as a result.  Clearing is the procedure by which an organization acts as a middleman for parties in stock, bond or mutual fund transactions.  The clearing divisions of the Clearing Defendants are utilized by hundreds of smaller brokerages, known as "correspondents."

68.     The active participation in and facilitation of market timing and/or late trading by financial institutions acting as clearing platforms for market timing and/or late trading was central to the success of the fraudulent scheme and breaches of fiduciary duties alleged herein.  During the Class Period, defendants BOA and Bear Stearns acted as key conduits of the market timing and/or late trading activities described herein.  The Clearing Defendants serviced both brokers who specialized in timing (including brokers from within the ranks of the Clearing Defendants, who often earned as much as $15 million a year in commissions from timing activities alone) and timers directly.

69.     The Clearing Defendants recklessly and/or knowingly disregarded the excessive mutual fund trades being transacted through their trading systems, or "platforms," by the market timers and substantially assisted and participated in such excessive trading and, consequently, were unjustly enriched.  Moreover, the Clearing Defendants specifically engineered trading strategies that catered exclusively to timers and late traders.  For instance, Prudential developed a "shotgun" system that allowed a market timer to scatter trades across various mutual funds to enable the timers to successfully execute larger and more frequent trades by hedging against the risk that "capacity" would be taken before they placed their orders, were they to have placed their order in only one or a few fund families.  Other Clearing Defendants, such as Bear Stearns and BOA, actually installed special equipment for timers and their brokers to allow them to execute market timing and late trading transactions at their whim, while the Clearing Defendants captured the

resulting fees and commissions.

### Broker Defendants John Does 1-25

70.     Plaintiff's counsel's investigation based upon, *inter alia*, confidential witnesses who had direct knowledge and familiarity with market timing within the mutual fund industry generally, and specifically as it pertained to PIMCO, revealed that certain broker-dealers acted as intermediaries to shop market timing "capacity" (described below) at mutual fund companies, including the PIMCO Fund complex.  These broker-dealers acted as middlemen to bring together market timers desirous of market timing capacity, and mutual fund companies, including PIMCO, who would provide it, and accept such timers.  These broker-dealers profited substantially from their role as intermediaries, as the ADAM-affiliated Defendants would pay them commissions and fees, including a portion of Rule 12b-1 fees, in return for bringing the market timer's assets into the PIMCO Funds, and the market timers would pay them as well, frequently as a percentage of the market timing capacity the broker-dealers obtained from PIMCO Funds for the timers.  The true names and capacities of these broker-dealers (collectively referred to as the "Broker Defendants"), sued herein as Broker Defendant John Does 1-25, who were active participants with the ADAM-affiliated Defendants and/or their employees in the widespread wrongful conduct alleged herein, have yet to be ascertained.  Lead Plaintiff will seek to amend this Complaint to state the true names and capacities of said defendants when they have been ascertained.

71.     Collectively, the defendants identified in paragraphs 65-70 are referred to herein as the Broker and Clearing Platform Defendants.

### CERTAIN RELEVANT NON-PARTIES

72.     PIMCO Funds: Multi-Manager Series (the "MMS Trust") is an open-end registered investment company organized as a business trust under the laws of the Commonwealth of Massachusetts, with principal executive offices at 840 Newport Center Drive, Newport Beach, California  92660.  The MMS Trust is the registrant under the Securities Act and the Investment

- 32 -

Advisors Act for, among other Funds, the PIMCO PEA Target, PIMCO PEA Innovation, PIMCO PEA Opportunity, PIMCO PEA Growth, and PIMCO PEA Select Growth Funds. In October 2002, the PIMCO PEA Select Growth Fund merged into the PIMCO PEA Growth Fund. According to the MMS Trust registration statements and prospectuses filed during the Class Period, ADAM is the parent company of the MMS Trust's Advisor and sub-advisors, including PAFM and PEA, and the Trust's distributor and principal underwriter, PA Distributors LLC.

73.     According to the October 31, 2003 MMS Trust Registration Statement and Prospectus, "[t]he business of the Trust is managed under the direction of the Trust's Board of Trustees. Subject to the provisions of the Trust's Declaration of Trust, its By-Laws and Massachusetts law, the Trustees have all powers necessary and convenient to carry out this responsibility, including the election and removal of the Trust's officers." The MMS Trust Funds are managed under the supervision of the Board of Trustees, which is also responsible for setting guidelines and procedures for management of these Funds.

74.     The MMS Trust is referred to sometimes herein as the "Registrant."

**The PIMS Trust**

75.     PIMCO Funds: Pacific Investment Management Series, a/k/a PIMCO Funds (the "PIMS Trust"), is an open-end registered investment company organized as a business trust under the laws of the Commonwealth of Massachusetts, with principal executive offices at 840 Newport Center Drive, Suite 360, Newport Beach, California 92660. The PIMS Trust is the registrant under the Securities Act and the Investment Advisors Act for, among other Funds, the PIMCO High Yield, PIMCO Real Return, PIMCO Total Return, PIMCO Money Market, PIMCO Short Term, and PIMCO Low Duration Funds. According to the PIMS Trust registration statements and prospectuses filed during the Class Period, ADAM is the parent company of the PIMS Trust's investment Advisor, PIMCO, and the Trust's distributor and principal underwriter, PA Distributors LLC. The PIMS Trust is not named as a defendant herein.

- 33 -

76.     As with the MMS Trust, the registration statements and prospectuses during the Class Period for the PIMS Trust state that "[t]he business of the Trust is managed under the direction of the Trust's Board of Trustees.  Subject to the provisions of the Trust's Declaration of Trust, its By-Laws and Massachusetts law, the Trustees have all powers necessary and convenient to carry out this responsibility, including the election and removal of the Trust's officers." (*See* October 31, 2003 PIMS Trust Registration Statement and Prospectus.)  Like the MMS Trust Funds, the Funds comprising the PIMS Trust are managed under the supervision of a Board of Trustees, which is also responsible for setting guidelines and procedures for management of the PIMS Funds.

77.     The PIMCO Equity Advisors Horizon Fund L.P. (the "Horizon Fund") is a PIMCO Funds hedge fund advised by PEA, whose portfolio manager was Michael Gaffney (also portfolio manager of the PEA Opportunity Fund).  The Horizon Fund focused on small cap growth stocks, and had assets of $31.1 million as of February 28, 2003.

78.     Michael Gaffney ("Gaffney") was at all relevant times portfolio manager of the PIMCO Equity Advisors Horizon Fund, L.P. and the PIMCO PEA Opportunity Fund, as well as a Managing Director of PEA during the Class Period according to Company filings.

79.     Brean Murray, Inc. ("Brean Murray") is a registered broker-dealer, with its principal place of business located at 570 Lexington Avenue, New York, New York.  Brean Murray was Canary's introducing broker-dealer to various mutual fund complexes, including PIMCO, for the purpose of market timing and/or late trading PIMCO Funds.  Michael Grady and Ryan Goldberg were broker-dealers employed by Brean Murray during the Class Period.  As set forth below, Messrs. Grady and Goldberg acted as middlemen among, *inter alia*, Canary, Bear Stearns, and the PIMCO Funds and their affiliates, in facilitating market timing and/or late trading of PIMCO Funds.

80.     Circle Trust Company ("Circle Trust") is an investment management company with

principal executive offices at Metro Center, One Station Place, Suite 30, Stamford, CT
06902-6889.  During the Class Period, Circle Trust cleared timing transactions in PIMCO Funds.

81.     Taegan Goddard ("Goddard") was at all relevant times Managing Director and
Chief Operating Officer of PEA.  It was Goddard who was first contacted by the market timers'
representatives at Circle Trust Company, and Goddard who introduced Circle Trust Company to
John Cashwell and others at PEA.  Goddard, together with defendants John Cashwell and Kenneth
Corba, negotiated, entered into on behalf of PEA, and supervised market timing agreements.

82.     David Byck ("Byck") was at all relevant times a consultant who acted as an
intermediary to obtain and execute market timing agreements on behalf of various clients,
including Canary.  Byck introduced Canary to the PIMCO Fund family.

- 35 -

## FACTUAL BACKGROUND

### Market Timing Practices

#### Background Information and the Forward-Pricing Rule

83.     The domination of PIMCO Funds by the Investment Advisors, along with the inherent conflicts of interest described herein, have led to the wrongful market timing and/or late trading practices complained of herein.  These practices have provided a means for the PIMCO Funds complex to increase deposits in the PIMCO Funds dramatically by permitting short-term traders to engage in conduct prohibited by the terms of many Fund prospectuses, and highly detrimental to other investors in the Funds.  Since PAFM, PIMCO and PEA, as investment Advisor or sub-Advisor, PAD as underwriter/distributor, and PAFM and PIMCO as administrator or sub-administrator, are paid a fee as a percentage of the value of the assets under management, the increased deposits resulting from market timing has served to increase their fees, and the revenues to their affiliated entities and parent, ADAM, substantially.

84.     Market timing opportunities stem from inefficiencies in the manner in which shares of individual mutual funds are priced.  Shares of open-end mutual funds, including PIMCO Funds, are priced daily, based on the Funds' NAV at the time of the valuation.  Unlike equity or debt securities that are valued and traded on stock exchanges, open-end mutual funds continuously issue new shares as new investments are received, and redeem shares as investors withdraw assets. The value of these shares is calculated at 4:00 p.m. each day (the close of trading on the New York Stock Exchange), by determining the NAV of the fund (the value of assets less liabilities), and then dividing that amount by the number of shares outstanding.  For example, if a mutual fund with 100,000 shares outstanding holds total assets with an NAV of $1 million, then it will be priced at $10 per share.  Thus, an investor seeking to invest $1,000 in this fund would receive 100 newly issued shares, valued at $10 per share.

85.     Since mutual fund shares, including PIMCO Fund shares, are only priced once per

- 36 -

day (at 4:00 p.m. New York time), the potential exists for an investor to purchase shares at a "stale" price that does not incorporate the latest information and thereby make a quick profit. For example, if an investor were able to purchase shares of a PIMCO Fund at the NAV calculated before his purchase, with knowledge that the investments held within the Fund had risen in value before the next NAV calculation, he could make a risk-free profit by simply buying the shares and then selling them the next day at the new, higher NAV.

86.     To prevent this arbitrage opportunity, the SEC enacted Rule 22c-1 under the Investment Company Act, which provides:

> No registered investment company issuing any redeemable security, no person designated in such issuer's prospectus as authorized to consummate transactions in any such security, and no principal underwriter of, or dealer in, any such security shall sell, redeem, or repurchase any such security except at a price based on the current net asset value of such security which is next computed after receipt of a tender of such security for redemption or of an order to purchase or sell such security ... [Emphasis added.]

87.     Under Rule 22c-1 (also known as the "forward-pricing rule"), PIMCO Fund investors who place orders to purchase Fund shares during trading hours do not know the exact price at which their orders will be executed; instead, these orders are executed at the NAV calculated after the order is received, at the 4:00 p.m. close of trading on the New York Stock Exchange. Thus, all PIMCO Funds' investors should have the same opportunity to digest "pre-4:00 p.m. information" before they buy or sell, and no investor should have the benefit of "post-4:00 information" prior to making an investment decision. Further, a PIMCO Funds investor who can avoid forward pricing and buy at the prior NAV has a significant trading advantage, since he can wait until after the market closes for significant news such as a positive earnings announcement to come out, and then buy the Fund at the old, low NAV which does not yet reflect the positive news, at essentially no risk.

**Subverting the Forward-Pricing Rule Through Market Timing**

88.     The forward-pricing rule alone, however, does not eliminate the arbitrage opportunity for frequent traders in mutual funds. This is due to the fact that the NAV of the Funds, as calculated after investors purchase their shares, still might not incorporate all public information. A typical example is a U.S. mutual fund that holds Japanese shares. Due to time zone differences, the Japanese market may close at 2:00 a.m. New York time. If the U.S. mutual fund manager uses the closing prices of the Japanese shares in his fund to calculate an NAV at 4:00 p.m. in New York, he is relying on market information that is fourteen hours old. Any positive market moves during the New York trading day that will likely cause the Japanese market to rise when it later opens, will not be reflected in the "stale" Japanese prices, and thus the overall fund's NAV will be artificially low.

89.     "Market Timing" is the practice of trying to take advantage of this information delay in the pricing of mutual funds. Specifically, a market timer who purchases the Japanese fund described in the preceding paragraph at the "stale" price is virtually assured of a profit that can be realized the next day by selling. Taking advantage of this kind of short-term arbitrage repeatedly in a single mutual fund is called "timing" the fund.

90.     Market Timing opportunities are not limited to mutual funds holding foreign investments, but instead also arise in mutual funds containing illiquid securities such as high-yield bonds, or smaller capitalization stocks, such as the PEA Innovation, Target and Opportunity Funds, and the High Yield Bond Fund. In such cases, the fact that some of the fund's securities may not have traded for hours before the New York closing time can render the fund's NAV stale, and thus open to being timed. Indeed, one of the major market timers who has profited by timing funds of numerous fund families in this MDL 1586 litigation, including the PEA Target, Opportunity, Innovation, Growth and High Yield Bond Funds, and certain other PIMCO Funds, has asserted that most funds may be timed, and it is mainly a question of degrees of arbitrage

- 38 -

opportunities.

91.     The availability of timing opportunities can become scarce, as some fund families prevent timing and the families like PIMCO, that prosper from it, tend to seek to control timing. According to one major market timer, it is known within the investment community that market timing activity is so disruptive to a fund's management and so deleterious to a fund's investment performance that only a certain amount of market timing can be sustained over the long term within any one mutual fund without completely undermining the performance of the mutual fund.

92.     According to the same witness, allowing completely unrestricted timing would generally result in very poor fund performance and therefore typically drive away the ordinary investors whose investments in the funds were needed to bear the hefty transaction costs and other liabilities that the timing activity generated.   Also, investment Advisors who allow timing, understanding that the ability to time a fund is a limited and valuable commodity to a market timer, place some limits on timing that maximize the Advisor's gains from the activity in light of the considerations discussed above.

93.     This finite "space" within a fund that could be used for timing assets is commonly referred to as market timing "capacity," and there was fierce competition among both timers and certain intermediaries who brokered timing "capacity," to secure such capacity and profit from it.

94.     As opposed to typical mutual fund investors, market timers are not concerned with the performance of the funds in which they invest and they are generally unconcerned about advisory and management fees, because they do not remain invested in the funds long enough to make money based on the funds' long-term performance or pay for management fees. Accordingly, by allowing timers into PIMCO Funds, the PIMCO Fund complex signaled that it was perfectly willing to cater to a species of investor – the market timer – who did not care about the performance of PIMCO Fund managers or Fund returns and would continue to inflate the assets under management at the PIMCO Fund complex.   The tension between the investment

- 39 -

objectives of ordinary PIMCO Fund investors, the market timers, and the ADAM-affiliated

Defendants who were compensated based on transaction fees and the amount of assets under

management, rather than the Funds' investment performance, therefore created a serious conflict of

interest within the PIMCO Funds complex. This conflict also violated Investment Company Act

§1(b)(2), which states, in pertinent part, that "the national public interest and the interest of

investors are adversely affected ... when investment companies are organized, operated, [or]

managed in the interest of directors, officers, investment Advisors, depositors, or other affiliated

persons thereof, ... underwriters, brokers, or dealers, special classes of their security holders, or in

the interest of other investment companies or persons engaged in other lines of business, rather

than in the interest of all classes of such companies' security holders."

### Harm of Market Timing to Mutual Fund Investors

95.     Market Timing causes significant harm to typical PIMCO Fund investors in a

variety of ways. For example, market timing causes "dilution", by not only depriving non-timer

PIMCO Fund investors of gains they would otherwise realize on their investments, but also by

forcing them to incur a disproportionate share of the losses on days that the NAV declines. The

timer steps in at the last minute and takes part of the buy-and-hold investors' upside when the

market goes up; and as a result the next day's NAV, as calculated on a per share basis, is less than

it would have been had the timer not invested in the Fund. Conversely, if the timer sells shares on

days that market prices are falling below the calculated NAV, the arbitrage has the effect of

making the next day's NAV, as calculated on a per share basis, lower than it would otherwise have

been, thus magnifying the losses that are experienced by other investors in the fund.

96.     The harm to PIMCO Fund investors from market timing extends beyond dilution.

For example, market timing requires frequent trading of mutual fund shares with significant

amounts of cash which, in turn dramatically increases transaction costs, such as commissions, on

the long-term investors that eat away at returns. Trades necessitated by timer redemptions can also

lead to realization of taxable capital gains at an undesirable time, or may result in managers having to sell stock into a falling market which impose costs on the Funds' long term investors.

97.     Market Timing also harms other Fund investors by forcing Fund managers to invest heavily in highly liquid, short-term investments that carry a lower rate of return than other securities, to ensure their ability to redeem shares sold by market timers.  Fund managers are therefore forced to enter into special investments as an attempt to "hedge" against timing activity (instead of simply refusing to allow it), thus deviating altogether from the ostensible, publicly stated investment strategy of their funds, and incurring further transaction costs.  Such action also rendered misleading the ADAM-affiliated Defendants' representations – such as in the MMS Trust prospectuses – that the Fund managers for the PEA Growth, Target, Opportunity and Innovation Funds "may temporarily" increase their positions in cash or cash equivalents "for defensive purposes in response to unfavorable market and other conditions." In fact, Fund managers would have to keep extra cash on hand – instead of being fully invested in the market according to their judgment of the best interests of the Fund shareholders – in order pay out on the market timers' redemptions, not purely for "defensive" reasons "in response to unfavorable market conditions."

98.     The harm inflicted by market timers also extends to the Funds within the PIMCO complex where such market timers place their assets temporarily to "rest", after and before darting in and out of a "target" Fund.  The transaction and other costs described above are imposed on such Fund's shareholders, each time the market timer places or withdraws assets into or out of the "resting" Fund, in order to "time" another Fund within the PIMCO complex.  For example, the frequent trading in large amounts by Canary into "target" Funds such as the PEA Opportunity, Target, Growth and Innovation Funds, was done out of certain Funds within the PIMS Trust, including, *inter alia*, the Short-Term Fund and Low Duration Fund.  To the extent that these frequent trades were effected and harmed the "target" fund shareholders due to increased transaction costs, disruption of the Funds, and other factors outlined above, they had a similar, correlative injurious impact on the Funds where these assets "rested" between trades in and out of

- 41 -

the "target" Funds.

99.     In general, experts estimate that mutual fund investors, including PIMCO Fund shareholders, have lost billions of dollars annually as a result of market timing. Indeed, a prominent recent study estimated that U.S. mutual funds lose $4-$5 billion per year to timers. Eric Zitzewitz, Who Cares About Shareholders? Arbitrage-Proofing Mutual Funds (October 2002) 35, http://faculty-gsb.stanford.edu/zitzewitz/Research/arbitrage1002.pdf.; *Money*, October 2003, "The Great Fund Rip-Off" at p. 52. University of South Carolina law professor John Freeman has similarly estimated that market timing trades may have drained more than $5 billion a year from long-term fund shareholders.

### Purported Efforts of Mutual Fund Complexes to Prevent Market Timing

100.     The ADAM-affiliated Defendants were aware of the harm caused by market timing to their Funds as early as 1999, and as a manifestation thereof, the various registration statements and prospectuses covering the PIMCO Funds, expressly recognized the negative effect market timing has on long term mutual fund investors and contained assurances that misled investors into believing that the investment advisors took steps to protect investors against the negative affect of market timing. *See also* New Jersey Consent Order, ¶ 2(i) ("The executives and officers at PEA and PAD were aware of the damaging effect that market timers had on their funds.")

101.     The registration statements and prospectuses at issue purported to both prohibit market timing and lessen substantially the ability to profit from market timing activity, by the following: (i) limiting the number of exchanges investors are permitted to make in and out of the fund over the course of a specific period; (ii) imposing significant redemption fees for exchanges made in close time proximity; and (iii) reserving the right to disallow any proposed transaction found not to be in the best interest of fund investors as a whole. The following is typical of the representations made in various PIMCO Fund prospectuses:

> The Trust reserves the right to refuse exchange purchases if, in the judgment of the Advisor, the purchase or other activity would adversely affect a Fund and its shareholders. In particular, a pattern of transactions characteristic of

- 42 -

"market-timing" strategies may be deemed by the Advisor to be detrimental to the Trust or a particular Fund. Currently, the Trust limits the number of "round trip" exchanges an investor may make. An investor makes a "round trip" exchange when the investor purchases shares of a particular Fund, subsequently exchanges those shares for shares of a different PIMCO Fund and then exchanges back into the originally purchased Fund. The Trust has the right to refuse any exchange for any investor who completes (by making the exchange back into the shares of the originally purchased Fund) more than six round trip exchanges in any twelve-month period. Although the Trust has no current intention of terminating or modifying the exchange privilege other than as set forth in the preceding sentence, it reserves the right to do so at any time.

*See, e.g.*, MMS Trust Prospectus, filed with the SEC on or about October 31, 2002; *see also* MMS Trust November 1, 2000 Prospectus; PIMS Trust July 31, 2002 Prospectus. Other language found in PIMCO Fund prospectuses imposes redemption fees of 1% for the respective Funds. The MMS Trust Prospectus supplement dated May 7, 2002 stated that "[t]he purpose of the Redemption Fees is to defray the costs associated with the sale of portfolio securities to satisfy redemption and exchange requests made by 'market timers' and other short-terms shareholders, thereby insulating longer-term shareholders from such costs. The amount of a Redemption Fee represents PIMCO Advisors' [predecessor Advisor to PAFM] estimate of the costs reasonably anticipated to be." The Prospectus stated that such fees would be charged "on shares redeemed or exchanged within 30 days of their acquisition."

102.     Indeed, an internal ADAM and PAD document reflects the minutes of a Shareholder Services department "Staff Meeting" dating from January 13, 2000, wherein Carol Rodgerson, a PIMCO Vice President who managed the Shareholder Services unit, presented to her staff on "New Business." The minutes state: "<u>Carol reviewed market timing and explained that in the MMS prospectus it states that no more than 6 round trips in any 12 month period is permitted</u>. She also mentioned that anyone inquiring about market timing trades <u>should be told that PIMCO discourages it.</u>" (Emphasis added.) The foregoing illustrates PIMCO's own senior officers' interpretation of the MMS Trust prospectus as prohibiting "more than 6 round trips in any 12 month period," and acknowledgment that "market timing" should not be allowed, or perceived as a policy tolerated by PIMCO, in recognition of the fact that it harmed the average PIMCO Fund

- 43 -

shareholder.  Moreover, that the ADAM-affiliated Defendants did not view the Funds'
prospectuses as ambiguous or permissive is further evidenced by that fact that, in instances where
ADAM "market timing police" wished market timers to stop a particular market timing activity,
they sent an e-mail communication such as one sent on May 16, 2002 to an identified timer, stating
that "PIMCO has identified certain [] accounts that violate PIMCO's prospectus and/or have been
determined to be harmful to our Funds and subsequently our shareholders.  These trades ... appear
to be transactions in response to market fluctuations (i.e. market timing).  As such, PIMCO does
not allow this activity to occur in our Funds."  When it suited their self-interest of increasing assets
under management, however, the ADAM-affiliated Defendants not only looked the other way
when market timing activity occurred in their Funds, but affirmatively entered into negotiated
transactions to permit massive amounts of market timing.

### Active Participation of the ADAM-Affiliated Defendants in Market Timing

103.   In reality, the ADAM-affiliated Defendants not only failed to discourage market
timing, but in many instances were aware of, and actively encouraged and facilitated, or entered
into negotiated agreements, to permit timing activity, and/or late trading, to the detriment of other
PIMCO Fund investors.  During at least 1999 to 2004, ADAM-affiliated Defendants directly, or
through brokers and other middlemen, entered into secret agreements with various hedge funds or
other preferred investors, allowing them to time many different PIMCO Funds, and acquiesced in a
substantial amount of additional market timing in PIMCO Funds, which they chose not to stop due
to the increased revenues and profits therefrom to the ADAM-affiliated Defendants.  In the case of
negotiated agreements, the ADAM-affiliated Defendants agreed with hedge funds or their
intermediaries on a predetermined amount of money to run in and out of predetermined target
Funds to be timed which would exempt the market timers from short-term redemption fees, or
would waive those fees.  In return, the market timers agreed to move money among those Funds,
and another "static" Fund, such as a money market fund, a bond fund or similar fund, in the
PIMCO Fund family, or "park" a large sum of money (known as "sticky assets"), in an amount,

- 44 -

and in an PIMCO Fund, specified by the ADAM affiliate or its employees. As in at least one instance, the Fund where the "sticky assets" were to be parked would be a PIMCO Fund, *e.g.*, the Select Growth Fund, that was new or otherwise needed a capital infusion.  By keeping their money – often millions or tens of millions of dollars – in the PIMCO Fund complex, the hedge funds and other market timers assured the ADAM-affiliated Defendants that they would receive management and other fees on the amount, whether it was in one of the target Funds, a bond Fund where timing assets temporarily "rested" between trips into the targeted Funds,  or the "sticky asset" Fund. Notably, by waiving applicable early redemption fees, the ADAM-affiliated Defendants would directly deprive the Fund of money that would have partially reimbursed the Fund for the impact of the permitted market timing, as recognized in the Funds' own prospectuses. *See, e.g.,* MMS Trust Prospectus dated May 7, 2002.  An example of such a negotiated relationship with one of the most renowned market timers, defendant Canary, is set forth in detail below.

### Unlawful Profits and Activities Stemming From Market Timing

**a.**     **Excessive Investment Advisory and Administrative Fees**

104.     Defendants ADAM, PAFM, PEA, PAD, and the other affiliated entities within the PIMCO Fund complex, had powerful incentives to facilitate the wrongful and improper market timing activity detailed herein.  As described above, the Investment Advisor(s), Underwriter/Distributor, and the Administrator, among other captive entities within the PIMCO Fund complex, earned substantial advisory, underwriting, distribution, and management fees based on a percentage of the amount of net assets under management in the PIMCO Funds, calculated on a daily basis.  Thus, the large infusions of cash provided by market timers, while detrimental to other investors in the Funds themselves, were a source of large profits to the investment advisors and their affiliates by dramatically increasing the amount of assets under management and thereby increasing the dollar amount of fees payable from those assets.  As detailed herein below, none of the ADAM-affiliated Defendants or their affiliates ever disclosed their practice of permitting and facilitating market timing, much less the fact that they earned millions of dollars in management

- 45 -

and advisory fees as a result of permitting this wrongful activity.

105.    By facilitating market timing, the ADAM-affiliated Defendants were also able to profit substantially from the receipt of increased fees under Rule 12b-1, promulgated by the SEC under the Investment Company Act, based upon the inclusion of the timers' cash infusions in the calculation of assets under management.  At times, the ADAM-affiliated Defendants then used a portion of these 12b-1 fees to make payments to outside brokerage firms and other intermediaries, in exchange for their bringing in market timing assets to the PIMCO Funds.  Indeed, on or about September 13, 2004, defendant PAD settled, for total fines of $9 million, claims made by the State of California in *People of the State of California v. PA Distributors LLC et al.* (Super. Ct. Cal., Sacramento Co.), that, from January 2000 to the date of the settlement, it had paid additional cash compensation and directed brokerage commissions to various brokers, totaling approximately $79 million, to steer investment dollars to PIMCO Funds, a substantial portion of which were market timing assets.

**b.      Profits Derived From "Sticky Assets"**

106.    As an additional inducement for facilitating market timing, the ADAM-affiliated Defendants sometimes received "sticky assets" as a <u>quid pro quo</u>.  These were typically long-term investments made not in the PIMCO Fund in which the timing activity was permitted, but in one of ADAM's other financial vehicles that assured a steady flow of fees to the ADAM-affiliated Defendants, but added no value to the PIMCO Funds' public shareholders. Often the sticky assets would be placed, and sit quietly, in low-risk money-market or government bond funds; but sometimes, as in the case of at least one instance detailed herein, they would end up in a hedge fund run by ADAM-affiliated Defendants with a higher fee structure than the typical mutual fund, generating huge fees for the investment Advisors and their affiliated ADAM entities.

- 46 -

### Late Trading

107.   Because of forward pricing, mutual funds are also susceptible to a manipulative practice known as "late trading." Late trading, either in conjunction with market timing or as a separate manipulative trading scheme, is the unlawful practice of allowing some investors to purchase or redeem mutual fund shares **after** 4:00 p.m. at that day's NAV, even though such after-hours trades should be priced at the next day's NAV.

108.   Late traders seek to take advantage of events that occur after the close of trading, such as earnings announcements, by purchasing shares of mutual funds on good news or redeeming shares on bad news at prices that do not reflect those events and are therefore under- or over-valued, respectively. "Late trading can be analogized to betting today on yesterday's horse races."[1] This manipulative device virtually eliminates investment risk.

109.   The late trader's arbitrage profit comes dollar-for-dollar out of the mutual fund that the late trader buys or redeems. When the late trader redeems his shares and claims his profit, the mutual fund manager has to either sell stock or use cash on hand – stock and cash that belong to the fund and its shareholders and would otherwise remain invested – to give the late trader his gain. The late trader's profit is revenue withheld from the mutual fund. The forward pricing rule was enacted to prevent precisely this kind of abuse. *See* 17 C.F.R. § 270.22c-1(a).

110.   Late trading can be accomplished in at least two different ways. The first way market timers are able to trade late is by making arrangements with a mutual fund Advisor, or a third-party intermediary who has made arrangements with a mutual fund Advisor, to have access to a trading terminal after the close of trading at 4:00 p.m. each day. Defendant BOA provided trading terminals to at least three broker-dealers that engaged in market timing and Canary – in effect, making them branch offices of BOA, but unencumbered by BOA's obligation to adhere to the forward pricing rule – giving them the ability to place orders for mutual fund shares as late as

---

[1] *State of New York v. Canary Capital Partners et al.*, Supr. Ct. of N.Y. ¶ 10 ("NYAG Complaint").

- 47 -

6:30 p.m. Pacific Time, more than five hours after the financial markets closed in New York each day. Bear Stearns also provided software and/or terminals installed in the offices of broker-dealers that engaged in market timing, including but not limited to Brean Murray, as well as Canary, that provided a direct link to Bear Stearns' system, for similar uses.

111.    Market timers are also able to trade late by making arrangements with intermediaries, such as broker-dealers, trust companies, and other clearing agents, to combine the market timers' trades with other mutual fund purchases or redemptions, and submit the net orders to a mutual fund's transfer agent through the Mutual Fund Settlement, Entry and Verification Service ("FundSERV"), an automated system operated by the National Securities Clearing Corporation ("NSCC"), the only registered clearing agency that operated an automated system for processing mutual fund orders during the Class Period.

112.    Although orders must be submitted to the intermediary broker-dealers, banks, and retirement plans before 4:00 p.m. eastern time, SEC rules permit those intermediaries to forward the order information to FundSERV or transfers agents at a later time. Often intermediaries process orders in the early evening. The entire process, ending in processing of orders by the transfer agent, is typically completed in the middle of the night.

113.    Late traders have found numerous ways to exploit the forward-pricing regime to their advantage. For example, some intermediaries allowed certain preferred investors to place orders after the 4:00 p.m. cutoff, but before orders were submitted to transfer agents. These intermediaries sometimes blended late trades with legitimate trades in the net order information submitted to FundSERV in order to conceal the late trading. In other cases, late traders placed orders before the 4:00 p.m. cutoff, but were permitted to cancel or retract the orders after 4:00 pm. Similarly, some intermediaries have permitted late traders to alter orders after 4:00 p.m. Finally, some late traders were given trading platforms, integrated hardware-software systems that allowed them to trade mutual fund shares directly without using an intermediary to submit an order to FundSERV. In some cases fund managers themselves permitted and aided late trading by fund

- 48 -

investors.

114.     Late traders were not necessarily restricted to trading in any single fund family through these schemes.  Often intermediary broker-dealers sell shares of many different fund families through "Supermarkets."  It is not unusual for a single Supermarket to offer thousands of mutual funds.  By gaining access to the trading platform of a fund Supermarket, a market timer could late trade all of the funds in that Supermarket.  Likewise, a market timer could late trade many different mutual funds through agreements with broker-dealers who operate a fund Supermarket.

115.     Market timing and late trading was not limited to third parties who acted either alone or in complicity with intermediaries to time mutual funds.  Fund insiders, like advisors, managers, and portfolio managers, sometimes unfairly availed themselves of the opportunity that market timing are late trading provided for quick profits at the expense of the mutual funds.

## SUBSTANTIVE ALLEGATIONS OF WRONGDOING AT THE PIMCO FUND COMPLEX

### Overview

116.     During the Class Period, defendants unlawfully acted to enrich themselves and their hedge fund clients and other favored investors at the expense of other Fund shareholders.  As detailed herein, with respect to the ADAM-affiliated Defendants, senior PIMCO Fund complex executives had knowledge of, and furthered, this activity and would not pass up the profits generated by courting multi-million dollar hedge fund clients, and other market timers and late traders, putting profits over their fiduciary duties to act in the best interests of the PIMCO Funds' long-term shareholder clients.  Indeed, defendants PAFM, PEA, and PAD were recently the subject of an Order Instituting Administrative and Cease-and-Desist Proceedings Pursuant to Section 15(b) of the Securities Exchange Act of 1934, Sections 203(e) and 203(k) of the Investment Advisors Act of 1940 and Sections 9(b) and 9(f) of the Investment Company Act of 1940, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order, dated September 13, 2004, File

- 49 -

No. 3-11645 (the "SEC Consent Order"). Pursuant to the SEC Consent Order, defendants PAFM, PEA, and PAD were ordered to pay a total of $50 million, and were ordered to comply with certain internal governance reforms. The total payment of $50 million, consisted of disgorgement in the amount of $10 million and civil money penalties in the amount of $40 million: $10 million by PAFM, $10 million by PAD, and $20 million by PEA. The findings of fact by the SEC in the SEC Consent Order against defendants PAFM, PAD and PEA, all subsidiaries of defendant ADAM, conclude that senior officers at these ADAM entities knowingly arranged to permit market timing by third parties in the Funds beginning, at least, from 2001 up to and through 2003.

117.    In addition, defendants ADAM, PAD and PEA, among others, were the subject of a Complaint filed by the New Jersey Attorney General in the Superior Court of New Jersey, Essex County, New Jersey, at Civil Action Docket Number C-54-04, on or about February 15, 2004. The New Jersey Complaint charges ADAM, PAD, PEA and other ADAM entities with fraud in a scheme that, *inter alia*, allowed a large investor and his affiliated entities to market time many hundreds of millions of dollars in PIMCO Funds in exchange for, *inter alia*, placing $25 million of long term "sticky" assets in a PIMCO hedge fund where PIMCO's officers desired greater assets, and transferring and maintaining assets temporarily not actively deployed in "targeted" funds in the market timing scheme, in money market funds and/or short term bond funds within the PIMCO Fund family. The ADAM-affiliated defendants permitted such scheme, notwithstanding that such investor was well-known inside ADAM and mutual fund circles as a market timer.

118.    On or about June 1, 2004, defendants ADAM, PAD and PEA entered into the New Jersey Consent Order, pursuant to which these defendants paid a total of $15 million in civil monetary penalties and $3 million to pay for investigative costs and further enforcement provisions, and each agreed to a series of corporate governance reforms designed to prevent such wrongful activity from occurring again.

119.    While the findings of fact made in connection with the regulatory proceedings were, indeed, shocking, the regulatory settlements outlined above recovered only a fraction of the total

damages inflicted on PIMCO Fund shareholders throughout the Class Period, and/or the monies and profits made from wrongful market timing and late trading activity by the ADAM-affiliated Defendants, the Market Timing Defendants, the Clearing Defendants and the Broker Defendants, at the expense of non-timer PIMCO Fund investors. Moreover, as stated above, the vast majority of the monies paid by the PIMCO entities to the regulators were in the form of penalties which were not to be used to compensate non-timer/non-late trader PIMCO Fund investors (*i.e.*, at least $58 million of the total of the approximately $68 million paid by the PIMCO-affiliated entities to the regulators).

120.    As found in the NJ Consent Order, in a little over a year, Canary alone made more than 200 market timing transactions and 100 round trips in the Funds, totaling more than $4 billion in purchases and redemptions. NJ Consent Order, ¶ 2(d). A substantial amount of Canary's trading in and out of the targeted Funds (*e.g.*, PEA Growth, Opportunity, Innovation and Target Funds), was from one of the following Funds used as "resting" or "parking" places: the PIMCO Total Return Fund, Real Return Fund, Short-Term Fund, and Low Duration Fund. *See, e.g., SEC v. PIMCO* Complaint, ¶ 33, *SEC v. Treadway* Complaint, ¶ 31, NJ Complaint ¶¶ 22, 66-67, and Ex. 8 thereto (Bates No. PAD-A00474). In addition, e-mails from PIMCO officers, including one from PIMCO Vice President Scott Spalding to renowned market timing intermediary David Byck, sent on or about December 13, 2002, explicitly identified two PIMCO bond funds – the Short Term Fund and Low Duration Fund – as well as the PIMCO Money Market Fund, where market timing assets would "rest" within PIMCO when not deployed to market time the PIMCO High Yield Fund, in which Byck had desired to obtain substantial timing capacity.

### The PIMCO Fund Prospectuses Prohibit Market Timing

121.    The PIMCO Fund complex is required to provide all prospective mutual fund customers with copies of mutual fund prospectuses. Such prospectuses must contain all information that a prospective investor would find relevant in making an educated decision to purchase shares of the Funds.

- 51 -

122.    As found by the SEC in the SEC Consent Order, during the Class Period,
prospectuses for PIMCO Funds have generally contained language addressing market timing
activity.  The language has varied somewhat from fund to fund and over time, but the prospectuses
have typically stated that the PIMCO Funds' investment Advisor "reserves the right to refuse
exchange purchases if, in the judgment of the Advisor, the purchase would adversely affect a Fund
and its shareholders," that "[i]n particular, a pattern of exchanges characteristic of 'market- timing'
strategies may be deemed by the Advisor to be detrimental to the Trust or a particular Fund," and
that the Trust has the right to refuse any exchange for any investor who completes (by making the
exchange back into shares of the originally purchased Fund) more than six round trip exchanges in
any twelve-month period.  *E.g.*, MMS Trust May 7, 2002 Prospectus Supplement, cited *supra*
(emphasis added). Prospectuses have also warned that redemption fees "will" be charged on shares
redeemed or exchanged within thirty days of their acquisition "to defray the costs  associated with
the sale of portfolio securities to satisfy redemption and exchange requests made by 'market
timers' and other short-terms shareholders." *Id.*  As the SEC found, "the prospectuses gave the
misleading impression that the mutual funds discouraged timing," but failed to disclose that, in
fact, agreements existed with renowned market timers to permit timing in the Funds in exchange
for the parking of "sticky assets" in other PIMCO Funds.  SEC Consent Order, ¶ 2.

123.    The SEC found that "without any disclosure to Fund shareholders (***and contrary to
representations***)," PAFM, PEA and PAD "executed a secret arrangement with one preferred client
to allow market timing in amounts ***exceeding $4 billion in trading volume***" – from this one client
alone.  SEC Consent Order, ¶ 1 (emphasis added).

124.    The NJ Consent Order found that "PEA's prospectuses created the misleading
impression that they were vigilantly protecting other PEA investors against the negative effects of
market timing.  However, PEA officers sold the right to market time their funds ... while the PEA
prospectuses made no mention of the sticky assets arrangements with, or disclosure of the non-

- 52 -

public holdings to, [one hedge fund client: Canary.]" The New Jersey Consent Order also found that "PEA: (a) entered into an undisclosed, sticky asset arrangement that allowed Canary to market time in excess of PEA's prospectus, (b) concealed and omitted material facts from its prospectus, (c) made materially false and misleading statements to investors relating to the market timing relationship with Canary, and (d) disclosed material, non-public holdings of the funds in which Canary was invested" to Canary  NJ Consent Order, ¶2(h), (j).  The statements relating to market timing in the PIMCO Funds' prospectuses were false and misleading because they gave the misleading impression that the ADAM-affiliated Defendants sought to prevent market timing that exceeded six "round trips" per year, or otherwise was detrimental to the Funds' non-timer, long-term public shareholders, due to the harm to such long-term shareholders, when in fact these defendants allowed certain preferred market timers, such as Canary, to time PIMCO Funds notwithstanding that they exceeded six "round trips" per year, or harmed the Funds' long-term shareholders.  Moreover, contrary to the PIMCO Funds' prospectuses' statements, cited above, that redemption fees would be imposed on investors who redeemed their shares within a prescribed time period of purchasing such shares (*e.g.*, 30 days), such redemption fees were not imposed on the preferred investors whom the ADAM-affiliated Defendants permitted to time PIMCO Funds, including Canary.

125.    The PEA Target, PEA Innovation, PEA Select Growth, and PEA Opportunity Funds were offered through a prospectus that defendant MMS Trust issued on November 1, 2000 (the "November 1 prospectus").  The November 1, 2000 prospectus stated:

> The Trust reserves the right to refuse exchange purchases if, in the judgment of PIMCO Advisors [predecessor of investment advisor PAFM], the purchase would adversely affect a Fund and its shareholders. In particular, a pattern of exchanges characteristic of market-timing strategies may be deemed by PIMCO Advisors to be detrimental to the Trust or a particular Fund. Currently, the Trust limits the number of "round trip" exchanges investors may make. An investor makes a "round trip" exchange when the investor purchases shares of a particular Fund, subsequently exchanges those shares for shares of a different PIMCO Fund, and then exchanges back into the originally purchased Fund. The Trust has the right to refuse any exchange for any investor who completes (by making the exchange back into the shares of the originally purchased Fund) more than six round trip exchanges in any

- 53 -

twelve-month period.

126.    The statements set forth in the previous paragraph were repeated in, *inter alia*, the

following SEC filings pertaining to the PEA Target, PEA Innovation, PEA Select Growth, PEA

Growth, and/or PEA Opportunity Funds:

a.    Post-Effective Amendment filed with the SEC on October 31, 2001, which was signed by defendants Stephen J. Treadway, Donald P. Carter, Philip Cannon, Gary A. Childress, W. Bryant Stooks, and Gerald M. Thorne;

b.    Definitive Materials filed with the SEC on January 24, 2002, including a Shareholders' Guide (the relevant statements therein were in the plural because statements pertained to both the MMS and PIMS Trusts, but were otherwise identical to the above-cited statements);

c.    Definitive Materials filed with the SEC on February 4, 2002, including a Statement of Additional Information dated February 1, 2002;

d.    Definitive Materials filed with the SEC on February 8, 2002, including a prospectus dated February 5, 2002;

e.    Definitive Materials filed with the SEC on March 18, 2002, including a Shareholders' Guide dated March 18, 2002 (the relevant statements were in the plural because statements pertained to both the MMS and PIMS Trusts, but were otherwise identical to the above-cited statements);

f.    Definitive Materials filed with the SEC on March 25, 2002, including a prospectus dated March 25, 2002;

g.    Definitive Materials filed with the SEC on April 2, 2002, including a Shareholders' Guide dated April 1, 2002 (the relevant statements therein were in the plural because they pertained to both MMS and PIMS Trusts, but were otherwise identical to the above-cited statements);

h.    Definitive Materials filed with the SEC on July 30, 2002, including a Statement of Additional Information dated July 22, 2002;

i.    Post-Effective Amendment filed with the SEC on August 29, 2002, which was signed by Treadway, Carter, Cannon, Childress, Coburn, Stooks, and Thorne;

j.    Post-Effective Amendment filed with the SEC on October 31, 2002, signed by Treadway, Carter, Cannon, Childress, Coburn, Stooks, and Thorne;

k.    Definitive Materials filed with the SEC on November 1, 2002, including a prospectus dated November 1, 2002;

l.    Post-Effective Amendment filed with the SEC on November 1, 2002, which was signed by Newton B. Schott, Treadway, Carter, Cannon, Childress, Coburn, Stooks,

and Thorne;

m.     Definitive Materials filed with the SEC on November 4, 2002, including a Statement of Additional Information dated November 1, 2002;

n.     Post-Effective Amendment filed with the SEC on December 31, 2002, which was signed by Treadway, Carter, Cannon, Childress, Coburn, Stooks, and Thorne;

o.     Definitive Materials filed with the SEC on January 6, 2003, including a prospectus dated December 31, 2002;

p.     Definitive Materials filed with the SEC on May 15, 2003, including a Shareholders' Guide dated May 15, 2003 (the relevant statements therein in the plural because they pertained to both MMS and PIMS Trusts, but were otherwise identical to the above-cited statements); and

q.     Post-Effective Amendment filed with the SEC on August 29, 2003, signed by Schott, Treadway, Carter, Cannon, Childress, Coburn, Stooks, and Thorne.

127.    Similarly, the MMS Trust Prospectuses during the Class Period imposed redemption fees of 1% for the respective Funds. For example, an MMS Trust prospectus supplement dated May 7, 2002 stated that "[t]he purpose of the Redemption Fees is to defray the costs associated with the sale of portfolio securities to satisfy redemption and exchange requests made by 'market timers' and other short-terms shareholders, thereby insulating longer-term shareholders from such costs. The amount of a Redemption Fee represents PIMCO Advisors' [predecessor Advisor to PAFM] estimate of the costs reasonably anticipated to be." The Prospectus stated that such fees would be charged "on shares redeemed or exchanged within 30 days of their acquisition."

128.    The foregoing false and misleading statements were virtually identical to statements material in the PIMS Trust Prospectuses during the Class Period, including Prospectuses for, *inter alia*, the PIMCO High Yield, Real Return, Short Term and Low Duration Funds.

129.    The statements set forth in paragraph 101, 125 and 127 and referred to in paragraph 126 were false and misleading and/or omitted material information necessary to make them not false and misleading each time they were made because the MMS Trust, the signatories to each of the MMS Trusts' registration statements and prospectuses during the Class Period, and the

- 55 -

Doc. 151743

ADAM-affiliated Defendants, failed to disclose that, as exemplified below, numerous favored

investors, including certain preferred broker-dealers, hedge funds, and other selected investment

companies were permitted to engage in such prohibited transactions, making far more than six

round-trip exchanges a year, without penalty, including at least one wealthy private hedge fund

client who was given an agreement allowing his company to make such transactions without

penalty in exchange for significant hedge fund investments, in violation of the relevant

prospectuses and registration statements.  Moreover, the primary purpose of the "market timing"

disclosures in the PIMCO Funds prospectuses detailed above was to give comfort to long-term

investors that the PIMCO Funds were vigilant in guarding against market timing, because it was

admittedly harmful to the long-term investors, and ostensibly to provide a warning to market

timers against timing PIMCO Funds.  However, these statements were materially false and

misleading in light of the ADAM-affiliated Defendants' actual deals to permit market timing (and

late trading) in their Funds, and their permitting other known market timers to time PIMCO Funds

on a large scale, because these defendants did not want to turn away the substantial increased fees

to the PIMCO Fund complex from the resultant increased assets under management, as detailed

below.  The ADAM-affiliated Defendants obtained substantial revenues through increased fees

and expenses from the increased assets under management gained as a result of permitting the

market timing, which diluted shareholder returns and increased the fees and expenses for other

non-timer, long-term shareholders.  Such conduct was, in addition, in violation of the Code of

Ethics applicable to PIMCO Fund advisors and their employees, which was attached to, and

incorporated into, MMS Trust Prospectuses during the Class Period, and stated, in pertinent part:

> This Code of Ethics is based on the principle that you, as a director, officer or other
> Advisory Employee of Pacific Investment Management Company ("PIMCO")
> [predecessor of ADAM], owe a fiduciary duty to, among others, the shareholders of
> the Funds and other clients (together with the Funds, the "Advisory Clients") for
> which PIMCO serves as an advisor or subadvisor. Accordingly, you must avoid
> activities, interests and relationships that might interfere or appear to interfere with
> making decisions in the best interests of our Advisory Clients.

At all times, you must observe the following general rules:

1.      You must place the interests of our Advisory Clients first.  In other words,
        as a fiduciary you must scrupulously avoid serving your own personal
        interests ahead of the interests of our Advisory Clients.  You must adhere to
        this general fiduciary principle as well as comply with the Code's specific
        provisions.  Technical compliance with the Code's procedures will not
        automatically insulate from scrutiny any trades that indicate an abuse of
        your fiduciary duties or that create an appearance of such abuse.

Code of Ethics, dated as of December 31, 2001, attached to MMS Trust Prospectus filed with the

SEC October 29, 2003.  The Code of Ethics was specifically made applicable to, *inter alia*,

PIMCO Advisors L.P., predecessor to ADAM and PAFM.  As set forth herein, the ADAM-

affiliated Defendants and their officers acted to further the financial gain of the ADAM-related

entities, themselves, and certain preferred investors, to the detriment of their long-term investors in

the Funds, in violation of the Code of Ethics.

### The PIMCO Funds Prospectuses on Late Trading

130.    In addition to violating the forward-pricing rule, late trading in PIMCO Funds was

expressly prohibited by the MMS Trust and PIMS Trust Prospectuses during the Class Period,

which provided, *inter alia*, that:

> A purchase order received by the Trust's transfer agent ... prior to the close of
> regular trading on the New York Stock Exchange (normally 4:00 p.m., Eastern
> time), on a day the Trust is open for business, together with payment made in one of
> the ways described below, will be effected at that day's net asset value ("NAV"). An
> order received after that time will be effected at the NAV determined on the next
> day the Trust is open for business.

*See, e.g.*, MMS Trust October 31, 2002 Prospectus; identical statements were contained in the

PIMS Trust Prospectuses during the Class Period.

### The ADAM-Affiliated Defendants Followed an Undisclosed Practice Under Which They Allowed Market Timers to Trade in a Manner That Conflicted with the Fund Prospectuses

131.    During the Class Period, the ADAM-affiliated Defendants entertained requests to

conduct market timing under a different standard from that expressed in the PIMCO Funds'

prospectuses.  At times, parties would seek advance approval to conduct market timing in PIMCO

- 57 -

Funds. Such requests were forwarded to senior officers at the Advisor Defendants, senior officers at PAD, and/or portfolio managers. Although, as set forth above, the prospectuses contained, *inter alia*, numerical guidelines regarding the frequency and dollar amounts of timing trades that would be allowed by the Funds, in fact, the ADAM-affiliated Defendants had extensive market timing and/or late trading agreements with broker-dealers, hedge funds, and other selected investment companies, which generated tens of millions of dollars in fees for the ADAM-affiliated Defendants which exceeded the restrictions set forth in the Funds' prospectuses during the Class Period.

132.    These market timing and late trading agreements violated the terms of the Funds' Prospectuses and, with respect to late trading, applicable laws, and the ADAM-affiliated Defendants knew that allowing selected investors to engage in market timing and late trading would harm long term Fund shareholders by diluting returns and increasing fees and expenses for such Fund shareholders not engaging in market timing or late trading.

133.    While the Advisor Defendants were following the aforementioned unlawful practices, they participated in annual reviews of the Fund prospectuses, which were incorporated in registration statements filed by the registered investment companies that operated the PIMCO Funds. During the reviews, the Advisor Defendants could suggest changes in the prospectus language, yet they never caused the language to be changed to reflect the foregoing undisclosed practices.

134.    In addition to their agreements with certain favored investors, the ADAM-affiliated Defendants permitted numerous investors to engage in substantial amounts of market timing without entering into express market timing agreements with the PIMCO Fund complex. Nevertheless, in breach of their fiduciary duties, the ADAM-affiliated Defendants permitted this rampant market timing activity to continue, even though they knew that it would dilute long term Fund shareholder returns and increase fees and expenses for other Fund shareholders, because of the greater fees it would bring the PIMCO Fund complex due to increased assets under

- 58 -

management, so long as the timer did not cause more economic damage to the ADAM-related entities from, *inter alia*, disruptive trading, than it benefitted the ADAM-affiliated Defendants from generating increased fees from higher assets under management. Thus, the ADAM-affiliated Defendants put their own interests ahead of Fund shareholders.

## THE ADAM-AFFILIATED DEFENDANTS' UNDISCLOSED MARKET TIMING AGREEMENTS WITH CANARY

135. Perhaps the ADAM-affiliated Defendants' most extensive market timing and late trading agreements were with Defendant Canary. Canary's business focused on market timing and late trading mutual funds, both pursuant to negotiated agreements with the mutual fund families' management, and outside such agreements. After a former employee of Canary became aware of the nature and extent of Canary's business and the harm it caused, she contacted the Attorney General of the State of New York, who then launched an investigation into timing agreements in the mutual fund industry. The New York Attorney General's investigation led to the Attorney General of New Jersey filing charges against, *inter alia*, defendants ADAM, PAD and PEA, which, as stated herein, these defendants have now settled. The New Jersey investigation was followed by the SEC instituting charges against PAFM, PEA, PAD, and against Treadway, and Corba, which – but for the charges against Treadway and Corba to date – have also been settled.

136. Late in 2000, Canary decided to expand its operations. To achieve that expansion, Canary began looking for more opportunities to engage in market timing and late trading.

137. Around October 2001, a broker-dealer at Brean Murray, Inc. ("Brean Murray") named Ryan Goldberg ("Goldberg"), working with Circle Trust, made high-level contacts at PEA seeking opportunities for market timing of PEA Funds. Brean Murray's business included finding market timing and late trading opportunities and entering into market timing/late trading agreements for numerous clients, including, but not limited to, Canary.

138. In October 2001, a representative of Circle Trust called Taegan Goddard, the Chief Operating Officer of PEA (and former employee of Circle Trust and former colleague of the

- 59 -

caller), to discuss market timing PIMCO's PEA Funds on behalf of Brean Murray and its client, Canary. After the call, Goddard arranged a meeting between Circle Trust and PEA Senior Vice President John Cashwell.

139.     Shortly after the initial October 2001 contact, Cashwell met with the Circle Trust representative, who suggested a subsequent meeting with Ken Corba, the Chief Executive Officer of PEA, to introduce PEA to brokers from Brean Murray. Brean Murray wanted to explain their business to Corba and, at the same time, obtain for Canary and/or other clients the ability to market time and late trade PEA Funds. To that end, a conference call between PEA, Circle Trust, and Brean Murray was scheduled a week later to discuss more of the details of such an arrangement.

140.     After Cashwell's meeting with Circle Trust, Cashwell briefed Corba and Goddard on the discussions, and informed them that he was going to contact Brean Murray for the purpose of setting up a meeting with Corba at PEA's offices. That meeting took place on November 1, 2001, when Brean Murray came to PEA to meet with Corba and Cashwell, in Corba's office. At the November 1, 2001 meeting, Brean Murray explicitly told Corba and Cashwell that they had high net worth clients that were interested in market timing PEA Funds.

141.     During the November 1, 2001 meeting, Brean Murray explained that they were seeking approximately $100 million in market timing capacity in the Funds at a rate of three to four "round-trip" exchanges per month (contrary to the PIMCO Funds' above-cited prospectus language). Brean Murray specified that they only wanted capacity in Funds where their client's investment would consist of 3% or less of the total fund value. In exchange for permission to execute the round trip exchanges, Brean Murray proposed that their clients would make a "long-term investment," *i.e.*, provide so-called "sticky assets," in certain PEA or PIMCO Funds that would equal 25% of the market timing capacity, *i.e.*, approximately $25 million.

142.     The next day, November 2, 2001, Brean Murray wrote a letter to Corba, which read in part:

- 60 -

We are proposing a relationship whereby our clients, Canary Management, LLC and Trout Trading Management Co., have approval from your firm to trade on a short-term basis in the PIMCO Target fund, PIMCO Innovation fund, and the PIMCO Growth fund. Our proposal is based on capacity of up to three percent of these funds for trading on a short-term basis. Short-term trading can be defined as trading four to five round-trips per calendar month. Additionally, Canary and Trout will make a commitment of long-term assets to a PIMCO bond fund, a PIMCO money market fund or to the fund that is being traded. Our clients are generally comfortable with depositing 25% of the total trading assets into the long-term commitments. On occasion we will substitute long-term assets placed in a bond, money market, or mutual fund with a long-term investment in an internal hedge fund.

143.     According to Cashwell, after the November 1, 2001 meeting with Brean Murray, it was Cashwell's understanding that Corba had to have the Brean Murray relationship approved by "the executives of PIMCO Funds, meaning Steve Treadway. . . ." During a January 27, 2004 deposition before the New Jersey Bureau of Securities ("January 27 Deposition"), Cashwell specifically stated that, "[Goddard] and others wanted to make sure there were specific parameters set around the trading relationship, meaning the number of round-trips, the percentage of cash, the monies represented in each fund. I think those were the two most important factors."

144.     In or about January 2002, Corba met with Treadway to discuss the proposed market timing agreement with Canary and to obtain Treadway's approval of the agreement. Treadway's approval was needed for several reasons: (1) the agreement involved large amounts of money; (2) the agreement required accommodation of market timing, which would violate the Funds' prospectuses; and (3) Treadway was Managing Director of PAD, which controlled the so-called "market timing police," *i.e.*, the department within PAD responsible for monitoring and eradicating market timing. During the January 2002 meeting between Corba and Treadway, Corba explained that Canary was interested in market timing the Funds, and that Corba also wanted to get Canary to invest in the PIMCO PEA Select Growth Fund. Corba also advised Treadway that the market timing Canary wanted to engage in could run afoul of the MMS Trusts' market timing rules.

145.     At the January 2002 meeting with Corba, Treadway approved the market timing

- 61 -

agreement with Canary.

146.    On January 15, 2002, Cashwell sent an e-mail to Michael Grady ("Grady") at Brean

Murray, stating:

> Mike,
>
> As per our discussion this morning, I've attached the following info:
>
> -12/31/01 holdings for each of the Funds you'll be investing in
>
> -12/31/01 product fact sheets on the PIMCO Equity Hedge Funds (Advantage, Navigator & Horizon)
>
> Also please invest the long-term assets in Ken Corba's PEA Select Growth Fund (admin share class).  The ticker is PCEAX.

147.    Corba made the decision to have Canary "park" the long-term investments, or

"sticky assets," in the PEA Select Growth Fund (which he managed) in order to increase the assets

in the Fund, which were relatively small at the time.  Indeed, Canary's sticky assets in the PEA

Select Growth Fund nearly doubled the assets in that Fund.  Putting the sticky assets in the PEA

Select Growth Fund helped attract other investors to the Fund by increasing the Fund's assets

under management to a level sufficient to have the funds NAV published in *The New York Times*

and *The Wall Street Journal*.  Thus, by putting Canary's sticky assets in the PIMCO PEA Select

Growth Fund, the Fund increased in size, and in turn got free publicity, which would lead to

greater investment, again increasing the Fund's size, thus increasing the fees paid to PEA and

Corba.

148.    Early in 2002, Corba met with the Managing Directors and Portfolio Managers at

PEA to inform them that PEA was going to enter a market timing relationship with Brean Murray

and their clients Trout and Canary.  The terms of the agreement (the "Brean Murray Agreement")

were to allow market timing for a total of $100 million in the PEA Growth, PEA Innovation, and

PEA Target Funds.  Canary would be allowed to make four to five "round trip" exchanges per

month in those Funds.  PEA was allowing the market timing in exchange for $25 million in sticky

assets in the PIMCO PEA Select Growth Fund. Moreover, virtually all of Canary's trades of PIMCO Funds pursuant to the Brean Murray Agreement were late trades.

149.    The Brean Murray Agreement blatantly violated the express representations made in the relevant prospectuses relating to the PIMCO PEA Growth, PEA Innovation, and PEA Target Funds as described in paragraphs 101, 125-27 above.

150.    On January 30, 2002, after Canary had decided to accept the full $100 million in timing capacity, Canary arranged for $25 million in sticky assets to be deposited in the PIMCO PEA Select Growth Fund. On February 8, 2002, Brean Murray, on behalf of Canary, invested $27,301,027.00 in the PIMCO PEA Target Fund, and $26,052,341.00 in the PIMCO PEA Innovation Fund. E-mails dated February 11 and 12, 2002, among Brean Murray representatives (including Michael Grady and Ryan Goldberg) and ADAM personnel (including Corba, Treadway, Cashwell, Goddard, and others) reflect that substantial amounts of the monies placed in the Target and Innovation Funds had been initially deposited through BOA, into the PIMCO Short-Term, Low Duration, Total Return, Money Market and Real Return Funds. Exhibits attached to the New Jersey Complaint make clear that the ADAM-affiliated Defendants, and particularly Cashwell, were kept meticulously abreast of Canary's trading and Cashwell received virtually every significant e-mail regarding the Canary account. For example, a February 11, 2002 e-mail from Michael Grady of Brean Murray to Cashwell states, "John, We apologize for the delay in getting you this e-mail. *Going forward you will receive the trade confirms from us on the same day that we trade on.* On 2/8/02 we exchanged into $27,301,027.00 of the Pimco Target Fund & $26,052,341.00 of the Pimco Innovation Fund." (Emphasis added.)

151.    After Canary began actively timing the Innovation Fund, the portfolio manager of the Fund, Dennis McKechnie, decided that large redemptions late in the day disrupted his trading strategies and harmed returns for Fund shareholders. For these reasons, McKechnie forbade Canary from making further trades in the Innovation Fund after late February 2002.

- 63 -

152.    During 2002, Canary was conducting its market timing transactions as exchanges in and out of PIMCO bond funds.  However, as certain representatives at PIMCO complained that the rapid trading in and out of those Funds was injurious to such Funds, Brean Murray arranged for the trades to be made through a cash account at defendant Bear Stearns, although trading through the PIMCO bond funds continued during the Class Period (and such trading through PIMCO bond funds continued to be offered to Canary through other intermediaries such as David Byck, *see, e.g.*, December 13, 2002 e-mail from Scott Spalding, PIMCO Vice President, to David Byck, cited *infra*).

153.    Defendant Bear Stearns arranged for Canary's trades to clear the day after the trade was entered ("T+1"), as opposed to three days later ("T+3"), as otherwise would have occurred. This enabled Canary to purchase and redeem Fund shares more quickly than the industry norm.  In February 2002, Brean Murray also executed three (3) roundtrips on behalf of Canary in the PEA Target Fund.

154.    After Canary lost capacity in the PIMCO PEA Innovation Fund, Stern had a lunch meeting on March 5, 2002 at The Racquet Club in Manhattan with Cashwell, Corba, Goldberg and Grady.  Treadway was supposed to attend but did not.  At the March 5 lunch meeting, Stern stated that he was interested in obtaining additional market timing capacity in the PIMCO Funds, and also expressed an interest in investing in PEA-managed hedge funds.

155.    On March 7, 2002, Cashwell sent Brean Murray the portfolio holdings information for the PIMCO PEA Target, Growth, and Select Growth Funds, which was non-public information.  On the same day, Cashwell also sent Stern an e-mail containing the operating documents for the PIMCO PEA Advantage and PIMCO PEA Worldwide Value hedge funds, as well as for the Horizon Fund, another hedge fund managed by PEA.

156.    On March 10, 2002, Stern responded to Cashwell's e-mail, stating that Canary was ready to begin trading in the PIMCO PEA Target and Growth Funds through Bear Stearns'

- 64 -

platform.

157.    On March 22, 2002, Stern met with Michael Gaffney ("Gaffney"), the portfolio manager of the Horizon Fund, as well as the PEA Opportunity Fund, and with John Cashwell. During the meeting, Gaffney pitched the Horizon Fund to Stern. Stern told Cashwell that Canary wanted to invest $2 million in the Horizon Fund. Stern also indicated he would "like to see a little give on the fund trading side," meaning that he wanted increased market timing capacity in the Funds in exchange for his investment in the Horizon Fund. On March 25, 2002, Cashwell told Corba that Canary wanted to market time the Innovation and Opportunity Funds as part of the agreement, and Corba was informed that part of the reason for the long-term investment in the Horizon Fund would be in exchange for Canary's ability to obtain further market timing capacity in the Funds, including the Opportunity Fund.

158.    Following the March 22, 2002 meeting with Stern, Canary invested $2 million in the Horizon Fund on a long-term basis, and in exchange therefor received an additional $5 million in trading capacity in the Opportunity Fund.

159.    On or about March 29, 2002, Cashwell sent Stern the subscription documents for the Horizon Fund. He also told Stern that PEA would draft a "side letter" allowing Stern to divest from the Horizon Fund if PEA's market timing relationship with Canary ended, and Canary obtained a waiver of the lock-up period for investments with the Horizon Fund in the event the Canary/PEA market timing relationship ended.

160.    PEA received 1% of total assets under management and a performance fee consisting of 20% of the net profits generated by the Fund in annual fees from the Horizon Fund. Likewise, PAFM and PEA collectively received an advisory fee of 0.65% of net assets under management for the Opportunity Fund.

161.    During March 2002 alone, Canary made five round-trip exchanges in the PEA Target Fund.

- 65 -

162.    On April 4, 2002, PEA sent a letter (dated April 2, 2002) to Stern that read:

Dear Ed:

In the event the market timing relationship between Canary
Investment Management and PIMCO Funds, PIMCO Equity
Partners will waive the 12-month lock-up period, without penalty,
for investments made on behalf of African Grey Capital Associates
LLC in the PIMCO EQUITY Advisors HORIZON FUND, L.P.
However, we will require at least thirty days notice for all
redemptions from the fund.

All other provisions of the PIMCO EQUITY ADVISORS
HORIZON FUND, L.P. will apply.

Sincerely,
Taegan Goddard.

163.    During his January 27 Deposition, Cashwell stated that either he or his assistant

typed the April 4, 2002 letter to Stern at Goddard's direction.  The letter was intended to give

Canary the ability, if the market timing relationship ended, to redeem its shares in the Horizon

Fund without waiting the usual 12-month period that other investors had to abide by.  This

exception to the usual 12-month lock-up period was not disclosed in the Horizon Funds private

placement memorandum nor otherwise disclosed to other investors in that Fund.

164.    Cashwell explained in the January 27 Deposition that the investment in the Horizon

Fund and the waiver of the lock-up came about because: (1) it was "tied to market timing access

in the [PIMCO] PEA Opportunity fund," which was also managed by Gaffney, and (2) Canary did

due diligence and was "comfortable" making the investment.

165.    Canary timed the Growth and Target Funds from April 2002 onward.  Throughout

this period of time, the broker representatives e-mailed Corba and others trade notifications for the

purchases and redemptions of the Funds.  These notifications demonstrated the frequent trading

activities in the Canary accounts.

166.    From April 2002 through November 2002 alone, Canary made approximately 28

round-trip exchanges in the Growth Fund.  The overall dollar volume of these exchanges was

nearly $1.8 billion.  From February 2002 through November 2002 alone, Canary made

approximately 40 round-trip exchanges in the Target Fund.  The overall dollar volume of these

exchanges was over $2 billion.

167.    Canary invested $2 million in sticky assets into the Horizon Fund on or around

April 1, 2002.  Canary then placed $5 million in the Opportunity Fund on or about April 11, 2002,

and market timed that account until at least April 2003.  From April 2002 through April 2003

alone, Canary made approximately 40 round-trip exchanges in the Opportunity Fund.  The overall

dollar volume of these exchanges alone was approximately $371 million.

168.    Pursuant to an April 1, 2002 request from Brean Murray, on April 4, 2002,

Cashwell sent Brean Murray a non-public list of the portfolio holdings of the PIMCO PEA Target,

PEA Growth, PEA Opportunity, and PEA Select Growth Funds.  By April 26, 2002, the Canary

account had executed "at least 5 round trips" that month alone in the PIMCO PEA Target Fund,

despite the fact that the agreement was limited to four round trips per month, and also despite the

fact that the relevant fund prospectuses indicated that no more than six round trips in any twelve

month period would be permitted, as discussed in greater detail herein.  Similarly, a "market

timing policeman" at PAD, PAD Vice President and former Manager of Operations, Steve Howell

("Howell"), alerted his superiors that the Canary account "was dividing the movement of shares (in

or out of the fund) across a couple of days thereby increasing the number of individual transactions

hitting the account."  At that point, Treadway requested a more "precise and limiting" definition of

what constituted "four round trips."

169.    On April 29, 2002, Howell was contacted by the Funds' transfer agent, which

requested that Bear Stearns wait one more day before placing the trades, because Canary's market

timing was so aggressive that its various related entities were placing large trades for redemption

even before the purchase orders had settled.  Howell forwarded the message to the Brean Murray

brokers working for Canary, stating that "[t]he current pattern and trading is of concern to us," and

- 67 -

informed them that the redemption orders were coming so quickly after the purchases that:

> This forces PIMCO to intervene and manually handle what would ordinarily be an
> automated transaction. . . . The manual element of this effort is prone to error and
> presents a risk that PIMCO finds unacceptable.

170.    During a February 4, 2004 deposition before the New Jersey Bureau of Securities,

Howell testified that the rapid trading was a problem because the turnaround time was too short to

allow the Funds to invest Canary's money or for the purchase actually to be recorded:

> The manner in which they had been placing trades was a problem for us or a
> problem for our transfer agent because they would place, for example, a redemption
> order before the purchase had settled and what that meant was there was [sic]
> actually no shares in an account for the redemption to take place.

Nonetheless, the market timing agreement remained in place, and Canary continued to excessively

trade in the PEA Funds, to the detriment of long-term shareholders.

171.    In May 2002, in flagrant disregard of the representations made in the prospectuses

for each Fund, Canary's brokers at Brean Murray executed (in that month alone) five round-trips in

each of the three funds that it was market timing: the PIMCO PEA Target, PIMCO PEA

Opportunity, and PIMCO PEA Select Growth Funds.

172.    On May 16, 2002, Canary sold more than a combined $22 million in shares in the

PIMCO PEA Target and PEA Opportunity Funds.  In response to this trading, on May 17, 2002

Corba sent an e-mail to Brean Murray that read:

> We are monitoring our agreed upon maximum of 4 round trips per month.  The
> pattern that is most disturbing to me is that you only seem to be interested in being
> in our funds for a day or two at a time – perhaps the most opportunistic but extreme
> form of market timing that I have ever seen.

173.    At the same time that Canary was permitted to market time more than $22 million

in the PEA Target and PEA Opportunity Funds, Circle Trust placed a trade at PIMCO on behalf of

another Canary entity, Cockatoo, in the amount of $479,751.00.  However, that trade was not

pursuant to an agreement to allow the market timing in exchange for sticky assets, and was

therefore rejected.

174.    From June 2002 until the end of September 2002, Canary continued to time the
PEA Target, PEA Opportunity, and Growth Funds to the full extent permitted in the Brean Murray
Agreement.

175.    On September 27, 2002, PEA executive Stephen Maginn ("Maginn") e-mailed
Howell, stating, "I spoke with Corba. He said that John Cashwell is going to call [Canary] and
give them an Oct. 15th deadline so that they're long gone before we merge [PIMCO PEA] Select
[Growth Fund] (where they are $40mm of the fund) into [PIMCO PEA] Growth."

176.    Nevertheless, Canary continued to time these Funds. Canary made three round trips
in each of the PIMCO PEA Target, PEA Opportunity, and Growth Funds in the month of October
2002. On November 8, 2002, Howell informed Maginn that it appeared Brean Murray was still
active with PEA. Maginn's response was that Treadway gave them until the end of the year.
Despite the two separate deadlines, October 15 and the end of the year, Brean Murray's market
timing on behalf of Canary and other market timers did not stop. In fact, Brean Murray, on behalf
of Canary, continued to make more than a dozen round trips in the PIMCO PEA Opportunity Fund
from November 2002 until May 2003, when Canary finally left these PEA Funds.

177.    In October 2002, Canary sought additional timing capacity in PIMCO Funds. On
October 1, 2002, Douglas J. Ongaro, PIMCO's Senior Vice President of Marketing, asked David
C. Hinman, an Executive Vice President at PIMCO, whether PIMCO fixed income funds could
handle $20 million in market timing trading once a month, or 12 times a year (*i.e.*, in excess of
what the prospectus permitted). Hinman said they could.

178.    On October 2, 2002, Scott M. Spalding, a PIMCO Vice President, sent an e-mail to
David Byck, a market timing consultant working for, among other clients, Canary. After
discussions, the two agreed that Byck's clients could market time PIMCO's fixed income funds.

179.    On December 13, 2002, Spalding sent an e-mail confirming the agreement's terms
(the "First PIMCO/Byck Agreement"), stating:

- 69 -

Dave,

The parameters of the account are as follows:

- Account will be opened directly with PIMCO
- Initial funding amount: approximately $30MM
- Maximum amount of trades per month in the High Yield Fund: one-round [sic] trip (i.e. one buy and one sale)
- When the assets are not in the High Yield Fund, the assets may be invested in one, or a combination, of the following PIMCO Funds: Money Market, Short Term, or Low Duration

We ask that you honor these guidelines.  If the guidelines are not honored, we reserve the right to terminate the account.

We appreciate your business.  Please contact me with any questions.

180.   On December 14, 2002, Byck sent Canary an e-mail, forwarding the foregoing e-mail from PIMCO Vice President Spalding, stating: "As promised, here is the deal from PIMCO in writing.  It is very difficult to come by a deal they give in writing, <u>I hope you are as excited about it as I am.</u>"  (Emphasis added.)  The fact that such a savvy market timing veteran as Byck professed to be notably excited at this deal, and expected such a rapid and large-scale market timer as Canary to be as well, strongly indicates that this deal allowed Canary to trade twelve round trips in the High Yield Fund per year, and perhaps more if the funding increased, or the account were broken up into several accounts as Canary was often able to negotiate with its market timing partners at the mutual fund families.  The New Jersey Attorney General has also interpreted this proposal on behalf of PIMCO according to its plain meaning, *i.e.*, that the agreement to allow one round trip per month meant 12 round trips per year.  *See, e.g.*, NJC ¶ 74; *see also id.* ¶ 72.  Moreover, in a subsequent, May 6, 2003 e-mail from Byck to Noah Lerner of Canary providing an overview of the market timing capacity Byck was able negotiate for Canary at several mutual fund complexes, Byck states:

Noah,

Here is a brief overview on the capacity we now have, most of which we have discussed:

*        *        *

- 70 -

3-PHIYX ($50 million) 1 TIME PER MONTH AS WE DISCUSSED
4-Pimco HY offshore 10 million 1 time per month

*       *       *

There likewise was no indication in said e-mail, either with respect to the PIMCO trades, or any other trades listed therein, that Canary was in any way limited from doing 1 such round trip "per month" *for an entire year*, *i.e.*, totaling 12 round trips per year.

181.    The First PIMCO/Byck Agreement blatantly violated the express representations made in the prospectuses relevant to the PIMCO High Yield Fund during the Class Period, as set forth herein, which were virtually identical to the representations in the MMS Trust Prospectuses. Since September 2000, the prospectus language for the PIMCO High Yield Fund and Real Return Fund, along with, *inter alia*, the Short Term and Low Duration Funds, concerning market timing has read identically to the language for the MMS Trust Funds, namely, that "a pattern of exchanges characteristic of 'market-timing' strategies may be deemed by PIMCO to be detrimental to the Trust or a particular Fund.  Currently, the Trust limits the number of 'round trip' exchanges investors may make . . . . The Trust has the right to refuse any exchange for any investor who completes . . . more than six round trip exchanges in any twelve-month period."

182.    On January 22, 2003, Spalding informed Carol Rodgerson, a Vice President managing the Shareholder Services unit at PIMCO, of the terms of the relationship between Canary and PIMCO.  Spalding asked Rodgerson to have Shareholder Services monitor the trades and not to reject any of them so long as Canary stayed within the terms of the agreement for $30 million in capacity and one round trip per month.  Rodgerson responded the next day that Shareholder Services would monitor and create monthly reports for the Canary account.  On the same day, a marketing assistant at PIMCO sent an e-mail to Byck, with copies to, *inter alia*, Scott Spalding, stating:

Hello Dave,

I have attached the Wire Instructions to facilitate opening an account at PIMCO.

- 71 -

Your account number is 104220.  On the day of your trade, please call our shareholder services department to assure that you will receive that days [sic] trade date.

183.    A February 4, 2003 e-mail from Noah Lerner of Canary to Spalding (in response to

Spalding's question, "What did you decide to do on the HY in the b/d account?") confirms:

> In the account at Bank of America we moved $6,306,551 (1,878,635 shares) from PHDAX [PIMCO Low Duration Fund] to the money market and will liquidate the money market over the next few days.

> We purchased $30,000,000 worth of PHIYX [PIMCO High Yield Fund] directly with the fund [sic].

184.    Throughout the period in which the market timing was allowed, Spalding and Byck

were in contact with Ongaro and Andre J. Mallegol III, a PIMCO Vice President of Marketing,

about the parameters of the market timing agreement with Canary.  In addition, both Ongaro and

Mallegol received monthly reports from Rodgerson about the Canary transactions.

185.    Byck, who was being paid 50 basis points per annum on the market timing capacity

he obtained for Canary in PIMCO, continued to search for more fixed income market timing

capacity in the PIMCO High Yield and Real Return Funds.  On April 28, 2003, he contacted

Mallegol to determine if there was more market timing capacity at PIMCO.  Two days later,

Mallegol responded that there was capacity for another $80 million subject to two conditions:  (1)

the trading would be done in four separate accounts; and (2) trading would occur on different days

(the "Second PIMCO/Byck Agreement").  Mallegol also requested a list of the accounts, client

names and asset levels of those who wanted timing relationships.

186.    In a May 5, 2003 e-mail, Byck confirmed to Mallegol that, pursuant to the Second

PIMCO/Byck Agreement, he had distributed an additional $50 million beyond the $30 million that

was already invested.  The funding was to occur on June 18, 2003, when Byck's client was placing

$4 million, to be held by Bear Stearns, in the PIMCO Real Return Fund.  A June 9, 2003 e-mail

from Byck to Noah Lerner of Canary reports, "Noah, Here is what I have so far- Pimco is ready for

the 1st 5-6 million.  The fund other than the money market that we discussed is PTLAX [PIMCO

- 72 -

Low Duration Fund]." A July 7, 2003 e-mail from Noah Lerner of Canary to Byck states that, "On 6/11 an additional $6 million was put into Pimco and on 6/23 $13.8 million was withdrawn from the Northeast [another fund complex, via trades through Security Trust Company, another market timing facilitator] and placed into Pimco." A June 17, 2003 e-mail from Byck to Lerner and Ed Stern of Canary lists pending market timing deals Byck had procured for Canary and notes, *inter alia*: "2) Pimco HY 50 million, we already started this with 6 million this week [...] 9) ... Pimco HY offshore-15 million offshore (need to get the offshore funding in place for this...)". Two weeks later the investment increased to $30 million, and it was invested directly through PAD. A July 2, 2003 e-mail from Byck to Noah Lerner and Stern of Canary notes, *inter alia*: "1) Pimco HY-we had 30 million to start with. As you know we were able to obtain another 50-55 million of this fund. I am not exactly sure how much you have invested in this fund now, but you have the ability to go to a total of about 85 million [...] 4) Pimco Offshore-We have 15 million in this fund which I know you are awaiting the offshore financing [sic]."

187.    The Second PIMCO/Byck Agreement blatantly violated the express representations made in the PIMCO Real Return Fund's relevant prospectuses.

188.    Between August 5, 2003, and August 6, 2003, PIMCO received the account numbers wherein the $30 million was invested, and a detailed list of all the market timing accounts that were placed with PIMCO pursuant to the Second PIMCO/Byck Agreement. These market timing transactions ceased on or about September 11, 2003.

189.    Between January 24, 2003 and July 7, 2003, Canary invested $30 million through Tripod LLC, a Canary entity. During that time there were 14 transactions, including purchases, exchanges, and redemptions, between the PIMCO High Yield and Money Market Funds.

190.    Between February 6, 2003 and September 11, 2003, another Canary entity invested $5 million with PIMCO. During that time there were 23 transactions, including purchases, exchanges, and redemptions, between the PIMCO High Yield and Money Market Funds.

Doc. 151743

191.     Between August 6, 2003 and September 15, 2003, Canary invested $30 million, through three separate accounts at Canadian Imperial Holdings.  During that time there were 45 transactions, including purchases, exchanges, and redemptions, between the PIMCO Real Return Fund and the Money Market Funds.

192.     Between February 8, 2002 and November 21, 2002 alone, Canary made 132 transactions, nearly 40 round trips, in the PIMCO PEA Target Fund, in clear violation of the prospectuses relevant to the PIMCO PEA Target Fund.

193.     Between April 11, 2002 and May 2003 alone, Canary made a total of 92 transactions, nearly 40 round trips, in the PEA Opportunity Fund, in clear violation of the prospectuses relevant to the PIMCO PEA Opportunity Fund.

194.     Between April 11, 2002 and November 21, 2002 alone, Canary made a total of 70 transactions, or 25 round trips, in the PIMCO PEA Select Growth Fund, in clear violation of the prospectuses relevant to the PIMCO PEA Select Growth Fund.

## LATE TRADING OF THE FUNDS

195.     In addition to allowing selected investors to engage in market timing, the ADAM-related Defendants also allowed late trading of the Funds.  According to a former employee in PIMCO's Shareholder Services department (the "Former Employee"), the PIMCO Defendants allowed certain investors to obtain the previous trading day's price even though the orders were not placed until the next morning.

196.     From 1999 to 2000, the Former Employee worked in PIMCO's Shareholder Services department, where he was responsible for receiving and processing trades.  He generally worked with institutional investors, such as 401k's, universities, "omnibus" trading accounts of broker-dealers, and smaller investors with accounts in the $5 million range.  However, he was also responsible for entering trades for the accounts of Charles Schwab.  The Former Employee's responsibilities included taking trades that had been received by fax, phone, or otherwise, and

- 74 -

entering them into the computer system.  He was also responsible for reconciling bank transfers to the purchases and sales made in a given day, and for screening improper trades.

197.    According to the Former Employee, generally, like any other account, if an omnibus account placed an order to buy or sell after the 4:00 p.m. (Eastern time) deadline, it would receive the next trading day's price.  However, Charles Schwab was routinely allowed to make large purchases and sales after the 4:00 p.m. cut-off and still receive that day's price.  The Former Employee first noticed that this occurred because the late trading caused problems with reconciling the bank transfers.  If a trade was made very late in the day, it usually was not processed by the bank until the next business day, which caused reconciliation problems.

198.    According to the Former Employee, every day the PIMCO Funds would receive trades by fax between approximately 5:00 and 5:30 a.m. (Pacific Coast time), and these trades were processed at the previous trading day's price even though they were placed long after the 4:00 p.m. (Eastern time) deadline had passed.  The former employee and PIMCO received and entered a large number of such trades each day.  According to the Former Employee, the PIMCO Funds would permit the late trading so long as the client had signed an agreement to the effect that if the client sent the trades in by fax before 5:30 a.m., the client's trades would be entered at the previous trading day's price (late trading agreement).  The Former Employee estimates that there were between 40 and 50 PIMCO Fund clients who had signed late trading agreements.

199.    According to the Former Employee, Charles Schwab was among the clients who had signed late trading agreements and would fax in trades before 5:30 a.m. and receive the previous trading day's price.  Charles Schwab also took the late trading one step further.  According to the Former Employee, Charles Schwab would sometimes call later in the day, after the 5:00-5:30 a.m. faxed-in trades had been entered, and ask to change the order.  The changes were either to increase or decrease the numbers of shares purchased or sold.  The Former Employee specifically recalls that on one occasion Charles Schwab called to change a late-trade

order in the PIMCO StocksPlus Fund. The Former Employee stated that he remembered it because he was unsure whether the changes were permissible, and he asked his superior, Jeffrey M. Sargent, a Senior Vice President of the MMS Trust, the PIMS Trust and PIMCO, whether he should put them in, and Sargent said "yes."

200.    According to the Former Employee, Charles Schwab also had a market timing agreement relating to trading in PIMCO Funds. The Former Employee stated that Charles Schwab would make changes to its late-traded orders after the market had opened and had moved significantly either up or down, which made late-trading at the previous day's price more or less advantageous.

201.    According to the Former Employee, Charles Schwab's late trading and market timing was continuing when he left PIMCO in 2000.

### DISCLOSURES OF NONPUBLIC INFORMATION TO MARKET TIMERS

202.    At various times during its relationship with Canary, PEA disclosed to Brean Murray, which then disclosed to Canary, the exact portfolio holdings of the Funds in which Canary was investing. These Funds included the PIMCO PEA Target, PIMCO PEA Growth, PIMCO PEA Innovation, PIMCO PEA Opportunity, and PIMCO PEA Select Growth Funds. PEA provided the portfolio holdings information to Brean Murray and Canary on a regular, monthly basis, before it was publicly available.

203.    Knowing a Fund's portfolio holdings information before it becomes publicly available allows an investor to use derivatives or sell short the stocks in the Funds, and thereby hedge market timing transactions.

204.    For example, on January 15, 2002, Cashwell sent the portfolio holdings information of the PEA Funds to Brean Murray. Brean Murray then forwarded that information to Canary.

205.    Moreover, on March 7, 2002, Brean Murray sent Cashwell a "reminder" to send the portfolio holdings for the PIMCO PEA Target, PIMCO PEA Growth, and PIMCO PEA Select

- 76 -

Growth Funds.  After a second reminder, Cashwell sent the portfolio holdings information on
April 4, 2002 for the PIMCO PEA Target, PIMCO PEA Growth, PIMCO PEA Opportunity, and
PIMCO PEA Select Growth Funds.

206.    From April 2003 until January 2004, a Marketing Associate at PEA regularly
(monthly) sent the complete portfolio holdings of the PIMCO PEA Opportunity Fund to Brean
Murray.  Thus, for example, a June 3, 2002 e-mail from Cashwell to Ryan Goldberg of Brean
Murray, regarding "Brean Murray Trading," in response to Goldberg's May 30, 2002 e-mail
(inquiring, "Hi John, If you could have the positions in the three fund [sic] POPAX [Opportunity]
PGWAX [Growth] PTAAX [Target] emailed to us we would appreciate it."), stated, "Hi Ryan, My
associate Kara Margolis will be sending you this info each month.... She'll send the May info."
That same day, an e-mail from Kara Margolis, identified in her e-mail as "Kara A. Margolis,
Marketing Associate, PIMCO Equity Advisors," was sent to Ryan Goldberg, regarding
"Month-End Holdings," stating, "Ryan, Attached is the holdings data you requested as of 5/31/02."

## REGULATORY AND CRIMINAL PROCEEDINGS

207.    In February 2004, the New Jersey Attorney General filed a complaint in the
Superior Court of New Jersey, Essex County, New Jersey, Civil Action Docket No. C-54-04,
charging certain defendants with violations of New Jersey law by entering into the market timing
agreements with Canary, as described above.  Specifically, the complaint alleged that the market
timing agreements violated: (i) N.J.S.A. 49:3-52, employing a device scheme or artifice to defraud
in connection with the offer, sale or purchase of securities; (ii) N.J.S.A. 49:3-52(b), making
materially false and misleading statements and omitting material facts necessary to make
statements made not misleading; and (iii) N.J.S.A. 49:3-52(c), engaging in any act, practice or
course of business that would operate as a fraud or deceit upon any person in connection with the
offer, sale or purchase or securities.

208.    In May 2004, the SEC filed a complaint in the United States District Court for the

- 77 -

Southern District of New York, Docket No. 04 Civ. 03464 (VM), charging PAD, PEA, PAFM, Treadway, and Corba with similar violations of the following federal securities laws and regulations: 15 U.S.C. §77q(a), for fraud in the offer or sale of securities; 15 U.S.C. §78j(b), and 17 C.F.R. §240.10b-5, for fraud in connection with the purchase or sale of securities; 15 U.S.C. §§80b-6(1) and 80b-6(2), for fraud by an investment advisor; and 15 U.S.C. §80b-4a, for misuse of nonpublic information, in disclosing Fund holdings to Canary and its representatives.

209.    In June 2004, the New Jersey Attorney General and the defendants in the New Jersey action entered into a consent order pursuant to which ADAM, PAD, and PEA paid a total of $15 million in fines and $3 million in investigation costs.

210.    On September 13, 2004, the SEC instituted cease-and-desist proceedings, File No. 3-11645, against PAFM, PEA, and PAD (the "SEC Respondents"). The SEC simultaneously entered an order agreeing to a settlement with the SEC Respondents as well as entering a cease-and-desist order. In the settlement, which did not include defendants Treadway and Corba, defendants PAFM, PEA, and PAD were ordered to pay a total of $50 million, $40 million of which consisted of penalties, and were ordered to comply with certain internal governance reforms.

211.    On November 10, 2004, the SEC filed a First Amended Complaint in 04 Civ. 3464 (VM) (S.D.N.Y.), against Stephen Treadway and Kenneth Corba in *SEC v. Treadway, et al.* These proceedings are ongoing as of the date of this Amended Complaint.

**Additional False and Misleading Statements and Omissions in the PIMS Trust Prospectuses**

212.    The PIMCO High Yield and PIMCO Real Return Funds were offered through a prospectus that defendant PIMS Trust issued on July 31, 2001 (the "July 31 prospectus").

213.    The July 31 prospectus stated:

The Trust reserves the right to refuse exchange purchases if, in the judgment of PIMCO, the purchase would adversely affect a Fund and its shareholders. In particular, a pattern of exchanges characteristic of "market-timing" strategies may be deemed by PIMCO to be detrimental to the Trust or a particular Fund. Currently, the Trust limits the number of "round trip" exchanges investors may make. An investor makes a "round trip" exchange when the investor purchases

- 78 -

shares of a particular Fund, subsequently exchanges those shares for shares of a different PIMCO Fund, and then exchanges back into the originally purchased Fund. The Trust has the right to refuse any exchange for any investor who completes (by making the exchange back into the shares of the originally purchased Fund) more than six round trip exchanges in any twelve-month period. The Trust reserves the right to impose additional restrictions on exchanges at any time, although it will attempt to give shareholders 30 days' prior notice whenever it is reasonably able to do so.

214.   The statements set forth in the previous paragraph were repeated in the following

SEC filings pertaining to the PIMCO High Yield and Real Return Funds:

a.   Definitive Materials filed with the SEC on December 3, 2002, including a prospectus dated November 26, 2002;

b.   Post-Effective Amendment filed with the SEC on December 27, 2002;

c.   Post-Effective Amendment filed with the SEC on December 30, 2002;

d.   Definitive Materials filed with the SEC on January 7, 2003, including a prospectus dated December 31, 2002;

e.   Post-Effective Amendment filed with the SEC on February 28, 2003;

f.   Definitive Materials filed with the SEC on May 19, 2003, including a Shareholders' Guide (the relevant statements therein were in the plural because they pertained to both MMS and PIMS trusts, but were otherwise identical to the above-quoted statements);

g.   Post-Effective Amendment filed with the SEC on May 23, 2003;

h.   Post-Effective Amendment filed with the SEC on June 30, 2003;

i.   Post-Effective Amendment filed with the SEC on July 17, 2003;

j.   Post-Effective Amendment filed with the SEC on July 31, 2003;

k.   Post-Effective Amendment filed with the SEC on August 1, 2003; and

l.   Definitive Materials filed with the SEC on November 6, 2003, including a prospectus dated October 31, 2003.

215.   The statements set forth in paragraph 213 and referred to in paragraph 214 were

false and misleading and/or omitted material information necessary to make them not false and

misleading each time they were made because the ADAM-affiliated Defendants failed to disclose

that:

- 79 -

a. The ADAM-affiliated Defendants negligently, or, in order to enrich themselves through increased fees and expenses, intentionally or recklessly, allowed certain broker-dealers, hedge funds, and other selected investment companies to engage in market timing and make more than six exchanges per year; and

b. The ADAM-affiliated Defendants allowed selected investors to engage in market timing, and/or late trading that diluted shareholder returns and increased fees and expenses for other shareholders.

216. The ADAM-affiliated Defendants knew or recklessly disregarded that the timing agreements contradicted the statements set forth in paragraphs 101, 125-27, 213-14.

217. For example, before Canary entered into timing agreements with certain of the PIMCO Funds, detailed above, certain of the ADAM-affiliated Defendants tried to stop Canary from market timing. For example, on March 6, 2001, Andrew Goodwin, a market timing trader who worked for Canary, received an e-mail from Daniel Printz at Security Trust Co., which at or around that time was entering many of Canary's market timing trades, stating that PIMCO Funds only permitted six round trips per year:

Please note: We have received a call from the compliance manager at Pimco [sic] stating that a maximum of six round trips per year between PIMCO Funds are allowed. I wanted to make sure that you were aware of this policy. You can continue to trade in PIMCO just as long as you do not exceed six round trips. They are not closing us down.

218. Before the market timing agreements described above were in place, the ADAM-affiliated Defendants also suspended Canary's trading on occasion for market timing. For example, on June 4, 2001, Barry Brown of Paine Webber, which acted as broker for many of Canary's market timing trades, sent an e-mail to Andrew Goodwin and other traders at Canary, stating:

We were kicked out of :

WS-32854 B Nations

WS-34011 B American Century, Oppenheimer, Pilgrim, **PIMCO** [sic], and State Street.

(Emphasis added.)

219. PIMCO thus selectively enforced its own stated policies and procedures with

- 80 -

respect to market timing, which, contrary to its representations in the PIMCO Funds prospectuses during the Class Period, turned not on whether an investor made more than the amount of trades specified in the prospectus, or made trades that could adversely affect a Fund, but on whether the ADAM-affiliated Defendants determined that it was in the ADAM-affiliated Defendants' financial interest to permit (passively, or by explicit agreement) such market timing activity, rather than acting in the best interests of the non-timer, long-term Fund shareholders.

### Rampant Timing Through Third Party Brokers - e.g., Prudential

220.    A further example of the wide-scale timing of PIMCO Funds is provided in recent allegations in an SEC complaint filed in the District of Massachusetts against five former brokers, Martin J. Druffner ("Druffner"), Justin F. Fricken ("Fricken"), Skifter Ajro ("Ajro"), John S. Peffer ("Peffer"), and Marc J. Bilotti ("Bilotti"), and one branch manager, Robert Shannon ("Shannon"), of the Boston branch office of Prudential Securities Incorporated ("Prudential"), in connection with their market timing trades in dozens of mutual funds (the "*SEC v. Druffner* Complaint") (Druffner, Fricken, Ajro, Peffer, Bilotti and Shannon are collectively referred to herein as the "Prudential Brokers").  The SEC filed an initial complaint against the Prudential Brokers on November 4, 2003, and an amended complaint against them on July 14, 2004.  That complaint was sustained, on a motion to dismiss, by Judge Nathaniel Gorton of the United States District Court for the District of Massachusetts.  Thus far, Druffner and Ajro have been convicted upon guilty pleas in federal court of wire and securities fraud in connection with the market timing at Prudential, on September 19, 2005 and August, 10, 2005, respectively, and on December 8, 2005, Peffer settled SEC charges of market timing, in exchange for agreeing to be barred from the securities industry for three years and to pay a $50,000 fine.  According to a January 1, 2004 article appearing in *Registered Rep*, an industry publication for investment professionals, Druffner and Ajro "claim that [] the mutual fund companies knew what was going on," and that Prudential "knew about" and "approved" the market timing trading.  The remaining Prudential Brokers are still in litigation as of the date of this Complaint.

- 81 -

221.    In its amended complaint, the SEC alleges that, from at least January 2001 through September 2003, the Prudential Brokers placed thousands of market timing trades worth more than $1.3 billion for seven hedge funds in the funds of more than fifty mutual fund companies.  These seven hedge funds (the "Seven Hedge Funds") were clients in either Druffner's or Peffer's group of brokers (the "Druffner Group" was comprised of Druffner, Fricken and Ajro, and the "Peffer Group" was comprised of Peffer and Bilotti).  Specifically, hedge fund Headstart Advisors Ltd. ("Headstart"), based in the United Kingdom, opened its first account with Druffner in July 1999; Chronos Asset Management ("Chronos"), based in Cambridge, Massachusetts, opened its first account with Druffner in January 2000; Pentagon Asset Management ("Pentagon"), based in the United Kingdom, opened its first account with Druffner in March 2000.  The Peffer Group had two principal clients, the relevant one here being Global Analytical Capital ("Global"), based in Salem, Massachusetts, which opened its first account with Peffer in May 1998.  Global acted as an investment Advisor for hedge funds based in the Netherlands Antilles.  (These Four Hedge Funds, out of the Seven Hedge Funds named in the SEC complaint, market timed PIMCO Funds.)

222.    According to the SEC's amended complaint, a substantial amount of mutual fund shares which were purchased in connection with the market timing scheme of the Prudential Brokers were in PIMCO Funds – nearly $30 million ($29,662,546).

223.    The *SEC v. Druffner* Complaint alleges that the Prudential Brokers knew that the mutual fund companies monitored and attempted to control excessive trading in their funds.  To evade this attempted control, the Prudential Brokers disguised their identities by establishing numerous broker identification numbers (known at Prudential as "FA [financial advisor] numbers") and sought to disguise their customers'/clients' identities by opening approximately two hundred customer accounts under various names for the Seven Hedge Funds seeking timing capacity in more than 52 mutual fund companies.  Id. at ¶¶ 2, 17, 32.  The brokers processed their clients' trades through dozens of customer accounts, using fictitious names and multiple FA numbers.

- 82 -

224.    The Prudential Brokers used multiple accounts and FA numbers to buy large

amounts of PIMCO Fund shares for the same client within a short period of time.  Examples

include:

- Between 4/18/01 and 7/6/01, Headstart bought $2,436,000 of the High Yield and Foreign Bond funds using twelve accounts and five FA numbers.  One of the accounts was opened on 4/25/01, and another was opened on 7/2/01.

- Between 10/3/01 and 10/24/01, Headstart bought $2,436,000 of the High Yield and Foreign Bond funds using eight accounts and four FA numbers.

- Between 12/31/01 and 2/12/02, Headstart bought $2,110,000 using of the High Yield and Total Return funds suing nine accounts and four FA numbers.  One of the accounts was opened on 1/31/02.

- Between 4/1/02 an d5/1/02, Chronos bought $820,000 of the Total Return fund suing three accounts and two FA numbers.

- Between 5/17/02 and 5/29/02, Pentagon bought $1,203,173 of the High Yield fund using seven accounts and two FA numbers.

- Between 7/2/02 and 7/24/02, Pentagon bought $2,230,000 using ten accounts and two FA numbers.

- Between 7/19/02 and 8/2/02, Headstart bought $1,800,000 using seven accounts and three FA numbers.

- Between 10/31/02 and 11/20/02, Headstart bought $1,975,000 of the High Yield fund using six accounts and four FA numbers.

- Between 11/12/02 and 11/27/02, Pentagon bough $1,400,000 of the Total Return and StocksPLUS funds using five accounts and three FA numbers.

- On 8/11/03 and 8/20/03, Chronos bought $501,000 of the Emerging Markets fund using four accounts and two FA numbers.

225.    The Prudential Brokers exchanged PIMCO Fuund shares held in several of their

clients' accounts on the same day.  Examples include:

- On 7/10/01, Headstart exchanged $2,002,556 in eleven accounts from the Global Innovations fund to the money market fund.

- On 7/30/02, Chronos exchanged $962,222 in four accounts from the SmallCap Value and Opportunity funds to the Total Return fund.

- On 8/12/02, Pentagon exchanged $2,645,632 in nine accounts from the Total Return fund to the money market fund.

- 83 -

- On 1/15/03, Global exchanged $503,791 in five accounts from the International Growth and Emerging Markets funds to four bond funds.

226.    According to the *SEC v. Druffner* Complaint, in spite of the brokers' attempts to disguise their trades, due to, *inter alia*, the sheer volumes and frequency of the brokers' trades, the mutual fund companies, including the ADAM-affiliated Defendants, were able to identify many account and FA numbers which were engaging in market timing.  Indeed, according to the SEC's amended complaint, during the January 2001 and September 2003 time frame, the mutual fund companies often issued letters and e-mails to defendant Prudential imposing blocks on these brokers' market timing activities.

227.    Although the SEC notes, in an exhibit to the *SEC v. Druffner* Complaint, that the ADAM-affiliated Defendants sent at least eight letters and e-mails to Prudential indicating that it was restricting trading, and that "[i]n some" such instances, PIMCO blocked certain accounts from making further purchases or exchanges in its Funds, notably (i) this confirms that the ADAM-affiliated Defendants were highly aware of the market timing activity, and (ii) the fact that the ADAM-affiliated Defendants blocked certain accounts in "some" instances does not take into account how many times the Funds' market timing desk saw the violations, but did not send any letter or warning or otherwise did not block trading.  Significantly, at best, this indicates that the ADAM-affiliated Defendants would in certain instances decide to enforce the Funds' stated policies of policing market timing, and at times they would not.

228.    During the relevant period, as previously stated, four of Druffner and Peffer's Hedge Fund clients purchased approximately $30 million worth of shares in PIMCO Funds. Druffner's client Headstart alone purchased $15,644,373, and his client Pentagon purchased $7,158,173; while Peffer's client Global made purchases totaling $2,754,000.  The specific purchases made by the Four Hedge Fund clients in PIMCO Funds, primarily the High Yield, Foreign Bond, Total Return and Emerging Markets Funds, are set forth in Exhibit A annexed hereto.

- 84 -

229.    Notwithstanding occasional warnings to <u>certain</u> market timers the ADAM-affiliated Defendants did not consider desirable, the PIMCO Funds continued to accept market timing trades, despite the fact that the PIMCO Funds' market timing desk (primarily at PAD) could readily detect such trades.  While at times the ADAM-affiliated Defendants indicated they would restrict such further trading, they rarely did so.  This was in keeping with their practice and policy, which was not to stop market timing altogether, since such activity yielded substantial fees and profits to ADAM-affiliated Defendants (by, *inter alia*, increasing transaction-based fees, and fees based on amount of assets under management), but to control it, and restrict it to individuals, institutions, or situations which these defendants felt they could control – whether for the purpose of maximizing their profits, or to avoid regulatory detection, or for any other reason.  The primary function of the "market timing desk" was thus to strike a balance between "desirable" (and thus permitted) market timing which increased the profits of the ADAM-affiliated Defendants, and "undesirable" market timing, which could rise to the level where it threatened to do the Funds' more harm than good.

230.    Had the ADAM-affiliated Defendants truly wanted to spend the time and resources, they could have stopped such market timing by refusing to allow such timers – most of whom they could readily identify – to conduct their trades, and enforcing such prohibitions consistently and even-handedly, in accordance with the Funds' prospectuses, but they did not.  The ADAM-affiliated Defendants could have enforced such prohibitions by, *inter alia*, strictly imposing redemption fees – <u>uniformly</u> – consistent with the language in the Fund prospectuses, registration statements and related public filings, but they failed to do so.  Further evidence that discovering market timers and their activities was easily done at PIMCO Funds is provided by an internal PIMCO Funds September 2003 e-mail from John Abby to Andre Mallegol, with carbon copies to Jeff Sargent, that references a search on market timer Pentagon Capital, and adds, "I also searched on [sic] the contact names and found an account connected to Doug Reich – 104252 Thornberry Hill, LP.  There is quite a bit of exchanges from HY to Money Market."

231.    The ADAM-affiliated Defendants were either severely reckless in permitting timing

- 85 -

Doc. 151743

on such a wide scale as occurred in the PIMCO Funds, or acted knowingly. These defendants either acquiesced, or conspired in, the rampant market timing activity, consistent with their overall permissive policies and practices with respect to market timing, as evidenced by the above-described agreements to permit market timing in exchange for receiving "sticky assets," such as those with Canary.

232. That market timing capacity was known to be available at PIMCO is further evidenced by a June 2, 2003 internal Canary e-mail exchange between Ed Stern and Noah Lerner, noting that PIMCO had additional market timing capacity that Canary had not utilized yet, and that Canary had just been kicked out of two market timing ventures. Lerner notes that if one of these fund complexes that kicked Canary out could not be convinced to let Canary stay "in the next couple of days, I will reroute money elsewhere so we can start taking the additional PIMCO [market timing] space. I'll probably send to STC [Security Trust Company]." Stern replied to this e-mail a few hours later, "<u>I'd get it all straight to Pimco quickly. You know that other timers will be looking for capacity, so we should fill it quickly.</u>" (Emphasis added.)

233. The ADAM-affiliated Defendants and their employees further knew of, negotiated, and/or acquiesced in third-party broker-dealers' arrangements to bring market timing assets into PIMCO Funds, in exchange for these brokers being paid by ADAM-affiliated Defendants, and/or the market timers, for facilitating the timing arrangements.

234. Through, *inter alia*, the PAD "market timing desk," operated by individuals experienced in observing and discerning trading patterns and the identity of the traders, and through highly sophisticated tracking equipment, the ADAM-affiliated Defendants were readily able to, and did, identify market timers and market timing trades. This was particularly so where such trades were made through accounts known to be affiliated with market timers, or in suspicious lots, suspicious volumes, or in Funds known to be the target of timing activity, or simply where the same account could be observed trading in and then out of a Fund within a short period of time.

Doc. 151743

235.    According to one witness directly familiar with market timing in general, and in PIMCO Funds specifically, market timing was also easily recognizable by the ADAM-affiliated Defendants for, *inter alia*, the following reasons: (i) the frequency of trading activity (i.e., transaction volume) would generally be concentrated in Funds most typically the subject of market timing activity, such as international funds, bond funds, and small-mid cap funds (where timers sought to take advantage of time zone arbitrage, and liquidity inefficiencies, as alleged above); (ii) in addition to the fact that PIMCO Funds' management and the PAD "market timing desk" could observe that a large percentage of the Funds' transaction volume was concentrated in Funds most likely to be timed, they could also readily observe that most of the asset flow or transaction volume in that subset of Funds was attributable to a small subset of traders (*i.e.*, the market timers); (iii) the data concerning transaction volume or "turnover" or "churn rate" in specific PIMCO Funds was readily accessible at the Company, and the ADAM-affiliated Defendants could easily track the accounts or brokers responsible for a large percentage of the Fund's transaction volume; (iv) the PIMCO Funds' management and the PAD "market timing desk" could easily observe which accounts or brokers are responsible for an abnormally large volume of transactions on "good market timing days," *e.g.*, days where there were substantial time zone arbitrage opportunities, due to moves in the U.S. or overseas markets (and a corresponding market move after the time zone lag); (v) even where trades in PIMCO Funds were done in "omnibus" accounts, submitted by broker-dealers, that did not identify each specific account holder, the ADAM-affiliated Defendants could easily have asked the broker-dealer to identify the underlying account(s) of any suspicious trading activity, where, for example, trading in "omnibus" accounts surged at suspicious times (*e.g.*, inflection points in the market).

236.    For instance, during calendar year 2000, the assets in the following PIMCO Funds turned over the following amounts of times:  the assets in the PIMCO Target Fund turned over approximately 6.80 times, the Growth Fund 4.29 turned over approximately times, the Opportunity Fund turned over approximately 3.85 times, the Short-Term Fund approximately 1.93 times, the

- 87 -

Low Duration Fund approximately 1.58 times, the StocksPLUS Fund approximately 1.40 times, and the Innovation Fund approximately 1.29 times. In 2002, the PIMCO Target Fund turned over approximately 3.77 times, the Growth Fund turned over approximately 2.97 times, the Short-Term Fund turned over approximately 1.19 times, and the Low Duration Fund turned over approximately 0.92 times. In 2003, the PIMCO Growth Fund turned over approximately 5.55 times, the Target Fund turned over approximately 3.82 times, the Short-Term Fund turned over approximately 0.99 times, and the Innovation Fund turned over approximately 0.97 times.

237.    Such abnormally high turnover rates, as exemplified above, are strongly indicative of timing activity and should have been flagged by PIMCO Funds' market timing desk. Moreover, notably, the highest turnover rates in PIMCO Funds were consistently in the Funds which turned out to have been the targets of high timing activity and the pre-arranged timing agreements with Canary, and generally occurred in the type of smaller cap stock funds known by mutual fund industry insiders to be most typically the subject of market timing activity. In light of such data, the ADAM-affiliated Defendants knew or should have known of the improper trading activity in PIMCO Funds detailed herein but recklessly disregarded such warning signs.

**Additional Examples of the ADAM-Affiliated Defendants Permitting
Large-Scale Market Timing in PIMCO Funds**

238.    As alleged above, BOA provided a clearing platform and installed trading terminals for several market timers and their brokers to facilitate market timing and/or late trading. Some time prior to late 1999, in order to facilitate market timing and late trading in mutual funds by market timers and brokers, BOA, in conjunction with ADP, developed a special electronic trading system called "RJE" ("Remote Job Entry"), commonly known as "the box," which it provided to certain market timers and broker-dealers who acted as intermediaries for a large number of market timers. BOA installed the box in the offices of, *inter alia*, three broker-dealers who routinely market-timed and late-traded mutual funds on behalf of themselves and their clients: (i) Aurum Securities Corp. ("Aurum Securities"), a California corporation, registered investment advisor and

- 88 -

broker-dealer based in San Francisco, CA and its affiliate, Aurum Capital Management Corp.

("Aurum Capital"), a California corporation and registered investment advisory firm, (collectively,

"Aurum") in late 1999 or early 2000, (ii) Trautman Wasserman & Company, Inc. ("Trautman"), a

Delaware corporation, registered investment advisor and broker-dealer based in New York, NY, in

early 2001, and (iii) Pritchard Capital Partner LLC ("Pritchard"), a Louisiana limited liability

company, registered investment advisor and broker-dealer based in Mandeville, LA, in early 2003.

BOA also installed the box in Canary's offices in or around the summer of 2001.  However, BOA

did not charge a fee to Canary for utilizing the box, but instead provided it to Canary free of charge

as part of a special arrangement negotiated between Stern and Theodore Sihpol III ("Sihpol") of

BOA's Private Client Services Group, pursuant to which Canary was charged a "wrap fee" of 100

basis points (*i.e.*, 1%) for late trading and market timing funds offered by BOA itself (*e.g.*, the

Nations Funds), and 50 basis points, or 0.5%, for late trading and market timing funds offered by

other mutual fund families, such as PIMCO Funds.

239.    On September 16, 2003, the SEC instituted an administrative proceeding against

Sihpol, charging him with violations of the Securities Act of 1933 ("Securities Act"), Exchange

Act, Investment Company Act and Investment Advisers Act of 1940, for his role in enabling

Canary to engage in late trading shares of mutual funds offered by BOA and other mutual fund

families, in particular for his facilitation of Canary's late trading of mutual funds both "manually"

and through the box.  Sihpol was also criminally indicted under New York law on 40 counts in

connection with late trading at BOA, including a scheme to defraud in the first degree, grand

larceny in the first degree, violations of the Martin Act (New York's securities act), and falsifying

business records in the first degree. On October 12, 2005, Sihpol settled the SEC charges, agreeing

to pay a $200,000 penalty and to be barred from the securities industry for five years.  In its Order

Making Findings and Imposing Remedial Sanctions, dated that day, the SEC found that Sihpol

participated in BOA's offering and installing of equipment in Canary's offices to allow Canary to

late trade and market time through BOA's electronic clearing platform, in exchange for wrap fees

- 89 -

paid to BOA. *Id.*, ¶¶ 9-20.

240.   It has been publicly alleged that BOA, by providing the box to Aurum, Trautman, and Pritchard, also facilitated their late trading and timing in the PIMCO Funds in the aggregate amount of $75,649,621 as follows:

| Fund Name | Number of Shares Purchased and Sold | Dollar Value of Purchases | Dollar Value of Sales |
|---|---|---|---|
| PIMCO Select International A | 3,905,118 | 16,765,302 | 16,922,016 |
| PIMCO Total Return A | 1,254,148 | 13,420,828 | 13,534,030 |
| PIMCO Innovation A | 111,070 | 2,617,291 | 2,658,503 |
| PIMCO RCM Intl Grw Eqty A | 919,595 | 7,817658 | 7,844,511 |
| Lg-Tm US Govt A | 393,721 | 4.049,675 | 4,064,535 |
| PIMCO RCM Emerging Markets A | 68,972 | 644,940 | 658,381 |
| PIMCO RCM Europe Fund A | 149,411 | 925,754 | 937,241 |
| PIMCO Short Term A | 129,169 | 1,286,986 | 1,288,953 |
| PIMCO Real Ret Bd A | 15,410 | 168,432 | 170,077 |
| PIMCO NACM Int'l Fund A | 114,340 | 902,568 | 903,680 |
| RCM Global S/C Fund A | 55,274 | 654,912 | 655,991 |
| PIMCO Target A | 1,884 | 54,938 | 558,86 |
| PIMCO Low Duration A | 137,422 | 1,414,343 | 1,414,383 |
| PIMCO High Yield A | 19 | 198 | 197 |
| PIMCO RCM Int'l Gr Eq Inst | 537,212 | 6,075,729 | 6,075,442 |
| PIMCO Growth A | 46,876 | 1,103,589 | 1,101,739 |
| PIMCO Global Innov A | 357,372 | 3,321,388 | 3,314,769 |

| | | | |
|---|---|---|---|
| PIMCO Emerging Mkts Bd A | 1,638,624 | 14,106,542 | 14,049,280 |
| **TOTAL** | 9,835,636 | 75,331,073 | 75,649,612 |

241.   Defendant BOA, by providing the box to Canary, facilitated Canary's late trading and timing in the PIMCO Funds, in the aggregate amount of $531,184,286, as follows:

| Fund Name | Number of Shares Purchased and Sold | Dollar Value of Purchases | Dollar Value of Sales |
|---|---|---|---|
| PIMCO High-Yield A | 1,891,840 | 16,120,454 | 16,569,662 |
| PIMCO Real Ret Bd A | 8,250,149 | 84,916,109 | 84,995,806 |
| PIMCO Low Duration A | 3,613,399 | 36,737,823 | 36,776,601 |
| PIMCO Total Ret II Admin | 469,330 | 4,824,946 | 4,825,052 |
| PIMCO Short Term A | 1,208,054 | 12,117,241 | 12,115,766 |
| PIMCO Total Return A | 13,341,153 | 140,502,491 | 140,260,825 |
| PIMCO Target A | 13,716,356 | 213,463,615 | 212,946,154 |
| PIMCO Innovation A | 1,129,638 | 23,857,947 | 22,694,419 |
| **TOTAL** | 43,619,920 | 532,540,626 | 531,184,286 |

242.   The foregoing trading by Canary and Aurum, Trautman and Pritchard was done on both a negotiated and non-negotiated basis with the PIMCO Funds, although even where such trading was non-negotiated, it was done in such high dollar amounts and sheer volume of asset turnover in the Funds, that, for the reasons set forth above, including in the allegations relating to the trading by the Prudential Brokers, it was known to, or recklessly disregarded by, the ADAM-affiliated Defendants.

## ADDITIONAL SCIENTER ALLEGATIONS

243.    As alleged herein, defendants acted with scienter in that each of them knowingly or recklessly participated in a scheme to defraud Plaintiff and other purchasers and holders of the Funds and profited from their participation in said scheme, as alleged herein.  Each of the defendants knowingly or recklessly permitted and/or engaged in market timing and/or late trading of shares of the Funds, as alleged herein.

### Scienter of the ADAM-Affiliated Defendants

244.    The SEC Consent Order found that PAFM, PEA and PAD, and the NJ Consent Order found that ADAM, PAD and PEA, knowingly entered into and/or were aware of agreements with known market timers and late traders that explicitly permitted the wrongdoing complained of herein, and/or facilitated or implemented such agreements.  For example, the SEC Consent Order found that, "without any disclosure to Fund shareholders (and contrary to representations), Respondents executed a secret arrangement with one preferred client to allow market timing in amounts exceeding $4 billion in trading volume" (*id.*, ¶ 1), and that PAFM, PEA and/or PAD "willfully violated" §§ 206(1)-(2) and 204A of the Investment Advisers Act (in, *inter alia*, employing schemes to defraud their clients) and §§17(d) and 34(b) of the Investment Company Act (in, *inter alia*, making material misrepresentations or omissions in registration statements).  *Id.* ¶¶ 54-57.  The ADAM-affiliated Defendants had employees whose jobs were to enable, facilitate, and monitor trading by market timers and late traders, and were otherwise able to detect market timing and late trading through these Defendants' trading and order entry systems, as alleged herein.

245.    The ADAM-affiliated Defendants knew that market timing and late trading activity was enormously harmful to long-term investors in the Funds, including Plaintiff and the other members of the Class.  *See, e.g.,* New Jersey Consent Order, ¶ 2(i) ("The executives and officers at PEA and PAD were aware of the damaging effect that market timers had on their funds.")  Moreover, the SEC Consent Order and New Jersey Consent Order found that these Defendants knew that the public documents and statements issued or disseminated in the name of the Funds

- 92 -

were materially false and misleading and that such statements or documents would be issued or disseminated to the investing public. Each of these ADAM-affiliated Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents.

246.    The ADAM-affiliated Defendants were highly motivated to allow and facilitate the wrongful conduct alleged herein. Investors attracted to the Funds by market timing and/or late trading arrangements increased the amount of assets under management, and thereby permitted these Defendants to receive increased management fees, brokerage commissions, and other fees, which were based on the amount of assets under management and/or the size and volume of transactions in the Funds. *See, e.g.*, New Jersey Consent Order, ¶ 2(i) ("As a result of permitting market timing, PEA, ADAM and PAD, and Canary and their intermediaries, profited substantially at the expense of the long-term PEA fund investors.")

247.    In the fiscal years listed, the following Funds in the MMS Trust paid the investment advisory fees as listed (in thousands of dollars):

|  | PEA Value | PEA Renaissance | PEA Growth & Income | PEA Growth | PEA Select Growth | PEA Target | PEA Opportunity | PEA Innovation |
|---|---|---|---|---|---|---|---|---|
| 1999 | * | 3,771 | * | 10,729 | * | 5,383 | 3,171 | 4,454 |
| 2000 | 909 | 3,279 | * | 13,318 | 20 | 9,096 | 3,486 | 21,684 |
| 2001 | 991 | 4,839 | 87 | 12,303 | 285 | 11,480 | 3,382 | * |
| 2002 | 2,168 | 17,211 | 475 | 7,300 | 254 | 7,551 | 2,463 | 11,386 |
| 2003 | 3,670 | 18,258 | 400 | 4,400 | + | 4,471 | 1,617 | 5,354 |

+ In October 2002, the PIMCO PEA Select Growth Fund merged into PIMCO PEA Growth Fund and at that point the PIMCO PEA Select Growth Fund ceased to exist.

* Data unavailable.

In the fiscal years listed, the following Funds in the PIMS Trust paid the listed investment advisory fees (in thousands of dollars):

- 93 -

| | PIMCO Total Return | PIMCO Real Return | PIMCO Money Market | PIMCO Short Term | PIMCO Low Duration | PIMCO High Yield |
|---|---|---|---|---|---|---|
| 1999 | 55,230 | 37 | 364 | 1,163 | 8,637 | 6,324 |
| 2000 | 72,342 | 286 | 755 | 1,611 | 10,481 | 8,797 |
| 2001 | 89,506 | 1,358 | 596 | 1,707 | 10,648 | 7,084 |
| 2002 | 118,914 | 5,064 | 542 | 3,548 | 13,117 | 7,997 |
| 2003 | * | 14,082 | 581 | 7,487 | 21,105 | 10,591 |

\* Data unavailable.

## Scienter of Canary

248.     Canary knew of and participated in the fraudulent scheme alleged herein by entering into agreements to engage in, and/or by repeatedly conducting, market timing of the Funds.

249.     Canary knew that: (i) market timing was enormously harmful to long-term investors in the Funds, including Plaintiff and the other members of the Class; (ii) market timing was contrary to the language in the Funds' Prospectuses, Statements of Additional Information, Registration Statements, and amendments thereto, as alleged herein; and (iii) the ADAM-affilated Defendants had mechanisms in place to prevent market timing and late trading, but knowingly or recklessly circumvented such mechanisms for the benefit of Canary and other market timers/late traders.

250.     Canary was highly motivated to participate in the wrongdoing alleged herein, pursuant to which Canary made enormous profits at the expense of long-term investors in the Funds, including Plaintiff and the other members of the Class.

## Scienter of the Broker and Clearing Defendants

251.     Each of the Broker and Clearing Defendants knew of and participated in the fraudulent scheme alleged herein by entering into and/or effectuating agreements to engage in, and/or by repeatedly conducting, market timing and/or late trading of the Funds.

252.     Each of the Broker and Clearing Defendants knew that: (i) market timing and late trading activity was enormously harmful to long-term investors in the Funds, including Plaintiff

and the other members of the Class; (ii) market timing and late trading was contrary to the language in the Funds' Prospectuses, Statements of Additional Information, Registration Statements, and amendments thereto, as alleged herein; and (iii) the ADAM-affiliated Defendants had mechanisms in place to prevent market timing and late trading, but knowingly or recklessly circumvented such mechanisms for the benefit Canary and other market timers and late traders.

253.    The Broker and Clearing Defendants recklessly and/or knowingly disregarded the excessive mutual fund trades being transacted through their trading systems, or platforms, by Canary and other market timers and substantially assisted and participated in such excessive trading. Moreover, the Broker and Clearing Defendants specifically engineered trading strategies that catered exclusively to market timers and late traders. For example, Bear Stearns and BOA actually installed special equipment for market timers/late traders and their brokers to allow them to execute market timing and late trading transactions at their whim, while Bear Stearns and BOA captured the resulting fees and commissions.

254.    BOA and Bear Stearns were motivated to engage in such conduct by the many sources of income offered by opening their execution systems to market timers and late traders, including the fees and commissions (including contingent deferred sales charges, or "CDSC's").

255.    By way of further example, BOA provided Canary and other market timers and/or brokers with an electronic trading system that permitted Canary and such other timer/brokers to circumvent restrictions on the frequency and timeliness of its trades. For example, beginning in 2001, BOA: (1) set Canary up with a state-of-the-art electronic late trading platform, allowing it to late-trade as late as 6:30 Eastern Time in the hundreds of mutual funds that the bank offered its customers; (2) provided Canary with approximately $300 million of credit to finance its late-trading and market timing activity in the hundreds of mutual funds that BOA could access by virtue of its size and power; and (3) sold Canary the derivative short positions it needed to time the funds as the market dropped. As a result, Canary became one of BOA's largest and most profitable customers.

- 95 -

256.     BOA profited greatly from the fees generated by Canary's trading.  Both Canary and BOA made tens of millions of dollars through the late trading and timing activity, all of which was coordinated through BOA's private client services group, with the knowledge and consent of many of its senior executives, across various BOA divisions.  Furthermore, Canary agreed to leave millions of dollars of sticky assets with BOA bond funds on a long-term basis and paid BOA substantial fees, often over a million dollars per month.

257.     In addition, throughout the Class Period, Bear Stearns facilitated market timing throughout the mutual fund industry.  Bear Stearns actively facilitated the improper trading of mutual funds by knowingly permitted its affiliated broker-dealers to execute market timing and late trades over its clearing platform.  Bear Stearns' improper use of its platform involved trading in several mutual fund complexes and Bear Stearns' employees expressly approved this trading.  Bear Stearns also actively communicated with various market timers and mutual fund firms to further the improper trading via the firm's platform.  In fact, according to one confidential witness to the timing activity, in the late 1990s through 2001, a large portion of all timing brokers cleared their trades using Bear Stearns' platform.

258.     Bear Stearns knowingly facilitated improper trading through a network of introducing broker-dealers, to whom Bear Stearns provided access to its clearing platform.  Bear Stearns' network of broker-dealers included in-house personnel and outsider firms such as Brean Murray and Kaplan & Co., which facilitated substantial amounts of market timing mutual funds on behalf of their hedge fund clients.

259.     Specifically, senior Bear Stearns employees approved the use of the firm's trading platform for this improper purpose.  For instance, during the Class Period, representatives of Brean Murray met with Michael Zackman of Bear Stearns to specifically discuss arranging market timing and late trading capabilities through the firm's platform.  This meeting resulted in Bear Stearns installing a computer in Brean Murray's offices that accessed its trading platform, known internally as the Bear Stearns Mutual Fund Routing ("MFR") System.  Similar to the sophisticated equipment

- 96 -

that BOA set up in Canary's office, the MFR system provided Brean Murray with a direct link to Bear Stearns' clearing platform through which Brean Murray could make automated market timing trades at will.

260.     Bear Stearns also provided its network of brokers with access to the MFR system so that they could engage in late trading.  For instance, Bear Stearns permitted its affiliated brokers at Brean Murray to enter trades as late as 5:30 p.m. ET, but at the price set as of 4:00 p.m. ET. Furthermore, Bear Stearns permitted its brokers to employ deceptive strategies to avoid detection from regulators and internal monitors.  For example, the time stamp function on the MFR system was disabled so that there was no record of when the late trades were placed.

261.     Brean Murray, on behalf of Canary, entered traded orders in PIMCO Funds on Bear Stearns' "MFR" software specially installed in its offices.  Bear Stearns allowed Brean Murray to enter or cancel trades until at least 5:30 p.m., after the 4:00 Eastern time deadline for receiving that day's NAV, permitting Brean Murray to circumvent the forward-pricing rule.  Internal Brean Murray documents reflect that the "Treasurer of Bear Stearns has approved leverage above Reg-T for various existing clients."  PIMCO Funds personnel, including Steve Howell of the market timing police at PAD, were aware, at a minimum through e-mails sent by Ryan Goldberg of Brean Murray, that Brean Murray was using Bear Stearns' system to enter its trades of PIMCO Funds.

262.     Senior managers at Bear Stearns met with market timers to assure them that it permitted improper trading over its platform.  For example, according to the same confidential witness to the timing activity cited above, a representative of Canary met with a Bear Stearns introducing broker-dealer (Kaplan & Co.) who had direct access to Bear Stearns' clearing platform. The meeting occurred in Boca Raton, Florida, in the vicinity of the Bear Stearns building, in which the broker-dealer also maintained its office.  In addition to the introducing broker and the Canary representative, the meeting was attended by Mr. Acosta, Bear Stearns' compliance officer for the Boca Raton office.  According to the same confidential timing witness, Mr. Acosta "knew exactly" what Canary was looking for from Bear Stearns (*i.e.*, the ability to market time using its platform),

- 97 -

and he approved Canary's use of Bear Stearns' trading platform for its improper trading activity.

263.    Throughout the Class Period, Bear Stearns profited from its participation in the market timing and late trading scheme.  In particular, Bear Stearns profited from the commissions and fees generated from timers trading over the firm's platform.

264.    Each of the Broker and Clearing Defendants was highly motivated to participate in the wrongdoing alleged herein, pursuant to which they each received enormous fees and commissions, including brokerage fees and commission, wrap fees, clearing fees, and other transaction fees, for their participation in the market timing and late trading schemes.

## CLASS ACTION ALLEGATIONS

265.    Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of themselves and the members of a Class consisting of all persons and entities who purchased (the "Purchasers") and/or held (the "Holders") shares of any mutual fund in the Allianz Dresdner fund family that was advised, sub-advised, and/or managed by PEA Capital LLC, PA Fund Management Co., PIMCO, or their predecessors, or any of their affiliated investment advisor or sub-advisor companies (collectively, the "PIMCO Funds" or the "Funds"), which shares were harmed or adversely affected by market timing and/or late trading in the Funds, during the period from February 23, 1999 to February 17, 2004, inclusive (the "Class Period").  Excluded from the Class are defendants, members of the immediate families of the individual defendants, and their legal representatives, parents, affiliates, heirs, successors or assigns and any entity in which defendants have or had a controlling interest, all trustees and portfolio managers of the Funds, and any other person who engaged in the wrongful conduct alleged herein (the "Excluded Persons").

266.    The Class is so numerous that joinder of all members of the Class is impracticable. Throughout the Class Period Fund shares were actively traded on the New York Stock Exchange. While the exact number of members of the Class is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least thousands of

members of the Class.

267.    Plaintiffs' claims are typical of the claims of the other members of the Class they seeks to represent because the damages of Plaintiffs and all of the members of the Class arise from and were caused by the same misconduct committed by defendants.  Plaintiffs do not have interests antagonistic to, or in conflict with, the members of the Class.

268.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in prosecuting class actions and securities litigation.

269.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting any individual members of the Class.  These common questions of law and fact include, among others:

(a)    Whether certain defendants violated Sections 10(b) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder, and whether certain defendants were control persons who are further liable for violations of Section 10(b) by their controlled persons under Section 20(a) of the Exchange Act;

(b)    Whether certain defendants violated Section 36(b) of the Investment Company Act, and whether certain defendants were control persons who are further liable for violations of Section 36(b) by their controlled persons under Section 48(a) of the Investment Company Act;

(c)    Whether the prospectuses at issue omitted and/or misrepresented material facts about the Funds, including, *inter alia*, the PIMCO PEA Target, Opportunity, Growth, Select Growth, and Innovation Funds;

(d)    Whether certain defendants breached their fiduciary duties to Lead Plaintiff and the other Class members;

(e)    Whether defendants were unjustly enriched to the detriment of Lead Plaintiff and the Holders through defendants' conduct as alleged herein;

- 99 -

(f)     Whether defendants participated in the course of conduct complained of herein;

(g)     Whether Lead Plaintiff and the other members of the Class sustained damages because of defendants' conduct, and the appropriate measure of damages; and

(h)     Whether defendants acted in an intentional, willful or wanton manner justifying an award of punitive damages.

270.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Joinder of all members of the Class is impracticable.  The likelihood of individual members of the Class prosecuting separate individual claims is remote.  Since the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation makes it impracticable for members of the Class individually to seek redress for the wrongs done to them.  No unusual difficulties are likely to be encountered in the management of this action as a class action.

## CAUSES OF ACTION

### VIOLATIONS OF THE EXCHANGE ACT

### FIRST CLAIM FOR RELIEF

### VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5 PROMULGATED THEREUNDER ON BEHALF OF PURCHASERS

*[Against the ADAM-affiliated Defendants, Cashwell, Corba, Treadway, Stern, Canary, Banc of America and Bear Stearns]*

271.    Lead Plaintiff hereby incorporates by reference all of the allegations set forth above as though fully set forth hereafter.

272.    This claim is brought on behalf of all Purchasers pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j, and SEC Rule 10b-5 promulgated thereunder, against the ADAM-affiliated Defendants, Cashwell, Corba and Treadway (the "PIMCO Section 10(b) Defendants"); Stern and Canary (the "Canary Section 10(b) Defendants"); and BOA and Bear Stearns (the

"Clearing Platform Section 10(b) Defendants"). The PIMCO Section 10(b) Defendants, Canary Section 10(b) Defendants, and the Clearing Platform Section 10(b) Defendants are collectively referred to herein as the "Section 10(b) Defendants."

273.    During the Class Period, each of the Section 10(b) Defendants participated in a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did deceive the investing public, including Lead Plaintiff and other Purchasers, as alleged herein, and caused Lead Plaintiff and other Purchasers to purchase the Funds' shares or interests at distorted prices that they would not have paid had they known of the wrongful conduct alleged herein. In addition, in connection with the wrongful market timing purchases and sales of the Funds' shares described above, Lead Plaintiff and the Purchasers suffered damages from, among other things, the dilution of their investment in the Funds as set forth herein. In furtherance of this unlawful scheme, plan and course of conduct, the Section 10(b) Defendants, and each of them, took the actions set forth herein.

274.    The Section 10(b) Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made misleading statements of material fact and omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the Purchasers of the Funds' securities during the Class Period, including Lead Plaintiff and other Purchasers, in an effort to enrich themselves through undisclosed manipulative trading tactics by which they wrongfully appropriated the Funds' assets and otherwise distorted the pricing of their securities in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5. All defendants named in this claim are sued as primary participants in the wrongful conduct and scheme charged herein.

275.    The Section 10(b) Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in the manipulative scheme, and/or a continuous course of conduct to conceal adverse material information about the Funds' operations, as alleged herein.

- 101 -

276.    The Section 10(b) Defendants employed devices, schemes and artifices to defraud and a course of conduct and scheme as alleged herein to unlawfully manipulate and profit from secretly timed trading in the Funds and thereby engaged in transactions, practices and a course of business which operated as a fraud and deceit upon Lead Plaintiff and the Purchasers.

277.    The Section 10(b) Defendants knowingly participated in the manipulative scheme alleged herein and/or had actual knowledge of the misleading statements and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misstatements and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the truth.

278.    As a result of the manipulative scheme alleged herein and/or the PIMCO Section 10(b) Defendants' dissemination of the materially misleading information and failure to disclose material facts, as set forth above, the prices of the Funds' securities were distorted during the Class Period such that they did not reflect the risks and costs of the continuing course of conduct alleged herein.  In ignorance of these facts that the prices of the Funds' securities were distorted, and relying directly or indirectly on the misleading statements in the Registration Statements/Prospectuses, and/or on the absence of material adverse information that was known to or recklessly disregarded by the Section 10(b) Defendants but not disclosed in public statements by defendants during the Class Period, and the integrity of the market, Lead Plaintiff and the other Purchasers were damaged by acquiring the shares or interests in the Funds during the Class Period at distorted prices, and by the harm, including costs, imposed on the Funds by market timing and late trading activity, as alleged above, which were borne by the Funds' non-timer shareholders, including the Purchasers, and the profits effectively stolen from Lead Plaintiff and the Purchasers by the market timing allowed by the Section 10(b) Defendants.

279.    At the time of said misleading statements and omissions, Lead Plaintiff and other Purchasers were ignorant of their falsity, and of the omitted adverse facts, and believed such

- 102 -

statements to be true and materially complete. Had Lead Plaintiff, the other Purchasers, and the marketplace known of the truth concerning the Funds' operations and market timing-related activities, which were not disclosed by defendants, Lead Plaintiff and the other Purchasers would not have purchased or otherwise acquired their shares or, if they had acquired such shares during the Class Period, they would not have done so at the distorted prices which they paid.

280.    In addition, defendants PEA and Cashwell are liable as "tippers" for the passing, and Canary is liable as "tippee," for the receipt, of non-public material inside information concerning the current holdings of the PEA Funds in which Canary traded, *e.g.*, the PEA Target, Innovation, Opportunity and Growth Funds, on at least a monthly basis, prior to their publication to the investing public. As alleged above, such non-public, inside information, setting forth in detail these Funds' up-to-date holdings, was transmitted from PEA by John Cashwell and/or one of his assistants, to Canary, generally through Canary's representative broker, Brean Murray. Canary traded on such non-public inside information, and PEA and Cashwell knew that Canary intended to, and did, trade on such information. Because of this improper insider trading, such defendants had a duty to disclose this special trading arrangement with Canary.

281.    By virtue of the foregoing, the Section 10(b) Defendants have violated Section 10(b) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder.

282.    The Clearing Platform Section 10(b) Defendants profited from their above-described role in the schemes in that they each received, among other things, enormous fees and commissions, including brokerage fees and commission, wrap fees, clearing fees, and other transaction fees, for their participation in the market timing and late trading schemes.

283.    As a direct and proximate result of the Section 10(b) Defendants' wrongful conduct, Lead Plaintiff and the other Purchasers suffered damages.

284.    Any statutory safe harbor provided for forward looking statements under certain circumstances does not apply to the Section 10(b) Defendants' misleading statements and material omissions alleged in this Complaint. The "safe harbor" for forward looking statements is not

- 103 -

applicable since these defendants' statements were contained in Registration

Statements/Prospectuses issued by them and disseminated to Lead Plaintiff and the Purchasers, the

Section 10(b) Defendants' misleading statements were not identified as forward looking statements

when made, they were not accompanied by meaningful cautionary statements identifying important

factors which could cause actual results to differ materially from those in forward looking

statements, and they were not forward looking statements within the meaning of the statute.

**SECOND CLAIM FOR RELIEF**

**VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT
AND SEC RULE 10b-5 PROMULGATED THEREUNDER
ON BEHALF OF HOLDERS**

*[Against the ADAM-affiliated Defendants, Cashwell, Corba, Treadway, Stern, Canary, Banc of America and Bear Stearns]*

285.    Lead Plaintiff hereby incorporates by reference all of the allegations set forth above

as though fully set forth hereafter.

286.    This claim is brought pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. §

78j, and SEC Rule 10b-5 promulgated thereunder on behalf of all Holders, who were injured in

connection with the purchase and/or sale of PIMCO Funds by market timers and/or late traders, as

alleged herein, against the "Section 10(b) Defendants."

287.    During the Class Period, each of the Section 10(b) Defendants participated in a

plan, scheme and course of conduct which was intended to and, throughout the Class Period, did

deceive the investing public, including Lead Plaintiff and other Holders, as alleged herein, and

caused Lead Plaintiff and other Holders to hold the Funds' shares or interests which they would not

have, had they known of the wrongful conduct alleged herein.  In addition, in connection with the

wrongful purchases and sales of the Funds' shares by the market timers and/or late traders

described above, Lead Plaintiff and the Holders suffered damages from, among other things, the

dilution of their investment in the Funds as set forth herein.  In furtherance of this unlawful

- 104 -

scheme, plan and course of conduct, the Section 10(b) Defendants, and each of them, took the actions set forth herein.

288.    The Section 10(b) Defendants:  (i) employed devices, schemes, and artifices to defraud; (ii) made misleading statements of material fact and omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the Holders of the Funds' securities during the Class Period, including Lead Plaintiff and other Holders, in an effort to enrich themselves through undisclosed manipulative trading tactics by which they wrongfully appropriated the Funds' assets and otherwise distorted the pricing of their securities in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5.  All defendants named in this claim are sued as primary participants in the wrongful conduct and scheme charged herein.

289.    The Section 10(b) Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in the manipulative scheme, and/or a continuous course of conduct to conceal adverse material information about the Funds' operations, as alleged herein.

290.    The Section 10(b) Defendants employed devices, schemes and artifices to defraud and a course of conduct and scheme as alleged herein to unlawfully manipulate and profit from secretly timed trading in the Funds and thereby engaged in transactions, practices and a course of business which operated as a fraud and deceit upon Lead Plaintiff and the Holders.

291.    The Section 10(b) Defendants knowingly participated in the manipulative scheme alleged herein and/or had actual knowledge of the misleading statements and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misstatements and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the truth.

292.    As a result of the manipulative scheme alleged herein and/or the PIMCO Section

- 105 -

10(b) Defendants' dissemination of the materially misleading information and failure to disclose material facts, as set forth above, the prices of the Funds' securities were distorted during the Class Period such that they did not reflect the risks and costs of the continuing course of conduct alleged herein.  In ignorance of these facts that the prices of the Funds' securities were distorted, and relying directly or indirectly on the misleading statements in the Registration Statements/Prospectuses, and/or on the absence of material adverse information that was known to or recklessly disregarded by the Section 10(b) Defendants but not disclosed in public statements by defendants during the Class Period, and the integrity of the market, Lead Plaintiff and the other Holders held the shares or interests in the Funds during the Class Period, and were damaged thereby, due to, among other things, costs imposed on the Funds by market timing and late trading activity, as alleged above, which were borne by the Funds' non-timer shareholders, including the Holders, and the profits effectively stolen from Lead Plaintiff and the Holders by the market timing allowed by the Section 10(b) Defendants.

293.    At the time of said misleading statements and omissions, Lead Plaintiff and other Holders were ignorant of their falsity, and of the omitted adverse facts, and believed such statements to be true and materially complete.  Had Lead Plaintiff, the other Holders, and the marketplace known of the truth concerning the Funds' operations and market timing-related activities, which were not disclosed by defendants, Lead Plaintiff and the other Holders would not have held their shares during the Class Period.

294.    In addition, defendants PEA and Cashwell are liable as "tippers" for the passing, and Canary is liable as "tippee," for the receipt, of non-public material inside information concerning the current holdings of the PEA Funds in which Canary traded, *e.g.*, the PEA Target, Innovation, Opportunity and Growth Funds, on at least a monthly basis, prior to their publication to the investing public.  As alleged above, such non-public, inside information, setting forth in detail these Funds' up-to-date holdings, was transmitted from PEA by John Cashwell and/or one of his assistants, to Canary, generally through Canary's representative broker, Brean Murray.  Canary

- 106 -

traded on such non-public inside information, and PEA and Cashwell knew that Canary intended to, and did, trade on such information. Because of this improper insider trading, such defendants had a duty to disclose this special trading arrangement with Canary.

295.   By virtue of the foregoing, the Section 10(b) Defendants have violated Section 10(b) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder.

296.   The Clearing Platform Section 10(b) Defendants profited from their above-described role in the schemes in that they each received, among other things, enormous fees and commissions, including brokerage fees and commission, wrap fees, clearing fees, and other transaction fees, for their participation in the market timing and late trading schemes.

297.   As a direct and proximate result of the Section 10(b) Defendants' wrongful conduct, Lead Plaintiff and the other Holders suffered damages.

298.   Any statutory safe harbor provided for forward looking statements under certain circumstances does not apply to the Section 10(b) Defendants' misleading statements and material omissions alleged in this Complaint. The "safe harbor" for forward looking statements is not applicable since these defendants' statements were contained in Registration Statements/Prospectuses issued by them and disseminated to Lead Plaintiff and the Holders, the Section 10(b) Defendants' misleading statements were not identified as forward looking statements when made, they were not accompanied by meaningful cautionary statements identifying important factors which could cause actual results to differ materially from those in forward looking statements, and they were not forward looking statements within the meaning of the statute.

## THIRD CLAIM FOR RELIEF

## VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT

### *[Against ADAM, the Investment Advisors, Treadway, Corba and Stern]*

299.   Lead Plaintiff hereby incorporates by reference all of the allegations set forth above as though fully set forth hereafter.

- 107 -

300.    This claim is brought on behalf of Class members pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t, against ADAM, the Investment Advisors, Treadway, and Corba (collectively, the "PIMCO Section 20(a) Control Person Defendants"), as control persons of the PIMCO Section 10(b) Defendants, and against Stern, as control person of Canary.  The PIMCO Section 20(a) Control Person Defendants and Stern collectively are referred to as "§ 20(a) Control Person Defendants."  It is appropriate to treat the PIMCO Section 20(a) Control Person Defendants as a group for pleading purposes and to presume that the false, misleading, and incomplete information conveyed in the Registration Statements/Prospectuses are the collective actions of the PIMCO Section 20(a) Control Person Defendants.

301.    ADAM, the Investment Advisors, Treadway, and Corba acted as controlling persons of PAD, the Investment Advisors, Treadway, Cashwell, and Corba, as well as other ADAM-affiliated entities and their employees during the Class Period that may be liable for violations of Section 10(b) but who are not named as defendants herein, within the meaning of Section 20(a) of the Exchange Act for the reasons alleged herein.  By virtue of their systematic involvement in the fraudulent scheme alleged herein, and their operational and management control of the business of (i) with respect to ADAM – the Investment Advisors, PAD, Treadway, Cashwell, and Corba; (ii) with respect to the Investment Advisors – Treadway, Cashwell and Corba; (iii) with respect to Treadway – PAD, and PAFM; and (iv) with respect to Corba – PEA, the PIMCO Section 20(a) Control Person Defendants each had the power to influence and control and did influence and control, directly or indirectly, the decision-making and actions of the Investment Advisors, PAD, Treadway, Cashwell and Corba, as well as other ADAM-affiliated entities and their employees during the Class Period that may be liable for violations of Section 10(b) but who are not named as defendants herein, including the content and dissemination of the various statements which Lead Plaintiff contends are misleading.  The PIMCO Section 20(a) Control Person Defendants had the ability to prevent the issuance of the statements alleged to be misleading or cause such statements to be corrected.

- 108 -

302.     In particular, (i) ADAM had direct and supervisory involvement in the operations of Investment Advisors, PAD, and Treadway, Cashwell, and Corba; (ii) the Investment Advisors had direct and supervisory control of Treadway, Cashwell and Corba; (iii) Treadway had direct and supervisory involvement in the operations of PAFM, and PAD; (iv) Corba supervised and controlled PEA, and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

303.     As set forth above, the Investment Advisors, PAD, Treadway, Cashwell and Corba, and certain other ADAM-affiliated entities and their employees during the Class Period (not named as defendants herein) each violated Section 10(b) and SEC Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the PIMCO Section 20(a) Control Person Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages.

304.     This claim is also brought pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t, against defendant Stern, as control person of Canary.

305.     Defendant Stern acted as a controlling person of Canary within the meaning of Section 20(a) of the Exchange Act for the reasons alleged herein.  By virtue of his systematic involvement in the fraudulent scheme alleged herein, and his operational and management control of the business of Canary, and his substantial ownership interest therein, Stern had the power to influence and control, and did influence and control, directly or indirectly, the decision-making and actions of Canary, including the scheme to permit the Canary to "park" "sticky assets" in certain of the Funds as specified above.

306.     In particular, Stern had direct and supervisory involvement in the operations of Canary, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

307.    As set forth above, Canary, along with Stern, each violated Section 10(b) and SEC Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of his position as controlling person, Stern is liable pursuant to Section 20(a) of the Exchange Act for the violations of Section 10(b) and SEC Rule 10b-5 by Canary.  As a direct and proximate result of Stern's wrongful conduct, Lead Plaintiff and other members of the Class suffered damages during the Class Period.

## FOURTH CLAIM FOR RELIEF
## VIOLATIONS OF THE INVESTMENT COMPANY ACT OF 1940
## VIOLATION OF SECTION 36(b) OF THE INVESTMENT COMPANY ACT
### *[Against the Investment Advisors, Treadway, and PAD]*

308.    Lead Plaintiff hereby incorporates by reference all of the allegations set forth above as though fully set forth hereafter.

309.    This claim is brought on behalf of all Holders pursuant to Section 36(b) of the Investment Company Act, 15 U.S.C. § 80a-35(b), against the Investment Advisors, Treadway, and PAD (the "Section 36(b) Defendants").

310.    Under Section 36(b) of the Investment Company Act, the Section 36(b) Defendants are deemed to owe a fiduciary duty to Lead Plaintiff and other Holders with respect to the receipt of fees and compensation that such defendants receive for services of a material nature.

311.    The Section 36(b) Defendants devised and implemented a scheme to obtain substantial and improper fees and other income for themselves and their affiliates by allowing others to engage in timing of the Funds throughout the Class Period and in violation of their fiduciary duties to their customers, *i.e.*, Lead Plaintiff and other Holders.  The Section 36(b) Defendants failed to reveal material facts concerning their conduct such that Lead Plaintiff and other Holders were not able to make informed decisions about the true value and performance of the Funds.  Moreover, the advisory and/or portfolio management agreements between the

- 110 -

Investment Advisors and the MMS Trust and/or the Funds, and the distribution agreements between PAD and the MMS Trust and/or the Funds, were not the product of arm's-length bargaining and the fees charged under these agreements did not bear a reasonable relationship to the services rendered under them, especially with respect to the Section 36(b) Defendants' role relating to the market timing and late trading activities detailed above. The Section 36(b) Defendants thus received fees they were not entitled to directly from advisory fees gained from the increased assets under management related to the alleged wrongful market timing/late trading conduct. Defendant Treadway received compensation as an affiliated person of an investment adviser, of which he was CEO and Managing Director, from the investment company, of which he was President and Chairman of the Board, from the advisory fees gained from the assets advised and/or managed by the investment adviser, pursuant to his employment agreement described above at paragraph 37.

312.    Lead Plaintiff and other Holders have been injured as a result of the Section 36(b) Defendants' breaches of fiduciary duties, which arose out of their misleading statements, material omissions, conduct, and receipt of improper fees.

### FIFTH CLAIM FOR RELIEF

### VIOLATION OF SECTION 48(a) OF THE INVESTMENT COMPANY ACT

*[Against ADAM, the Investment Advisors, Treadway and Corba]*

313.    Lead Plaintiff hereby incorporates by reference all of the allegations set forth above as though fully set forth hereafter.

314.    This claim is brought on behalf of all Holders pursuant to Section 48(a) of the Investment Company Act, 15 U.S.C. §80a-47, against ADAM, the Investment Advisors, Treadway, and Corba (the "Section 48(a) Control Person Defendants").

315.    Under Section 48(a) of the Investment Company Act, it is unlawful for any defendant to do indirectly that which, under the Act, it could not do directly.

- 111 -

316.     The Section 48(a) Control Person Defendants devised and implemented a scheme to obtain substantial fees and other income for themselves and their affiliates by allowing others to engage in market timing of the Funds throughout the Class Period and in violation of their fiduciary duties to their customers, *i.e.*, Lead Plaintiff and other Holders.  Defendants failed to reveal material facts concerning their conduct, such that Lead Plaintiff and other Holders were unable to make informed decisions about the true value and performance of the Funds.

317.     Lead Plaintiff and other Holders have been injured as a result of defendants' false and misleading statements, material omissions, conduct, and improper fees, as set forth herein.

318.     By virtue of Lead Plaintiff's and the Holders' ownership of the Funds, the representations that the MMS Trust and the Trustee Defendants made in the Registration Statements/Prospectuses about market timing, and the obligations imposed by law, the ADAM-affiliated Defendants owed Lead Plaintiff and the Holders fiduciary duties of the highest good faith, integrity and fair dealing.

319.     The defendants charged above with primary violations of the Investment Company Act, and each of them, breached their fiduciary duties by engaging in the acts and omissions detailed more fully above, including but not limited to, treating certain mutual fund investors differently than other mutual fund investors; failing to follow their disclosed policy and procedures of preventing market timing; affirmatively allowing certain investors to engage in market timing in exchange for investing in the ADAM-affiliated Defendants' other Funds; and failing to disclose their true practices and procedures to Lead Plaintiff and the Holders.

320.     Each of the Section 48(a) Control Person Defendant knew that the other defendants named above as primary violators of the Investment Company Act (and certain other ADAM-affiliated entities and their employees, not named as defendants herein) were breaching their fiduciary duties to Lead Plaintiff and the Holders.  Notwithstanding their knowledge, the Section 48(a) Control Person Defendants, and each of them, engaged in conduct, hereinbefore described, which rendered substantial assistance to, caused directly or indirectly, and/or encouraged, the

- 112 -

breaches of fiduciary duty.

321.    As a result of the wrongful conduct of the defendants charged with primary violations of the Investment Company Act and that of the Section 48(a) Control Person Defendants, Lead Plaintiff and the Holders have suffered and will continue to suffer economic losses and other general and specific damages, all in an amount to be determined according to proof.

**VIOLATIONS OF STATE AND COMMON LAW**

**SIXTH CLAIM FOR RELIEF**

**BREACH OF FIDUCIARY DUTY/CONSTRUCTIVE FRAUD**

*[Against ADAM, the Investment Advisors, the Trustee Defendants, and PAD]*

322.    This claim is brought on behalf of all Holders against the ADAM-affiliated Defendants and the Trustee Defendants.

323.    These defendants owed fiduciary duties to Lead Plaintiff and the Holders to use reasonable care and skill in operating, administering, issuing, underwriting, distributing, and managing the Funds.  They also had the fiduciary duty of loyalty which prohibited them from self-dealing for their own benefit at the expense of the Holders and the Funds.  As a part of their fiduciary duties to Lead Plaintiff and the Holders, the aforementioned defendants also owed a duty to make a full and truthful disclosure of all material facts, to ensure that their representations regarding market timing were complete and accurate, and to ensure that actions were taken to protect Holders of shares in the Funds from damage caused to their investments from market timing.

324.    Defendants named in this Claim intentionally or recklessly breached their fiduciary duties by allowing favored investors to conduct timed trading in the Funds, by making misleading statements and concealing the existence of such market timing, and by placing their own financial interests above those of Lead Plaintiff and the Holders.

- 113 -

325.     These defendants breached their fiduciary duties to Lead Plaintiff and the Holders, tended to deceive, violated public and private confidence, and injured public interests.

326.     Lead Plaintiff and the Holders suffered injury as a result of these defendants' conduct in the form of, *inter alia*, the following:  increased transaction costs; deviation from stated investment objectives and lost market opportunities because the Funds had to keep excessive cash on hand to pay out timers' redemptions; lower NAVs; reduced investment performance; and increased management fees.

327.     Defendants' breaches of their fiduciary duties proximately caused the damages suffered by Lead Plaintiff and the Holders.

## SEVENTH CLAIM FOR RELIEF

### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

*[Against ADAM, the Investment Advisors; Treadway, Corba, Cashwell, the Broker Defendants; Stern; Canary; the Market Timing Defendants; and the Clearing Defendants]*

328.     This claim is brought on behalf of all Holders against ADAM, the Investment Advisors, Treadway, Corba, Cashwell, the Broker Defendants, the Market Timing Defendants, including Stern and Canary, and the Clearing Defendants.

329.     As alleged above, the ADAM-affiliated Defendants owed fiduciary duties to Lead Plaintiff and the Holders.  Those duties were breached when those defendants, among other things, permitted favored investors to market time in the Funds, and made misleading statements in, and omitted material facts from, the Funds' Registration Statements/Prospectuses.

330.     Defendants named in this Claim knowingly aided, encouraged, cooperated and/or participated in, and substantially assisted the ADAM-affiliated Defendants named in the Tenth Claim in breaching their fiduciary duties.

331.     As a result of these defendants' conduct, Lead Plaintiff and the Holders suffered damages.

- 114 -

## EIGHTH CLAIM FOR RELIEF

## UNJUST ENRICHMENT

### *[Against All Defendants]*

332.   This claim is brought on behalf of all Holders against all defendants.

333.   Lead Plaintiff and the Holders conferred a benefit on the defendants.  Defendants derived management fees, profits, and other benefits and were otherwise unjustly enriched from transactions connected with the Funds, to the detriment of Lead Plaintiff and the Holders.

334.   Defendants' enrichment is directly and causally related to the detriment of Lead Plaintiff and the other Holders.

335.   The benefit was accepted by defendants under such circumstances that it would be inequitable for it to be retained without payment.  As alleged above, many of the defendants, <u>inter alia</u>, breached their fiduciary duties to Lead Plaintiff and the Holders and/or aided and abetted said breaches of fiduciary duty, and therefore defendants are not justified to retain the benefits conferred upon them.

336.   As a result of all of the defendants' conduct, Lead Plaintiff and the other Holders suffered damages.

### <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Lead Plaintiff, on behalf of itself and the members of the Class, prays for relief and judgment, as follows:

a.   Determining that this action is a proper class action and appointing Lead Plaintiff as a representative of the Class under Rule 23 of the Federal Rules of Civil Procedure;

b.   Awarding compensatory damages in favor of Lead Plaintiff and members of the Class against all defendants for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.   Awarding Lead Plaintiff and the Class members restitution, disgorgement of the unjustly earned profits of defendants, and punitive damages;

- 115 -

      d.     An Order for equitable restitution and other appropriate equitable monetary relief against the defendants;

      e.     Awarding Lead Plaintiff and the other Class members their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

      f.     Such other and further relief as the Court may deem just and proper.

### **JURY TRIAL DEMANDED**

Lead Plaintiff hereby demands a trial by jury.

Dated: February 17, 2006

          Respectfully submitted,

          WOLF POPPER LLP

          By: _____/s/_____
          Marian P. Rosner
          Chet B. Waldman
          Andrew E. Lencyk
          845 Third Avenue
          Telephone: (212) 759-4600
          Fax: (212) 486-2093

          *Counsel for Lead Plaintiff, Combined Welfare Fund*

Dated: February 17, 2006
    Baltimore, MD

          TYDINGS & ROSENBERG LLP

          By: _____/s/_____
          William C. Sammons, Fed Bar No. 02366
          John B. Isbister, Fed Bar No. 00639
          100 East Pratt Street, 26th Floor
          Baltimore, MD 21202
          Telehphone: (410) 752-9700
          Fax: (410) 727-5460

          *Liaison Counsel*

- 116 -

SCHIFFRIN & BARROWAY, LLP
Three Bala Plaza East, Suite 400
Bala Cynwyd, PA 19004
Telephone:  (610) 667-7706
Fax:  (610) 667-7056

*Counsel for Plaintiff Warren Meier*

Paul J. Napoli
Napoli Bern Ripka, LLP
115 Broadway
New York, NY  10006
Telephone:  (212) 267-3700

David Boies III
Kenneth G. Walsh
Straus & Boies, LLP
2 Depot Plaza, 2d Floor
Bedford Hills, NY  10507
Telephone:  (914) 244-3200

*Of Counsel*

Doc#:       Ver#:              :

# Exhibit A

Excerpts from "Exhibit A" to the Amended Complaint in
*SEC v. Druffner, et al.*, Civ. Action No. 03-12154-NMG (D. Mass.),
filed on or about July 14, 2004

# EXHIBIT A
## ALL PURCHASES (by Fund Company)

| Date | Client | Account # | Account Name | FA# | Shares | Fund | Symbol | Price | Cost | Opened |
|---|---|---|---|---|---|---|---|---|---|---|
| **Pimco** | | | | | | | | | $5,571,000 | |
| 4/18/01 | H | 041-96590 | ISIS 401 LIMITED 3 | 15 | 19547.325 | PIMCO HIGH YIELD A | PHDAX | 9.72 | $190,000 | 3/15/01 |
| 5/1/01 | H | ERS-95308 | AQUILLA 401 LIMITED 1 | 15 | 25614.754 | PIMCO HIGH YIELD A | PHDAX | 9.76 | $250,000 | 4/25/01 |
| 5/3/01 | H | 0BB-96695 | HEADSTART B-P10 | DF | 25510.204 | PIMCO HIGH YIELD A | PHDAX | 9.80 | $250,000 | 9/13/00 |
| 5/8/01 | H | 0BB-96677 | CIBC CAYMAN CP-5 | MD | 12729.124 | PIMCO HIGH YIELD A | PHDAX | 9.82 | $125,000 | 7/18/00 |
| 5/9/01 | H | 041-96587 | MANDRAKE 401 LIMITED 1 | 14 | 19455.253 | PIMCO FOREIGN BOND A | PFOAX | 10.28 | $200,000 | 2/28/01 |
| 5/14/01 | H | 0BB-96694 | CIBC CAYMAN CP-6 | MD | 14662.757 | PIMCO FOREIGN BOND A | PFOAX | 10.23 | $150,000 | 9/13/00 |
| 5/17/01 | H | 0BB-96749 | CIBC CAYMAN CP-8 | MD | 17995.91 | PIMCO HIGH YIELD A | PHDAX | 9.78 | $176,000 | 2/1/01 |
| 5/22/01 | H | 0BB-96708 | CIBC CAYMAN CP-7 | 14 | 17173.7 | PIMCO FOREIGN BOND A | PFOAX | 10.19 | $175,000 | 11/20/00 |
| 5/24/01 | H | 041-96595 | APOLLO 2 | 15 | 18404.908 | PIMCO HIGH YIELD A | PHDAX | 9.78 | $180,000 | 4/18/01 |
| 6/8/01 | H | 041-96586 | ISIS 401 LIMITED 1 | 50 | 17123.288 | PIMCO FOREIGN BOND A | PFOAX | 10.22 | $175,000 | 2/15/01 |
| 6/25/01 | H | 0BB-96665 | CIBC CAYMAN CP-4 | MD | 17056.53 | PIMCO FOREIGN BOND A | PFOAX | 10.26 | $175,000 | 6/15/00 |
| 7/6/01 | H | 0BB-96749 | CIBC CAYMAN CP-8 | MD | 18664.047 | PIMCO FOREIGN BOND A | PFOAX | 10.18 | $190,000 | 2/1/01 |
| 7/6/01 | H | ERS-95311 | AQUILLA 401 LIMITED 2 | 15 | 19646.365 | PIMCO FOREIGN BOND A | PFOAX | 10.18 | $200,000 | 7/2/01 |
| 8/7/01 | H | ERS-95309 | MERCUTIO 401 LIMITED 1 | 15 | 19436.346 | PIMCO FOREIGN BOND A | PFOAX | 10.29 | $200,000 | 6/5/01 |
| 8/7/01 | H | ERS-95310 | MERCUTIO 401 LIMITED 2 | 15 | 19436.346 | PIMCO FOREIGN BOND A | PFOAX | 10.29 | $200,000 | 7/2/01 |
| 8/17/01 | H | 041-96588 | ISIS 401 LIMITED 2 | 50 | 21676.301 | PIMCO FOREIGN BOND A | PFOAX | 10.38 | $225,000 | 3/14/01 |
| 10/3/01 | H | ERS-95314 | AQUILLA 401 LIMITED 3 | 50 | 19065.777 | PIMCO FOREIGN BOND A | PFOAX | 10.49 | $200,000 | 9/5/01 |
| 10/4/01 | H | 041-96599 | CIBC CAYMAN CP-10 | 50 | 19065.777 | PIMCO FOREIGN BOND A | PFOAX | 10.49 | $200,000 | 6/15/01 |
| 10/5/01 | H | 041-96609 | CIBC CAYMAN CP-11 | MD | 19066.777 | PIMCO FOREIGN BOND A | PFOAX | 10.49 | $200,000 | 8/17/01 |
| 10/5/01 | H | 0BB-96790 | OBERON 401 LIMITED 2 | 50 | 19161.106 | PIMCO FOREIGN BOND A | PFOAX | 10.49 | $201,000 | 7/2/01 |
| 10/5/01 | H | 0BB-96798 | OBERON 3 | 50 | 19065.777 | PIMCO FOREIGN BOND A | PFOAX | 10.49 | $200,000 | 8/10/01 |
| 10/11/01 | H | 041-96591 | APOLLO 1 | 14 | 21510.516 | PIMCO FOREIGN BOND A | PFOAX | 10.46 | $225,000 | 3/28/01 |
| 10/11/01 | H | 041-96603 | APOLLO 3 | 15 | 19120.459 | PIMCO FOREIGN BOND A | PFOAX | 10.46 | $200,000 | 8/10/01 |
| 10/12/01 | H | 041-96600 | ISIS 401 LIMITED 4 | 50 | 23877.746 | PIMCO FOREIGN BOND A | PFOAX | 10.47 | $250,000 | 7/2/01 |
| 10/16/01 | H | 041-96592 | CIBC CAYMAN CP-9 | MD | 26968.716 | PIMCO HIGH YIELD A | PHDAX | 9.27 | $250,000 | 4/5/01 |
| 10/24/01 | H | 041-96696 | MANDRAKE 401 LIMITED 3 | 14 | 23629.49 | PIMCO FOREIGN BOND A | PFOAX | 10.58 | $250,000 | 4/27/01 |
| 10/31/01 | H | ERS-95320 | LEVI 401 LIMITED 1 | 50 | 22603.978 | PIMCO TOTAL RETURN | PTTAX | 11.06 | $250,000 | 10/31/01 |
| 11/1/01 | H | 0BB-96658 | CIBC CAYMAN XP-2 | MD | 12112.403 | PIMCO GROWTH A | PGWAX | 20.64 | $250,000 | 6/7/00 |
| 11/1/01 | C | 0BB-96713 | CIBC CAYMAN XP-4 | MD | 10901.163 | PIMCO GROWTH A | PGWAX | 20.64 | $225,000 | 12/6/00 |
| 12/31/01 | H | ERS-95321 | LEVI 401 LIMITED 2 | 50 | 16025.641 | PIMCO HIGH YIELD A | PHDAX | 9.36 | $150,000 | 10/31/01 |
| 1/23/02 | H | 041-96613 | CIBC CAYMAN CP-12 | M5 | 17057.569 | PIMCO HIGH YIELD A | PHDAX | 9.38 | $160,000 | 10/9/01 |
| 1/23/02 | H | ERS-95321 | LEVI 401 LIMITED 2 | 50 | 18957.346 | PIMCO TOTAL RETURN | PTTAX | 10.55 | $200,000 | 10/31/01 |

# EXHIBIT A
## ALL PURCHASES (by Fund Company)

| Date | Client | Account # | Account Name | FA# | Shares | Fund | Symbol | Price | Cost | Opened |
|---|---|---|---|---|---|---|---|---|---|---|
| 1/24/02 | H | 0BB-96727 | HEADSTART B-P12 | 14 | 21299.255 | PIMCO HIGH YIELD A | PHDAX | 9.39 | $200,000 | 12/18/00 |
| 1/25/02 | H | 041-96613 | CIBC CAYMAN CP-12 | M5 | 10660.981 | PIMCO HIGH YIELD A | PHDAX | 9.38 | $100,000 | 10/9/01 |
| 1/25/02 | H | 0BB-96524 | HEADSTART B-P3 | 14 | 21321.962 | PIMCO HIGH YIELD A | PHDAX | 9.38 | $200,000 | 7/23/99 |
| 1/30/02 | H | 0BB-96523 | HEADSTART B-P2 | 50 | 32188.841 | PIMCO HIGH YIELD C | PHDCX | 9.32 | $300,000 | 7/23/99 |
| 1/30/02 | H | 0BB-96615 | CIBC CAYMAN CP-1 | MD | 18921.476 | PIMCO TOTAL RETURN C | PTTCX | 10.57 | $200,000 | 2/2/00 |
| 2/1/02 | H | 0BB-96582 | HEADSTART B-P6 | 50 | 18921.476 | PIMCO TOTAL RETURN C | PTTCX | 10.57 | $200,000 | 11/18/99 |
| 2/4/02 | H | ERS-95329 | APOLLO 4 | 14 | 18850.141 | PIMCO TOTAL RETURN C | PTTCX | 10.61 | $200,000 | 1/31/02 |
| 2/12/02 | H | 0BB-96488 | HEADSTART B-P1 | 14 | 18885.741 | PIMCO TOTAL RETURN C | PTTCX | 10.59 | $200,000 | 7/7/99 |
| 2/13/02 | P | 0BB-96785 | MANAGEMENT 5 | AF | 11825.822 | PIMCO TOTAL RETURN C | PTTCX | 10.57 | $125,000 | 6/7/01 |
| 3/1/02 | P | 041-96611 | ISIS 401 LIMITED 5 | 50 | 21810.251 | PIMCO HIGH YIELD C | PHDCX | 9.17 | $200,000 | 9/5/01 |
| 3/12/02 | P | 041-96598 | PMP 4 | AF | 14340.344 | PIMCO TOTAL RETURN C | PTTCX | 10.46 | $150,000 | 5/24/01 |
| 3/12/02 | P | 041-96610 | PP6 | AF | 16288.98 | PIMCO HIGH YIELD C | PHDCX | 9.22 | $150,000 | 8/17/01 |
| 3/19/02 | H | ERS-95326 | MANDRAKE 401 LIMITED 4 | 50 | 19138.756 | PIMCO TOTAL RETURN C | PTTCX | 10.45 | $200,000 | 1/7/02 |
| 3/19/02 | H | ERS-95331 | WINDSOR 401-2 LIMITED | 78 | 21691.974 | PIMCO HIGH YIELD C | PHDCX | 9.22 | $200,000 | 2/5/02 |
| 4/1/02 | C | 0BB-96657 | CIBC CAYMAN XP-1 | MD | 26897.214 | PIMCO TOTAL RETURN C | PTTCX | 10.41 | $280,000 | 6/2/00 |
| 4/2/02 | C | 0BB-96659 | CIBC CAYMAN XP-3 | MD | 27751.198 | PIMCO TOTAL RETURN C | PTTCX | 10.45 | $290,000 | 6/7/00 |
| 4/23/02 | P | ERS-95336 | PMP 11 LIMITED | AF | 18959.913 | PIMCO HIGH YIELD A | PHDAX | 9.23 | $175,000 | 4/17/02 |
| 4/23/02 | P | ERS-95337 | PERFORMANCE 401-11 | AF | 21668.472 | PIMCO HIGH YIELD A | PHDAX | 9.23 | $200,000 | 4/17/02 |
| 4/26/02 | P | ERS-95322 | MERCUTIO 401 LIMITED 3 | AF | 24350.649 | PIMCO HIGH YIELD A | PHDAX | 9.24 | $225,000 | 12/5/01 |
| 5/1/02 | C | 0BB-96799 | JST PAN INC | 14 | 23584.906 | PIMCO TOTAL RETURN | PTTAX | 10.60 | $250,000 | 5/11/00 |
| 5/6/02 | H | ERS-95330 | WINDSOR 401-1 LIMITED | 50 | 27262.814 | PIMCO HIGH YIELD A | PHDAX | 9.17 | $250,000 | 2/5/02 |
| 5/13/02 | C | 0BB-96714 | CIBC CAYMAN XP-5 | MD | 21905.805 | PIMCO HIGH YIELD A | PHDAX | 9.13 | $200,000 | 12/6/00 |
| 5/17/02 | P | 041-96597 | PPP 4 | 78 | 22253.65 | PIMCO HIGH YIELD A | PHDAX | 9.04 | $201,173 | 5/24/01 |
| 5/20/02 | P | 041-96602 | P 5 | AF | 22394.678 | PIMCO HIGH YIELD A | PHDAX | 9.02 | $202,000 | 8/3/01 |
| 5/21/02 | P | 041-96594 | PENTAGON MGMT. PARTNERS | 78 | 22148.394 | PIMCO HIGH YIELD A | PHDAX | 9.03 | $200,000 | 4/6/01 |
| 5/23/02 | P | ERS-95324 | PMP 401 - 8 | AF | 22099.448 | PIMCO HIGH YIELD A | PHDAX | 9.05 | $200,000 | 12/6/01 |
| 5/28/02 | P | ERS-95327 | M 10 | 78 | 22075.055 | PIMCO HIGH YIELD A | PHDAX | 9.06 | $200,000 | 1/10/02 |
| 5/29/02 | C | 0BB-96716 | CIBC CAYMAN XP-6 | M5 | 16917.292 | PIMCO TOTAL RETURN | PTTAX | 10.64 | $180,000 | 12/7/00 |
| 5/29/02 | P | 041-96593 | PENTAGON PERF. PARTNERS | AF | 22050.717 | PIMCO HIGH YIELD A | PHDAX | 9.07 | $200,000 | 4/6/01 |
| 5/29/02 | P | ERS-95323 | PENT. PERF. 9 | AF | 22050.717 | PIMCO HIGH YIELD A | PHDAX | 9.07 | $200,000 | 12/6/01 |
| 5/30/02 | H | ERS-95332 | MERCUTIO 401 LIMITED 4 | AD | 18779.343 | PIMCO TOTAL RETURN | PTTAX | 10.65 | $200,000 | 3/4/02 |
| 5/31/02 | H | 041-96617 | LEVI 401 LIMITED 4 | AD | 10070.493 | PIMCO GROWTH A | PGWAX | 19.86 | $200,000 | 3/4/02 |
| 5/31/02 | H | 0BB-96847 | WINDSOR 401-3 LIMITED | AD | 13012.362 | PIMCO VALUE FUND A | PDLAX | 15.37 | $200,000 | 3/5/02 |
| 6/4/02 | C | ERS-95334 | JST PAN INC. II | 50 | 23474.178 | PIMCO TOTAL RETURN | PTTAX | 10.65 | $250,000 | 4/3/02 |
| 6/10/02 | H | 0BB-96653 | CIBC CAYMAN CP-3 | M5 | 16315.205 | PIMCO STOCKPLUS A | PSPAX | 9.01 | $147,000 | 5/9/00 |
| 6/12/02 | P | ERS-95336 | PMP 11 LIMITED | 78 | 19596.865 | PIMCO HIGH YIELD A | PHDAX | 8.93 | $175,000 | 4/17/02 |

116

## EXHIBIT A
### ALL PURCHASES (by Fund Company)

| Date | Client | Account # | Account Name | FA# | Shares | Fund | Symbol | Price | Cost | Opened |
|---|---|---|---|---|---|---|---|---|---|---|
| 6/18/02 | P | ERS-95327 | M 10 | 78 | 18957.346 | PIMCO LG TM US GOV A | PFGAX | 10.55 | $200,000 | 1/10/02 |
| 6/20/02 | H | 041-96617 | LEVI 401 LIMITED 4 | AD | 19977.169 | PIMCO STOCKPLUS A | PSPAX | 8.76 | $175,000 | 3/4/02 |
| 6/20/02 | H | ERS-95322 | MERCUTIO 401 LIMITED 3 | AF | 19977.169 | PIMCO STOCKPLUS A | PSPAX | 8.76 | $175,000 | 12/5/01 |
| 6/24/02 | P | 041-96597 | PPP 4 | 78 | 22701.476 | PIMCO HIGH YIELD A | PHDAX | 8.81 | $200,000 | 5/24/01 |
| 6/24/02 | P | 041-96602 | P 5 | AF | 22701.476 | PIMCO HIGH YIELD A | PHDAX | 8.81 | $200,000 | 8/3/01 |
| 6/25/02 | G | 041-96620 | GACF N.V | 41 | 26960.784 | PIMCO LOW DURATION A | PTLAX | 10.20 | $275,000 | 6/10/02 |
| 6/26/02 | C | ERS-95333 | OXBO INC. II | AD | 23408.24 | PIMCO TOTAL RETURN | PTTAX | 10.68 | $250,000 | 4/3/02 |
| 7/2/02 | H | 09B-96746 | HEADSTART B-P15 | 78 | 16129.032 | PIMCO TARGET A | PTAAX | 12.40 | $200,000 | 1/24/01 |
| 7/2/02 | P | ERS-95328 | P 10 | AF | 28195.489 | PIMCO TOTAL RETURN | PTTAX | 10.64 | $300,000 | 1/10/02 |
| 7/3/02 | H | 09B-96653 | CIBC CAYMAN CP-3 | M5 | 11976.048 | PIMCO STOCKPLUS A | PSPAX | 8.35 | $100,000 | 5/9/00 |
| 7/5/02 | P | 09B-96640 | CIBC CAYMAN CP-2 | B6 | 13399.694 | PIMCO TARGET A | PTAAX | 13.06 | $175,000 | 4/14/00 |
| 7/8/02 | C | 09B-96800 | PATTEN INC | AD | 29205.607 | PIMCO STOCKPLUS A | PSPAX | 8.56 | $250,000 | 5/11/00 |
| 7/9/02 | C | 09B-96714 | CIBC CAYMAN XP-5 | MD | 11778.563 | PIMCO HIGH YIELD A | PHDAX | 8.49 | $100,000 | 12/6/00 |
| 7/11/02 | P | 041-96594 | PENTAGON MGMT. PARTNERS | 78 | 23724.792 | PIMCO HIGH YIELD A | PHDAX | 8.43 | $200,000 | 4/6/01 |
| 7/11/02 | P | ERS-95319 | MAN 7 | AF | 29665.991 | PIMCO HIGH YIELD A | PHDAX | 8.43 | $250,000 | 10/16/01 |
| 7/17/02 | P | ERS-95337 | PERFORMANCE 401-11 | 78 | 11876.485 | PIMCO HIGH YIELD A | PHDAX | 8.42 | $100,000 | 4/17/02 |
| 7/18/02 | P | 09B-96748 | PENTAGON PERF. PARTNERS | AF | 23781.213 | PIMCO HIGH YIELD A | PHDAX | 8.41 | $200,000 | 1/29/01 |
| 7/19/02 | H | 041-96616 | OBERON 401 LIMITED 4 | AF | 30282.638 | PIMCO STOCKPLUS A | PSPAX | 7.43 | $225,000 | 1/31/02 |
| 7/19/02 | P | ERS-95325 | PMP 401 (9) | AF | 29868.878 | PIMCO HIGH YIELD A | PHDAX | 8.37 | $250,000 | 12/27/01 |
| 7/22/02 | P | ERS-95319 | MAN 7 | AF | 9250.694 | PIMCO LG TM US GOV A | PFGAX | 10.81 | $100,000 | 10/16/01 |
| 7/23/02 | P | 041-96610 | PP6 | AF | 14044.944 | PIMCO TOTAL RETURN C | PTTCX | 10.68 | $150,000 | 8/17/01 |
| 7/23/02 | P | ERS-95313 | P7 | AF | 23105.36 | PIMCO LG TM US GOV A | PFGAX | 10.82 | $250,000 | 8/29/01 |
| 7/24/02 | H | 041-96589 | MANDRAKE 401 LIMITED 2 | 14 | 25773.196 | PIMCO TOTAL RETURN | PTTAX | 10.67 | $275,000 | 3/15/01 |
| 7/24/02 | P | 041-96598 | PMP 4 | AF | 14058.107 | PIMCO TOTAL RETURN C | PTTCX | 10.67 | $150,000 | 5/24/01 |
| 7/24/02 | P | 09B-96785 | MANAGEMENT 5 | AF | 16869.728 | PIMCO TOTAL RETURN C | PTTCX | 10.67 | $180,000 | 6/7/01 |
| 7/29/02 | H | 09B-96784 | OBERON 401 LIMITED 1 | AD | 23430.173 | PIMCO LG TM US GOV A | PFGAX | 10.67 | $250,000 | 6/5/01 |
| 7/30/02 | P | 09B-96662 | HEADSTART B-P9 | 14 | 23564.906 | PIMCO TOTAL RETURN | PTTAX | 10.60 | $250,000 | 6/13/00 |
| 7/30/02 | H | 09B-96709 | HEADSTART B-P11 | 14 | 23430.178 | PIMCO LG TM US GOV A | PFGAX | 10.67 | $250,000 | 11/22/00 |
| 7/31/02 | H | 041-96615 | LEVI 401 LIMITED 3 | AF | 13901.761 | PIMCO LG TM US GOV A | PFGAX | 10.79 | $150,000 | 1/7/02 |
| 7/31/02 | H | 041-96615 | LEVI 401 LIMITED 3 | AF | 18726.592 | PIMCO HIGH YIELD A | PHDAX | 8.01 | $150,000 | 1/7/02 |
| 8/2/02 | H | 09B-96732 | HEADSTART B-P14 | 14 | 23255.814 | PIMCO TOTAL RETURN C | PTTCX | 10.75 | $250,000 | 12/22/00 |
| 8/6/02 | H | 041-96599 | MANDRAKE 401 LIMITED 2 | 14 | 25103.351 | PIMCO INNOVAT A | PIVAX | 10.97 | $275,384 | 3/15/01 |
| 8/8/02 | D | 09B-96758 | PENTAGON MGMT. PARTNERS | AF | 22999.08 | PIMCO LG TM US GOV A | PFGAX | 10.87 | $250,000 | 2/28/01 |
| 8/21/02 | H | 09B-96603 | HEADSTART B-P7 | AD | 14934.289 | PIMCO STOCKPLUS A | PSPAX | 8.37 | $125,000 | 12/30/99 |
| 8/21/02 | H | 09B-96603 | HEADSTART B-P7 | AD | 15432.099 | PIMCO HIGH YIELD A | PHDAX | 8.10 | $125,000 | 12/30/99 |
| 8/23/02 | C | 041-96607 | BUCKHANNON INC | AD | 9146.341 | PIMCO HIGH YIELD A | PHDAX | 8.20 | $75,000 | 5/11/00 |

117

# EXHIBIT A
## ALL PURCHASES (by Fund Company)

| Date | Client | Account # | Account Name | FA# | Shares | Fund | Symbol | Price | Cost | Opened |
|---|---|---|---|---|---|---|---|---|---|---|
| 8/23/02 | C | 041-96607 | BUCKHANNON INC | AD | 9302.326 | PIMCO TOTAL RETURN | PTTAX | 10.75 | $100,000 | 5/11/00 |
| 9/3/02 | G | 0BB-96826 | INTL CAPITAL CONSULTANTS | 5 | 25291.829 | PIMCO LOW DURATION A | PTLAX | 10.28 | $260,000 | 12/24/01 |
| 9/6/02 | G | 0BB-96792 | GLOBAL STRATEGIES | 49 | 20632.737 | PIMCO RCM INTL G/E D | DIENX | 7.27 | $150,000 | 7/5/01 |
| 9/20/02 | G | 0BB-96792 | GLOBAL STRATEGIES | 49 | 25862.069 | PIMCO RCM INTL G/E D | DIENX | 6.96 | $180,000 | 7/5/01 |
| 9/25/02 | G | 0BB-96792 | GLOBAL STRATEGIES | 49 | 22321.429 | PIMCO RCM INTL G/E D | DIENX | 6.72 | $150,000 | 7/5/01 |
| 10/10/02 | G | 0BB-96792 | GLOBAL STRATEGIES | 49 | 34351.145 | PIMCO RCM INTL G/E D | DIENX | 6.55 | $225,000 | 7/5/01 |
| 10/11/02 | G | 0BB-96792 | GLOBAL STRATEGIES | 49 | 18757.327 | PIMCO RCM EMKT FD D | DRMNX | 8.53 | $160,000 | 7/5/01 |
| 10/16/02 | P | ERS-95312 | MP6 | FD | 9009.009 | PIMCO LG TM US GOV A | PFGAX | 11.10 | $100,000 | 8/28/01 |
| 10/21/02 | C | 0BB-96803 | RODGARS ALS INC | 14 | 20382.186 | PIMCO HIGH YIELD A | PHDAX | 7.85 | $160,000 | 5/11/00 |
| 10/21/02 | P | ERS-95312 | MP6 | FD | 9157.509 | PIMCO LG TM US GOV A | PFGAX | 10.92 | $100,000 | 8/28/01 |
| 10/25/02 | G | 0BB-96792 | GLOBAL STRATEGIES | 49 | 21489.971 | PIMCO RCM INTL G/E D | DIENX | 6.98 | $150,000 | 7/5/01 |
| 10/31/02 | H | 0BB-96582 | HEADSTART B-P6 | 50 | 40574.282 | PIMCO HIGH YIELD A | PHDAX | 8.01 | $325,000 | 11/18/99 |
| 11/4/02 | H | ERS-95321 | LEV 401 LIMITED 2 | 50 | 30902.349 | PIMCO HIGH YIELD A | PHDAX | 8.09 | $250,000 | 10/31/01 |
| 11/7/02 | H | 0BB-96525 | HEADSTART B-P4 | FD | 36674.817 | PIMCO HIGH YIELD C | PHDCX | 8.18 | $300,000 | 7/23/99 |
| 11/12/02 | H | 0BB-19959 | PENTAGON PERF. PARTNERS | FD | 36674.817 | PIMCO HIGH YIELD A | PHDAX | 8.18 | $300,000 | 3/13/00 |
| 11/12/02 | P | 0BB-96877 | PERFAGON MGMT. PARTNERS | DA | 22936.78 | PIMCO TOTAL RETURN | PTTAX | 10.90 | $250,000 | 1/7/02 |
| 11/13/02 | P | 0BB-19960 | PENTAGON MGMT. PARTNERS | FD | 27522.936 | PIMCO TOTAL RETURN | PTTAX | 10.90 | $300,000 | 3/13/00 |
| 11/13/02 | P | ERS-95341 | MANAGEMENT 401-12 | DA | 22935.78 | PIMCO TOTAL RETURN | PTTAX | 10.90 | $250,000 | 1/7/02 |
| 11/14/02 | H | ERS-95329 | APOLLO 4 | AF | 36496.35 | PIMCO HIGH YIELD A | PHDAX | 8.22 | $300,000 | 1/31/02 |
| 11/20/02 | H | 041-96627 | CREDIT LYONNAIS | DA | 35928.144 | PIMCO HIGH YIELD A | PHDAX | 8.35 | $300,000 | 10/21/02 |
| 11/20/02 | H | 0BB-96870 | CREDIT LYONNAIS | DA | 59980.24 | PIMCO HIGH YIELD A | PHDAX | 8.35 | $500,000 | 9/24/02 |
| 11/27/02 | P | ERS-95318 | PERF 8 | AF | 35971.223 | PIMCO STOCKPLUS A | PSPAX | 8.34 | $300,000 | 10/4/01 |
| 12/9/02 | C | 041-96620 | GACF N.V | 41 | 8888.889 | PIMCO LT TM US GOV C | PFGCX | 11.25 | $100,000 | 6/10/02 |
| 12/12/02 | C | 0BB-96803 | RODGARS ALS INC | 14 | 17180.095 | PIMCO HIGH YIELD A | PHDAX | 8.44 | $145,000 | 5/11/00 |
| 12/17/02 | P | 041-96598 | PMP 4 | AF | 24783.147 | PIMCO STOCKPLUS A | PSPAX | 8.07 | $200,000 | 5/24/01 |
| 12/24/02 | H | ERS-95343 | CIBC CAYMAN CP-14 | B6 | 41079.812 | PIMCO HIGH YIELD A | PHDAX | 8.52 | $350,000 | 11/27/02 |
| 12/30/02 | G | 0BB-96761 | EQUITY INVESTORS | 49 | 13610.315 | PIMCO RCM INT GR EQC | PRICY | 6.98 | $95,000 | 3/7/01 |
| 1/2/03 | G | 0BB-96680 | GACF, N.V. | 49 | 11739.594 | PIMCO RCM EMG MKT FC | PRCMY | 9.37 | $110,000 | 7/28/00 |
| 1/6/03 | G | 0BB-96792 | GLOBAL STRATEGIES | 49 | 13212.796 | PIMCO RCM INT GR EQC | PRICY | 7.19 | $95,000 | 7/5/01 |
| 1/9/03 | G | 0BB-96901 | GLOBAL ANALYTICAL | J3 | 10691.824 | PIMCO RCM EMG MKT FC | PRCMY | 9.54 | $102,000 | 1/7/03 |
| 1/23/03 | C | 0BB-96802 | DXBO INC | AD | 17241.379 | PIMCO HIGH YIELD A | PHDAX | 8.70 | $150,000 | 5/11/00 |
| 1/23/03 | G | 0BB-96901 | GLOBAL ANALYTICAL | J3 | 16835.017 | PIMCO RCM EUR FDC | PRCEY | 5.94 | $100,000 | 1/7/03 |
| 1/24/03 | G | 0BB-96901 | GLOBAL ANALYTICAL | J3 | 9354.537 | PIMCO TOTAL RETURN C | PTTCX | 10.69 | $100,000 | 1/7/03 |
| 2/11/03 | G | 0BB-96705 | ANALYTICAL INVESTORS | 41 | 11225.444 | PIMCO TOTAL RETURN C | PTTCX | 10.69 | $120,000 | 11/3/00 |
| 2/11/03 | P | 0BB-96705 | ANALYTICAL INVESTORS | 41 | 12716.763 | PIMCO HIGH YIELD C | PHDCX | 8.65 | $110,000 | 11/3/00 |
| 2/20/03 | C | ERS-95354 | CIBC CAYMAN XP-7 | B6 | 6983.24 | PIMCO TOTAL RETURN | PTTAX | 10.74 | $75,000 | 2/5/03 |

# EXHIBIT A
## ALL PURCHASES (by Fund Company)

| Date | Client | Account # | Account Name | FA# | Shares | Fund | Symbol | Price | Cost | Opened |
|------|--------|-----------|--------------|-----|--------|------|--------|-------|------|--------|
| 2/2/03 | C | ERS-95354 | CIBC CAYMAN XP-7 | B6 | 8670.52 | PIMCO HIGH YIELD A | PHDAX | 8.65 | $75,000 | 2/5/03 |
| 3/4/03 | G | 0BB-96900 | GLOBAL CAPITAL | J1 | 11958.998 | PIMCO HIGH YIELD C | PHDCX | 8.78 | $105,000 | 1/7/03 |
| 3/6/03 | C | ERS-95335 | HAVERS INC II | 23 | 4616.805 | PIMCO TOTAL RETURN | PTTAX | 10.83 | $50,000 | 4/8/02 |
| 3/6/03 | C | ERS-95335 | HAVERS INC II | 23 | 11363.636 | PIMCO HIGH YIELD A | PHDAX | 8.80 | $100,000 | 4/8/02 |
| 4/2/03 | C | 041-96625 | EVBO INC II | 23 | 16685.206 | PIMCO HIGH YIELD A | PHDAX | 8.99 | $150,000 | 8/7/02 |
| 4/8/03 | C | 0BB-96696 | CAPITAL INVESTORS | 49 | 8324.084 | PIMCO HIGH YIELD C | PHDCX | 9.01 | $75,000 | 9/21/00 |
| 4/8/03 | H | 041-83559 | SPENCER SECURITIES II | 23 | 13262.135 | PIMCO REAL RET FDC | PRTCX | 11.31 | $149,995 | 3/4/03 |
| 4/8/03 | H | 041-83559 | SPENCER SECURITIES II | 23 | 13940.033 | PIMCO TOTAL RETURN C | PTTCX | 10.76 | $149,995 | 3/4/03 |
| 4/11/03 | G | 0BB-96696 | CAPITAL INVESTORS | 49 | 8333.333 | PIMCO GNMA FUND C | PCGNX | 11.04 | $92,000 | 9/21/00 |
| 4/16/03 | H | 0BB-96746 | HEADSTART B-P15 | AF | 22026.432 | PIMCO HIGH YIELD A | PHDAX | 9.08 | $200,000 | 1/24/01 |
| 6/25/03 | H | 0BB-96640 | CIBC CAYMAN CP-2 | B6 | 11312.217 | PIMCO TOTAL RETURN | PTTAX | 11.05 | $125,000 | 4/14/00 |
| 6/25/03 | H | 0BB-96640 | CIBC CAYMAN CP-2 | B6 | 14384.35 | PIMCO STOCKPLUS A | PSPAX | 8.69 | $125,000 | 4/14/00 |
| 8/11/03 | C | 041-96606 | ABBY MILLS INC | AD | 11916.111 | PIMCO EMER MKTS BFA | PAEMX | 10.49 | $125,000 | 5/11/00 |
| 8/11/03 | C | 041-96607 | BUCKHANNON INC | AD | 11725.453 | PIMCO EMER MKTS BFA | PAEMX | 10.49 | $123,000 | 5/11/00 |
| 8/11/03 | C | 041-96608 | HAVERS INC | AF | 12202.097 | PIMCO EMER MKTS BFA | PAEMX | 10.49 | $128,000 | 5/11/00 |
| 8/20/03 | C | 0BB-96801 | EVBO INC | AD | 11748.12 | PIMCO EMER MKTS BFA | PAEMX | 10.64 | $128,000 | 5/11/00 |
| | | | | | | | | | $29,662,546 | |
| | | | | | | | | | | |
| **Pioneer** | | | | | | | | | | |
| 1/5/01 | P | 0BB-19959 | PENTAGON PERF. PARTNERS | DF | 23755.656 | PIONEER BOND FUND | PIOBX | 8.84 | $210,000 | 3/13/00 |
| 1/9/01 | H | 0BB-96732 | HEADSTART B-P14 | 14 | 22624.434 | PIONEER BOND FUND | PIOBX | 8.84 | $200,000 | 12/22/00 |
| 4/18/01 | H | 041-96590 | ISIS 401 LIMITED 3 | 15 | 22675.737 | PIONEER BOND FUND | PIOBX | 8.82 | $200,000 | 3/15/01 |
| 4/19/01 | H | 041-96595 | APOLLO 2 | 14 | 28473.804 | PIONEER BOND FUND | PIOBX | 8.78 | $250,000 | 4/18/01 |
| 6/20/01 | R | 0BB-96721 | ROCK HILL INC. | 14 | 12091.898 | PIONEER EUROPE FUND | PEURX | 24.81 | $300,000 | 12/8/00 |
| 6/21/01 | R | 0BB-96782 | PINE HILLS INC. II | DF | 10024.058 | PIONEER EUROPE FUND | PEURX | 24.94 | $250,000 | 6/4/01 |
| 7/12/01 | R | 0BB-96720 | PINE HILLS INC. | 14 | 10313.531 | PIONEER EUROPE FUND | PEURX | 24.24 | $250,000 | 12/8/00 |
| 7/25/01 | R | 0BB-96792 | GLOBAL STRATEGIES | 49 | 10242.475 | PIONEER EUROPE FUND | PEURX | 23.92 | $245,000 | 7/5/01 |
| 8/7/01 | G | 0BB-96792 | GLOBAL STRATEGIES | 49 | 9746.785 | PIONEER EUROPE FUND | PEURX | 24.88 | $242,500 | 7/5/01 |
| 9/10/01 | G | 0BB-96680 | GACF, N.V. | 49 | 21168.501 | PIONEER FRCH EQ FDA | PFRAY | 11.81 | $250,000 | 7/28/00 |
| 9/21/01 | H | 041-96599 | CIBC CAYMAN CP-10 | 50 | 16968.326 | PIONEER BOND FUND | PIOBX | 8.84 | $150,000 | 6/15/01 |
| 9/24/01 | G | 0BB-96680 | GACF, N.V. | 49 | 29990.628 | PIONEER FRCH EQ FDA | PFRAY | 10.67 | $320,000 | 7/28/00 |
| 9/24/01 | G | 0BB-96680 | GACF, N.V. | 49 | 101639.344 | PIONEER PAN EUR ERFA | PPEAY | 3.05 | $310,000 | 7/28/00 |
| 12/4/01 | P | ERS-95313 | P7 | AF | 25369.004 | PIONEER HIG YLD FDA | TAHYX | 10.84 | $275,000 | 8/29/01 |
| 1/15/02 | G | 0BB-96792 | GLOBAL STRATEGIES | 49 | 10470.085 | PIONEER EUROPE FUND | PEURX | 23.40 | $245,000 | 7/5/01 |
| 1/23/02 | H | 0BB-96708 | CIBC CAYMAN CP-7 | MD | 27497.709 | PIONEER HIG YLD FDA | TAHYX | 10.91 | $300,000 | 11/20/00 |